1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3             WESTERN DIVISION
                   - - -

4

UNITED STATES OF AMERICA,   :  CRIMINAL ACTION CR-1-02-054

5                  :

          Plaintiff,     :  Cincinnati, Ohio

6                  :  September 6, 2002

    -vs-            :

7                  :

WALTER PUGH, JR, and      :  Testimony of

8  TYREESE PUGH,         :  Shanell Holston

                  :

9        Defendants.     :

10                 - - -

11           EXCERPT OF PROCEEDINGS
       BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE,

12               AND JURY

13              - - -

14

For the Plaintiff:   Wende Cross, Esq.

15              Amul Thapar, Esq.
              Asst. U.S. Attorney

16             Atrium II, Suite 400
              221 East Fourth Street

17             Cincinnati, Ohio  45202

18  For the Defendant:   Pro Se
   (Walter Pugh, Jr.)

19             J. Robert Andrews, Esq.
   (Legal advisor)     Schuh & Goldberg

20             2662 Madison Road
              Cincinnati, Ohio  45208

21

   (Tyreese Pugh)      Edward J. Felson, Esq.

22             Felson & Felson
              CBLD Center, Suite 1650

23             36 East Seventh Street
              Cincinnati, Ohio  45202

24

  Courtroom Deputy:  Steve Snyder

25  Court Reporter:  Betty Schwab

DIRECT EXAMINATION

EXCERPT OF PROCEEDINGS

MS. CROSS:  The United States calls Shanell Holston.

(Witness sworn by the courtroom deputy.)

THE COURT:  You may proceed, Ms. Cross.

MS. CROSS:  Thank you, Your Honor.

SHANELL HOLSTON

DIRECT EXAMINATION

BY MS. CROSS:

Q.  Good morning, ma'am.

A.  Hi.

Q.  Will you please tell the ladies and gentlemen of the jury what your name is and spell your last name?

A.  Shanell Holston, H-o-l-s-t-o-n.

Q.  And in what area to you live?

A.  Hamilton.

Q.  How old are you?

A.  Twenty-four.

Q.  What is your marital status?

A.  Single.

Q.  Do you have any children?

A.  One.

Q.  Is that a boy or girl?

A.  She's a girl.

Q.  What's her name?

DIRECT EXAMINATION

|     |     |                                                        |
| --- | --- | ------------------------------------------------------ |
| 1   | A.  | Leandria.                                               |
| 2   | Q.  | Ms. Holston, where were you born and raised?           |
| 3   | A.  | Hamilton, Ohio.                                         |
| 4   | Q.  | And what is your educational background?               |
| 5   | A.  | I got my GED, but right now --                         |
| 6   | Q.  | When did you get your GED?                             |
| 7   | A.  | 2000.                                                   |
| 8   | Q.  | Okay.  And currently are you in school?                |
| 9   | A.  | Yes, I am.  I'm going to cosmetology school, Moeller.  |
| 10  | Q.  | Are you also employed, or do you go to school?         |
| 11  | A.  | No.  I just go to school.                              |
| 12  | Q.  | Ms. Holston, you're here pursuant to a federal         |
| 13  |     | subpoena; is that correct?                             |
| 14  | A.  | Yes.                                                    |
| 15  | Q.  | Have you ever testified in court before?               |
| 16  | A.  | No.                                                     |
| 17  | Q.  | Ms. Holston, you're familiar with the criminal justice |
| 18  |     | system, correct?                                       |
| 19  | A.  | Yes.                                                    |
| 20  | Q.  | Tell the ladies and gentlemen of the jury how you're   |
| 21  |     | familiar.                                               |
| 22  | A.  | I myself been locked up.  I have done prison time.    |
| 23  | Q.  | For what?                                               |
| 24  | A.  | Forgery, robbery, misdemeanor credit card use, all     |
| 25  |     | like that.                                             |

DIRECT EXAMINATION

1   Q.   When did you get out of prison?

2   A.   It was December of '99.

3   Q.   And have you been in any trouble since December of

4   '99?

5   A.   No.   Actually, I've been in school, trying to finish

6   school since then.

7   Q.   Do you know Walter Pugh?

8   A.   Yes.

9   Q.   And do you know the person that you know as Walter

10  Pugh, do you see him in the courtroom today?

11  A.   Yes.

12  Q.   Will you please identify him for the record by where

13  he's sitting and what he's wearing?

14  A.   He wearing a tan outfit on the end.

15           MS. CROSS:   Your Honor, may the record reflect

16  she's identified the defendant Walter Pugh?

17           THE COURT:   Any objection?

18           MR. FELSON:   No objection.

19           MR. ANDREWS:   No objection.

20           THE COURT:   The record will reflect the witness

21  has identified the defendant Walter Pugh.

22  BY MS. CROSS:

23  Q.   Did you know Tyreese Pugh?

24  A.   Yes.

25  Q.   Do you see him in the courtroom today?

DIRECT EXAMINATION

1   A.    He's sitting next to his dad.

2           MS. CROSS:   Your Honor, may the record reflect

3   that Ms. Holston has identified the defendant Tyreese Pugh?

4           THE COURT:   Are you talking about the gentleman

5   with the lighter suit?

6           THE WITNESS:   Yes, in the middle.

7           THE COURT:   Okay.   Any objection?

8           MR. FELSON:   No.

9           THE COURT:   The record will so reflect.

10  BY MS. CROSS:

11  Q.    Ms. Holston, tell the ladies and gentlemen how it is

12  you know Walter Pugh.

13  A.    We lived together from August, 2000 and March, 2002.

14  Q.    Where did you live together?

15  A.    We resided in one of my father's homes.

16  Q.    Where is that?

17  A.    At 433 Knightsbridge Drive.

18  Q.    Is that in Hamilton?

19  A.    Yes.

20  Q.    And is Walter Pugh the father of your child?

21  A.    No.

22  Q.    How is it that you know the defendant Tyreese Pugh?

23  A.    Actually, I just met Tyreese when he came home this

24  year.

25  Q.    Okay.   And has he ever lived at the residence at

DIRECT EXAMINATION

1    Knightsbridge?

2    A.    No.

3    Q.    How long did you and Walter live together?

4    A.    From the period of August, 2000, to March, 2002.

5    Q.    To your knowledge, does Walter smoke?

6    A.    Yes.

7    Q.    Does he smoke cigarettes?

8    A.    Yes.

9    Q.    What kind?

10   A.    Newports.

11   Q.    Does he smoke any other type of cigarette?

12   A.    Black & Mild cigars.

13   Q.    Do you smoke Black & Mild cigars?

14   A.    Every now and then.  Not -- no, not often as I smoke

15   cigarettes.  I smoke cigarettes more often than I smoke

16   Black & Milds.

17   Q.    To your knowledge, does Walter Pugh know how to drive?

18   A.    Yes, he can drive.

19   Q.    Does he have a car?

20   A.    Does he what?

21   Q.    Have a car?

22   A.    Yes.

23   Q.    What type of car does he have?

24   A.    We had two cars.

25   Q.    And will you describe them for the ladies and

DIRECT EXAMINATION

1   gentlemen of the jury?

2   A.    We had a black 2000 Mazda Protege and a '89 Cadillac

3   Sedan DeVille.

4   Q.    While you were dating the defendant Walter Pugh, did

5   you know him to have a job?

6   A.    No -- yes, pretty much the whole time we were

7   together.

8   Q.    Where did he work?

9   A.    He had a couple jobs, C&K Industrial Center in

10  Fairfield and Technicrete Corporation, concrete company.

11  Q.    Is that in Fairfield as well?

12  A.    Yes.

13  Q.    Did you pay bills together when you lived together?

14  A.    Yes.

15  Q.    How often did Walter get paid?

16  A.    Weekly.

17  Q.    Do you know how much he was paid?

18  A.    Sometimes.  Not -- I mean, no.  A little bit, yes, I

19  did.

20  Q.    Okay.  Let me ask it this way.

21  A.    Because it was a different amount, it wasn't the same

22  all the time.  It was in the range of maybe $700, or maybe

23  at one job he would get -- at C&K he was making a range.

24  In a two-week period, it was $1100 for the two weeks.  And

25  then at Technicrete it might have been like $700; it might

DIRECT EXAMINATION

1   have been $500.  It depends on how often he worked.

2   Q.   If he worked every day, would that be pretty much how

3   much he would make?

4   A.   Yes.

5   Q.   So, if he worked less, he would bring home less?

6   A.   Yes.  At his Technicrete job, they only worked certain

7   days they was needed, like they was going out of town

8   working.  So it depend on whenever they needed to go.

9   Q.   Depended on the job?

10  A.   Yeah, depended on the job.

11  Q.   So he didn't work every day?

12  A.   No, not all the time.

13  Q.   How long have you known the defendant Tyreese Pugh?

14  A.   I just met him when he got out of prison this year.

15  Q.   Okay.

16       MR. ANDREWS:  Objection.  I'll withdraw that.

17  Q.   How would you describe your relationship with Tyreese

18  Pugh?

19  A.   He was -- we didn't have any problems.  He was all

20  right.

21  Q.   That was your boyfriend's son?

22  A.   Son.

23  Q.   Okay.  How often would you see Tyreese during the time

24  you were dating Walter in any given week?

25  A.   Often.  Almost every day.

DIRECT EXAMINATION

```
 1   Q.   Where would you see him?
 2   A.   Sometimes he came over to the house, or, if we was
 3   at -- if I was outside in the street, I would see him
 4   outside.
 5   Q.   Were there ever any times where you and Walter would
 6   spend time with Tyreese at your house?
 7   A.   Yes.
 8   Q.   And would you describe generally those occasions where
 9   you all would spend time together?
10   A.   Like?
11   Q.   Would you play cards?  Would you watch TV?
12   A.   No, no card playing.  We'd sit down and maybe try to
13   watch TV.
14   Q.   Okay.  And did you know Tyreese to date anyone?
15   A.   Yes.
16   Q.   Who was he dating?
17   A.   Stephanie.
18   Q.   Luster?
19   A.   Yeah.
20   Q.   To your knowledge, was he dating Stephanie the whole
21   time you knew him?
22   A.   For the most part, yeah.  That's basically the person
23   I known him to be with.
24   Q.   Is that the person you'd see him with?
25   A.   Um-hum.
```

DIRECT EXAMINATION

1   Q.    Ms. Holston, turning your attention to a day in April,

2   2002, in fact, April 24, 2002, do you remember that day?

3   A.    Not really.  Only thing -- I was in school, and then I

4   got a call and heard what happened.  Actually, I was

5   starting a new job that day.  I went to the new job like at

6   five o'clock in the evening after everything had already

7   happened at the job, but I was just -- it bothered me the

8   whole day, because I was just hearing what was going on,

9   but I didn't hear --

10  Q.    Tell the ladies and gentlemen of the jury what you

11  learned.

12             MR. FELSON:  Objection.

13             MR. ANDREWS:  Objection.

14             THE COURT:  Basis?

15             MR. ANDREWS:  Hearsay.  What I heard.  When I

16  heard what was going on, Your Honor.

17             THE COURT:  Are you asking her what she heard

18  from others?

19             MS. CROSS:  Basically, Your Honor.  I'll rephrase

20  it, Your Honor.

21             THE COURT:  All right.

22  BY MS. CROSS:

23  Q.    Okay.  We're talking about a day in April, 2002, and

24  you said you were starting a new job that day.

25  A.    That was in the evening time, because during the day I

DIRECT EXAMINATION

1    go to school from 9 to 3, 3:30, 4 o'clock.  It depends.

2    Q.    Okay.  And you said you received a call?

3    A.    Yeah.

4    Q.    Did that call cause you to do anything?

5    A.    Like what?

6    Q.    That's what I'm asking.  When you received this call,

7    whatever call it was that you received --

8    A.    Um-hum.

9    Q.    -- did it then cause you to do anything?

10   A.    Not -- not anything drastic.  Just my mind was

11   boggled, put it like that, in a daze.  I was in a daze.

12   Q.    Did it cause you then to feel some type of emotion?

13   A.    Yes.

14   Q.    What did you feel?

15   A.    For him.

16   Q.    I'm sorry?

17   A.    For Walter.

18         MR. ANDREWS:  Objection.  Your Honor, I --

19   candidly, I'm not following this testimony.  You got a

20   call.  You feel something.  What --

21         THE COURT:  Wait.  Just let me have a short

22   objection, if I may.

23         MR. ANDREWS:  And the short objection is I don't

24   see the relevance of getting a call and feeling something.

25         THE COURT:  I understand.  You're saying

DIRECT EXAMINATION

1    irrelevant.

2              MR. ANDREWS:  Right.

3              THE COURT:  Overruled.

4    BY MS. CROSS:

5    Q.    You said you received a call April 24th.  It caused

6    you to feel for the defendant Walter Pugh; is that right?

7    A.    Um-hum, basically, I guess, yes.

8    Q.    Did you see Walter that day that you received this

9    call?

10   A.    No.

11   Q.    And you lived together?

12   A.    No, not at the time.  We separated in March.

13   Q.    Okay.  So you lived together until March, 2002?

14   A.    Yes.

15   Q.    Okay.  And you didn't -- you received this call, and

16   you didn't see Walter that day?

17   A.    No.

18   Q.    Okay.  This call that you received that made you feel

19   for Walter, what did you feel?

20   A.    What has he done?  Why?

21              MR. ANDREWS:  Objection.

22              THE COURT:  There is no foundation for that.  I'm

23   going to sustain the objection.

24              MR. ANDREWS:  And motion to strike, Your Honor.

25              THE COURT:  Yes.  Ladies and gentlemen of the

DIRECT EXAMINATION

1  jury, I'm going to ask you to disregard the last answer.

2  BY MS. CROSS:

3  Q.   Did this call cause you to do anything?

4  A.   I don't understand what you mean by "do anything."  Do

5  anything like what?  No.  I mean, I had to go on.  There

6  was nothing I could do.  We hadn't been living together.

7  All I could do was worry about him, basically.  That's what

8  I'm saying.  All I could do was worry about him and why

9  he --

10            MR. ANDREWS:  Objection, Your Honor.

11            THE COURT:  Overruled.

12  BY MS. CROSS:

13  Q.   Did you express your worry to anybody?

14  A.   At the time, no.

15  Q.   At any point later?

16  A.   Yes.

17  Q.   Who?  Tell the ladies and gentlemen who.

18  A.   What do you mean "who"?

19  Q.   You said, Ms. Holston, that you felt worry for the

20  defendant?

21  A.   Yes, um-hum.

22  Q.   And I'm asking you, did you share your concern and

23  your worry with anybody?

24  A.   I don't understand what you mean, did I share it with

25  anybody.  These are my feelings.

DIRECT EXAMINATION

1   Q.   I understand.  Please listen to my question.  I'm

2   maybe not asking it very well, but what I'm trying to ask

3   you is:  Did you call anyone and tell anyone about the call

4   that you had received and how you were feeling about the

5   call?

6   A.   What is April 24th?

7   Q.   I'm asking you.  Do you remember that day?

8   A.   Yes, I remember, but I don't know what day April 24th

9   was.  The day he came back?

10  Q.   Why don't we just calm down for one second, because I

11  think my questions are agitating you.

12  A.   Yes, they are.

13  Q.   And I don't mean to do that.

14          THE COURT:  Do you want to take a break?

15          MR. WALTER PUGH:  Yes.

16          MS. CROSS:  Yes, Your Honor.

17          THE COURT:  Let's take a ten-minute break.

18          (Jury excused from the courtroom at 9:20 a.m.)

19                      AFTER RECESS

20          THE COURT:  For the record, let me advise you

21  that, on reflection, I think I incorrectly sustained the

22  defense's objection when you asked her about her feelings,

23  because I hadn't heard the testimony that she had gotten a

24  telephone call.  So, if you want to go back into that area,

25  I'll permit it.

DIRECT EXAMINATION

1          MS. CROSS:  I'm going to try to ask better

2    questions this time.  Thank you, Your Honor.

3          MR. ANDREWS:  And, for the record, note that we

4    will continue to object.

5          THE COURT:  I know.  I know.  Your objection is

6    preserved.  I'm proud of you.

7          MR. ANDREWS:  Thank you, Your Honor.

8          THE COURT:  Do you want to get started?

9          MS. CROSS:  Yes, Your Honor.

10          (Jury present.)

11          THE COURT:  You may proceed, Ms. Cross.

12          MS. CROSS:  Thank you, Your Honor.

13    BY MS. CROSS:

14    Q.   Ms. Holston, upon reflection, I realized some of my

15    questions may have been confusing, so I'm going to try to

16    ask better questions.  Okay?  We're talking about April,

17    2002.

18    A.   Um-hum.

19    Q.   Do you remember a call that you received?

20    A.   Yes.

21    Q.   And based upon that call, I believe you said that you

22    felt something for Walter?

23    A.   Um-hum.

24    Q.   Remember that?  How did you feel?

25    A.   Okay.  If you're talking April 24th, the night he

DIRECT EXAMINATION

1    came -- the day, if it's the day he came back, okay.

2    Q.    I'm just asking how did you feel when you received the

3    call that made you feel bad for Walter?

4    A.    Because --

5              MR. ANDREWS:  Objection, just for the record.  I

6    understand.

7              THE COURT:  Objection noted.  Overruled.

8    BY MS. CROSS:

9    Q.    Ms. Holston, do you remember talking with Bessie Pugh?

10   A.    Yes.

11   Q.    And did you call her or she call you?

12   A.    I called her.

13   Q.    Why did you call Bessie Pugh?

14   A.    Because I had seen the newspaper.  Somebody told me to

15   get the newspaper and look at the newspaper.

16   Q.    And what did you read in the newspaper?

17   A.    About --

18             MR. ANDREWS:  Objection.

19             THE COURT:  Basis?

20             MR. ANDREWS:  What she read in the newspaper,

21   it's hearsay, Your Honor, and, as far as I know, doesn't

22   fall in any exception.

23             MS. CROSS:  Your Honor, I'm not asking it for

24   whether or not it's true what was in the newspaper but her

25   impression and what she related thereafter.

DIRECT EXAMINATION

1           THE COURT:  Right.  Overruled.  You may answer.

2           THE WITNESS:  Say the question again, please.

3    BY MS. CROSS:

4    Q.   You said someone told you to get the newspaper.

5    A.   Um-hum.

6    Q.   You picked up the newspaper.

7    A.   I read the newspaper, and I called Bessie.

8    Q.   And what did you talk to Bessie about?

9    A.   I first asked her if she had her car.

10   Q.   You asked Bessie if she had her car?

11   A.   Yes.

12   Q.   Why?

13   A.   Because I knew that her brother had her car, because

14   he had switched cars with her, and she was driving the car

15   that we have, the Cadillac that we have.  She was driving

16   that.

17   Q.   And why did you want to know about where her car was?

18   A.   Because I hadn't heard from Junior at all within the

19   last couple of days.

20   Q.   Was it typical?

21           THE COURT:  You hadn't heard from whom?

22           THE WITNESS:  Walter.

23   BY THE COURT:

24   Q.   When you say "Junior," you're talking about the

25   defendant Walter Pugh?

DIRECT EXAMINATION

1   A.    Sorry.  Yes.

2   Q.    And after reading this newspaper, you called Bessie

3   about her car; you wanted to know where her car was, right?

4   A.    And she said that she had her car, and I told her that

5   she needed to look at the newspaper, because I believed to

6   be her car in the newspaper and believed that the people

7   that they were looking for were her brother.

8   Q.    Okay.  And to your knowledge, did Bessie take care of

9   it?

10  A.    Yes.  She told me -- she said thanks for calling and

11  she was going to call the police right then and there.

12  Q.    Now, that day that you called Bessie after you read

13  the newspaper, had you seen the defendant Walter Pugh?

14  A.    I haven't seen him, haven't heard from him or nothing.

15  Q.    Was that unusual, or was that typical?

16  A.    That was very unusual.

17  Q.    Why was it unusual?

18  A.    Even though we were separated, he was still coming

19  around.

20  Q.    How often?

21  A.    Sometimes I would come home, if I was out, he would be

22  in the house when I came in.

23  Q.    After you spoke with Bessie about her car and related

24  to her what you believed --

25  A.    Um-hum.

DIRECT EXAMINATION

1    Q.    -- when was the next time you spoke with the defendant

2    Walter Pugh?

3    A.    The night before he came back.

4    Q.    And tell the ladies and gentlemen of the jury how

5    long, what time period that was.  You spoke with Bessie

6    about her car, and then the next time you talked with him

7    was how long in between?

8    A.    A week.

9    Q.    Now, when you talked with him, did you talk to him in

10   person?

11   A.    No.

12   Q.    Tell the ladies and gentlemen of the jury how you

13   talked to him.

14   A.    What happened was, the night before, he called me a

15   few times, tried to get me to rent a car and come down

16   there.

17   Q.    Come where?

18   A.    To where he was at.

19   Q.    Where was he?

20   A.    In Atlanta.

21   Q.    Did he tell you why he wanted you to come to Atlanta?

22   A.    No, not specifically.

23   Q.    What was your understanding as to why?

24   A.    I knew what he had done.

25   Q.    What was your understanding as to what he had done?

DIRECT EXAMINATION

1          MR. FELSON:  Objection.

2          MR. ANDREWS:  Objection.

3          MS. CROSS:  I'm asking her her understanding and

4  her impression.

5  A.   The newspaper, the car switching back --

6          THE COURT:  Hang on one second.  Overruled.

7          You may answer.

8  A.   Okay.  The newspaper, the car switching back all of a

9  sudden after she's already had the car for a while, she's

10  had our car and he's had her car, not seeing him.

11  Q.   And you believe that he had done what?

12  A.   Robbed the bank.

13  Q.   Now, you stated that you received a call?

14  A.   I received a few calls from him that night in the

15  middle of the night.

16  Q.   And tell the ladies and gentlemen of the jury the gist

17  of those calls.  What did you two talk about?

18  A.   First few times he called, he tried to get me, like I

19  said, to rent a car to come down there.  But I couldn't

20  rent no car, and I couldn't go down there.

21  Q.   Why not?

22  A.   Well, I have a daughter, first of all.  She's in

23  school.  So he knows every morning that I have to get up

24  and get her to school, put her on the bus and stuff like

25  that.  And then I didn't have any money to go down there.

DIRECT EXAMINATION

1  Q.    When he said that he -- when the defendant Walter Pugh

2  said that he was in Atlanta, did you believe him?

3  A.    He didn't actually tell me he was in Atlanta.  It's on

4  my caller ID.

5  Q.    What was on your caller ID?

6  A.    Atlanta, Georgia.

7  Q.    Do you know the area code?

8  A.    404.

9  Q.    So you received this call a week later after you read

10  the newspaper and talked with Bessie?

11  A.    Um-hum.

12  Q.    You talked with the defendant on the telephone?

13  A.    Um-hum.

14  Q.    So you obviously had phone service, correct?

15  A.    Yes.

16  Q.    Okay.  When was the next time after these calls in the

17  middle of the night with the defendant did you see or talk

18  to him?

19  A.    At approximately 8-something the next morning, I got a

20  call from my father stating that --

21                MR. ANDREWS:  Objection.

22                THE COURT:  Sustained.

23  BY MS. CROSS:

24  Q.    So you talked in the middle of the night with the

25  defendant.  So when is the next time you actually see or

DIRECT EXAMINATION

1   talk to him?

2   A.   I got a call from him from Hamilton stating to meet

3   him somewhere.

4   Q.   When was this?

5   A.   The next morning after he called me the night before.

6   Q.   And where did the defendant Walter Pugh tell you to

7   meet him?

8   A.   At first, it was in the back of the police station on

9   Front Street.

10  Q.   Did you go there?

11  A.   I went back towards that way, but he was pulling out

12  of an apartment complex on Front Street, and I just pulled

13  behind him and followed him.

14  Q.   Is all this in Hamilton?

15  A.   Yes.

16  Q.   What car was we driving at the time?

17  A.   The Cadillac we have.

18        MR. FELSON:   I'm sorry?

19  A.   '89 Cadillac.

20  Q.   So you pulled behind him.  Where do you two drive to?

21  A.   Straight down Front Street.

22  Q.   To where?

23  A.   Beckett.

24  Q.   What happened at Beckett Street?

25  A.   They opened the car doors and jumped in my car, parked

DIRECT EXAMINATION

1  the car, parked the Cadillac, and jumped in my car.

2  Q.    When you say "they," who are you talking about?

3  A.    Tyreese, Stephanie and Walter.

4  Q.    Approximately what time was this, do you recall?

5  A.    It was in the morning.  I guess 9-ish, in between

6  8:30, 9-something.

7  Q.    And what, if anything, did they have with them?

8  A.    I guess they had traveling bags, garbage bags, boxes,

9  clothes.

10  Q.    Clothes?

11  A.    Clothes.

12  Q.    Anything else?

13  A.    Guns.

14  Q.    What was your understanding as to where you were to

15  take them or where you were supposed to go?

16  A.    Didn't know.

17  Q.    Where did you take them?

18  A.    Actually, we drove around the streets for a while, for

19  a second, not long, maybe 15, 10 or 15 minutes or so.  And

20  then they found somebody I guess that was acquainted with

21  Butter -- excuse me -- Tyreese.

22  Q.    You know him as Butter?

23  A.    Yes.

24  Q.    Okay.  And what happened when you all met up with this

25  person?

DIRECT EXAMINATION

1   A.    They -- oh, God.  I don't recall everything that day.

2   But I know they got with him, and he more or less found

3   somewhere for them to go.

4   Q.    And this place that was found for them to go, did you

5   take them there?

6   A.    Yes.

7   Q.    Where was it?

8   A.    Off of Hamilton Avenue, Hamilton Avenue and John Gray

9   area, Fairfield or Springfield or something like that.

10  Q.    Could it have been Mt. Healthy?

11  A.    Yes, that was the area, off of Hamilton Avenue.

12  Q.    And did you take them to a home, a restaurant or --

13  A.    It was a home.

14  Q.    Do you know whose home?

15  A.    I don't know the man.

16  Q.    What was your understanding as to why they wanted to

17  go to this home?

18  A.    I guess they were trying to get another rental car.

19          MR. FELSON:  Objection.  Speculation.

20          THE WITNESS:  No, it's not speculation.  They --

21          THE COURT:  Wait.  Wait.  I need to rule on that.

22          Ms. Cross, you want to respond to the objection?

23          MS. CROSS:  I asked her what was her

24  understanding.  I'll lay a foundation for that

25  understanding now, Your Honor.

DIRECT EXAMINATION

1          THE COURT:  All right.

2     BY MS. CROSS:

3     Q.    Did either defendant Tyreese or Walter say anything

4     about why they wanted to go there?

5     A.    They wanted me to drop them off, and they were going

6     to get another-- they wanted to go to a room.  They wanted

7     me to find somebody to get them a hotel room and get them a

8     rental car.

9     Q.    When you took them to this house in Mt. Healthy --

10    A.    Yes.

11    Q.    -- what happened?

12    A.    I stayed for a few minutes.  They wanted something to

13    eat.  I then, me and Stephanie, went and got them something

14    to eat.  I returned.  I brought the food back.  I talked to

15    him, Walter, for a second, and he told me I had to leave

16    and find somebody to rent a car or rent a room for them.

17    Q.    Now, the items that were transferred from the Cadillac

18    to your car --

19    A.    Um-hum.

20    Q.    -- what happened to those items?

21    A.    Some stuff they took out.  I don't know everything

22    they took out, but some stuff they did take out.

23    Q.    What happened after you left the house?

24    A.    I went back to my house, and, well, I was with a

25    couple of my friends, and I just was deciding on what to do

DIRECT EXAMINATION

1   basically.

2   Q.   And in deciding what to do, did you come up with

3   something to do?

4   A.   Yes.

5   Q.   Tell the ladies and gentlemen of the jury what you

6   did?

7   A.   I called a friend, officer.

8   Q.   An officer of the Hamilton Police Department?

9   A.   Yes.

10  Q.   And which officer did you call; do you remember?

11  A.   Officer Jackson.

12  Q.   And Ms. Holston --

13  A.   Yes.

14  Q.   -- what did you tell Officer Jackson?  Please tell the

15  ladies and gentlemen of the jury.

16  A.   That I knew where he was.

17  Q.   And I see you're crying.  Did you want to do that?

18  A.   No.

19  Q.   Why did you do that, ma'am?

20  A.   Because I did not want to go get in any trouble for

21  what this man had done, and I knew it was wrong, and what

22  he did was wrong, even though I thought I loved him.

23           MR. ANDREWS:   Objection.

24           THE COURT:   Overruled.

25           MS. CROSS:   Your Honor, may the witness be given

DIRECT EXAMINATION

1    some Kleenex?

2            THE COURT:  There is some right there.

3            MS. CROSS:  Oh, thank you.

4    A.   I knew I had to tell.

5    Q.   Ms. Holston, after you spoke with officer Jackson and

6    told him where Walter was, what happened?

7    A.   I met up with them.

8    Q.   With the police?

9    A.   With the Hamilton police and Officer Detective

10   Calhoun, and they told me they were going to take me to the

11   Hamilton County Sheriff's jurisdiction because they were

12   out of the area.

13   Q.   And did you go there to the Hamilton sheriff's office?

14   A.   Yes, I did.

15   Q.   With Detective Calhoun?

16   A.   Yeah.  I drove my car.

17   Q.   Did he meet you there?

18   A.   Well, I guess one was in front of me, and the other

19   people, they were all behind me.

20   Q.   So they escorted you?

21   A.   Escorted me basically.

22   Q.   When you arrived at the Hamilton Sheriff's

23   Department -- Hamilton County Sheriff's Department, what

24   happened there?

25   A.   They basically asked me what I knew about them, what

DIRECT EXAMINATION

1  they had on them, asked me to describe the house to them,
2  because I had been in the house. And they asked me to call
3  him again, because, in between time, I was still calling
4  him because he was paging me, because I was supposed to
5  come back down there.
6  Q.    The defendant Walter Pugh was paging you?
7  A.    Yes.  So they had asked me to make a call to him.
8  Q.    In response to the page?
9  A.    Yes.
10 Q.    Did you do that?
11 A.    Yes.
12 Q.    Do you recall whether or not the calls that you made
13 to Walter were recorded?
14 A.    One.
15            MS. CROSS:  At this time, Your Honor, I would
16 like to show Ms. Holston Government Exhibit Number 22.
17            THE COURT:  What is 22?
18            MS. CROSS:  Tape, audio tape.
19 BY MS. CROSS:
20 Q.    Ms. Holston, do you recognize Government Exhibit
21 Number 22?
22 A.    Yes.
23 Q.    What is it?
24 A.    It's a tape that they made.
25 Q.    Have you listened to that?

DIRECT EXAMINATION

1   A.    Yes.

2   Q.    And did you recognize the voices on that tape?

3   A.    Um-hum.  It's me and Walter.

4   Q.    And based on your recollection of the call, does that

5   tape, what's on that tape, accurately reflect the

6   conversation that you had with Walter Pugh?

7   A.    Yes.

8            MS. CROSS:  Your Honor, at this time, I would

9   move to have Government Exhibit Number 22 moved into

10  evidence.

11           MR. WALTER PUGH:  No objection.

12           MR. FELSON:  I'm going to -- I'm not going to

13  object at this moment, but I certainly want my right to

14  object for the future.  I haven't heard it yet.

15           THE COURT:  You haven't heard it?  Didn't the

16  government provide it in discovery?

17           MR. FELSON:  We're going to listen to it now,

18  right.

19           THE COURT:  But didn't the government provide it

20  in discovery?

21           MR. FELSON:  They did.  But I'm assuming this is

22  the same one, and I'm assuming it's complete.  That's all.

23           THE COURT:  The objection is overruled, if there

24  was one.  I'm not sure if there was or not.  And Government

25  Exhibit 22 will be admitted and may be displayed to the

DIRECT EXAMINATION

1    jury.

2            MS. CROSS:  Thank you, Your Honor.  If I may have

3    the exhibit, Your Honor, we would like to play it at this

4    time.

5            THE COURT:  Do you need any assistance?

6            MS. CROSS:  This is my equipment, so I hope not.

7    Thank you, Your Honor.

8            (Exhibit number 22, an audio tape, was played for

9    the Court and jury.)

10   BY MS. CROSS:

11   Q.   Ms. Holston, you just heard the audio tape of the

12   conversation you had with Walter Pugh; is that correct?

13   A.   Yes.

14   Q.   Just a couple of things about that, questions.  We

15   heard Walter talking about washing $100,000.  Tell the --

16   explain to the ladies and gentlemen of the jury what that

17   was about, your understanding.

18   A.   Like he said on the tape, make it clean I guess.

19   Q.   Where did your grandparents live?

20   A.   In Arkansas.

21   Q.   In Arkansas.  Is that where you two were going to go?

22   A.   No.  I wasn't going nowhere.  My grandparents are in

23   the process of moving back up here.  They have been down

24   there 15 years, and they're bringing it back up here.  And

25   he knew that they were trying to sell their house.

DIRECT EXAMINATION

1    Q.    Ms. Holston, have you ever seen -- have there ever

2    been any guns at your house?

3    A.    Yes.

4              MR. FELSON:  Sorry.  I couldn't hear.

5    A.    Yes.

6    Q.    What type of guns have been at your house?

7    A.    Shotgun, .45, .9, .22's.

8    Q.    When you say 9 and 22 and 45, are you talking about

9    caliber?

10   A.    I don't know too much about guns, but those were the

11   names.

12   Q.    You say 9, do you mean 9 millimeter?

13   A.    9 millimeter.

14   Q.    And how did those guns get into your house; do you

15   know?

16   A.    All different kinds of ways.  I don't know.

17   Q.    Have you ever seen Walter Pugh with any guns in your

18   house?

19   A.    Yes.

20   Q.    I would like to show you Government Exhibits 10 and

21   11.

22              MS. CROSS:  Thank you, Mr. Snyder.

23   Q.    Ms. Holston, before you is Government Exhibit Number

24   10.  That's a shotgun in front of you.  Do you recognize

25   that?

DIRECT EXAMINATION

1   A.    Um-hum.

2   Q.    Have you seen it in your house before?

3   A.    Um-hum.

4         MR. FELSON:    What?

5   A.    Yes.  Yes.  Yes.

6   Q.    And when you saw it in your house, who did you see it

7   with?

8   A.    Junior had it.

9   Q.    What about the other, Government Exhibit Number 11?

10  It's the revolver.

11  A.    Yes.

12  Q.    Have you seen that in your house?

13  A.    Yes.

14  Q.    Did you see Walter with that?

15  A.    Yes.

16  Q.    Have you ever seen him use either of those guns?

17  A.    Yes.

18  Q.    Which one?

19  A.    This one he shot out back.

20        MR. FELSON:    Which one?

21  A.    This one here.

22  Q.    Government Exhibit Number 10, the shotgun?

23  A.    Yes.  Out back in our backyard.  And I'm not sure if

24  this is the -- Exhibit 11 is the exact gun that where we

25  have a hole in our living room or my living room.  It's a

DIRECT EXAMINATION

1    hole, but I have heard another one before.

2    Q.    Do you own any guns?

3    A.    No.

4    Q.    Are these your guns?

5    A.    No.

6    Q.    Government Exhibit Number 10, the shotgun, when you

7    saw it in your house, did you see it in that condition?

8    A.    Not at first.

9    Q.    In what condition -- how is it different?

10   A.    The handle's sawn off.

11   Q.    So the stock of it, you seen it with the stock on it?

12   A.    Yes.

13   Q.    Do you know where that stock is?

14   A.    In the garbage.

15   Q.    How did it get in the garbage?

16   A.    I threw it away.

17   Q.    Who took it apart or sawed it off?

18   A.    He did it on the side of our bed.

19   Q.    Walter?

20   A.    Yes.

21        MS. CROSS:    Thank you, Ms. Holston.    I realize

22   this is difficult for you.

23        No further questions, Your Honor.

24        THE COURT:    Let's take the morning break at this

25   time.    We'll stand in recess for 15 minutes.

CROSS-EXAMINATION

| 1 | (Recess at 10:15 a.m.) |
| 2 | AFTER RECESS |
| 3 | CROSS-EXAMINATION |
| 4 | BY MR. FELSON: |
| 5 | Q. Ms. Holston, is that how I should address you? |
| 6 | A. Yes. |
| 7 | Q. Okay. Now, you were with Walter living, actually |
| 8 | living with him up until March of this year? |
| 9 | A. Um-hum. |
| 10 | Q. But you did stay in contact with him after that? |
| 11 | A. Yes. |
| 12 | Q. And you know Tyreese is his son, right? |
| 13 | A. Yes. |
| 14 | Q. Now Walter has some other kids, too, doesn't he? |
| 15 | A. Yes. |
| 16 | Q. How many kids does he have? |
| 17 | A. Three sons in all. |
| 18 | Q. You know how old they are? |
| 19 | A. Not actually how old they are. I think one's 18, and |
| 20 | the other one's 25. |
| 21 | Q. And do you know how old Tyreese is? |
| 22 | A. Twenty-one, 22. |
| 23 | Q. Okay. And Walter's been around, I think -- did you |
| 24 | grow up in Hamilton? |
| 25 | A. Yes. |

CROSS-EXAMINATION

1   Q.    Walter's from there, too, as well?

2   A.    I guess so, yes.

3   Q.    When you were living together, did you have a lot of

4   friends in Hamilton?

5   A.    Friends, associates.

6   Q.    Friends, associates, knew a lot of people?

7   A.    Yes.

8   Q.    Okay.  Now, because you mentioned on that -- in that

9   phone call about someone, you talked about someone you said

10  "don't trust him," and I didn't know who you were talking

11  about.  You remember saying that?

12  A.    Yes.

13  Q.    Who were you talking about?

14  A.    The guy that house he was at.

15  Q.    You said "don't trust him"?

16  A.    Um-hum.  I said, "You don't trust him.  You don't even

17  know him."  That's what I said.

18  Q.    All right.  Now, tell me a little bit about the

19  shotgun.  You said you saw this shotgun before and it had a

20  handle on it?

21  A.    Um-hum.

22  Q.    Was that handle cut off?  Did you see it cut off?

23  A.    Yes, I did.

24  Q.    Was that -- where were you living when it was cut off?

25  A.    433 Knightsbridge Drive.

CROSS-EXAMINATION

1   Q.   And who were you living with?

2   A.   Walter Pugh.

3   Q.   So that was before this robbery?

4   A.   Yes.

5   Q.   Okay.  So, in other words, that gun had -- didn't have

6   any -- was the handle made of wood, or was it some sort

7   of --

8   A.   I don't know what it was made out of.

9   Q.   But the point is it had no wood on it, at least since

10  March or since you lived together with Walter, well before

11  the robbery; is that right?  It had no wood on it, right?

12  Look at it now.  It has no wood on it.

13  A.   I guess, yes.

14  Q.   Well, take a look at it.

15  A.   What's wood?  I don't know nothing about a gun to know

16  what wood is on a gun.

17  Q.   Like wood, like the -- you know, with the stock?

18  A.   The handle, yeah, it was replaced.  It was already

19  removed.

20  Q.   Okay.  And but it looked just like it does now, no

21  stock, no wood on it, right?  We can show it to you again

22  if you want to take a look at it.  It's Exhibit 10.

23       You recall the stock that was on this gun?

24  A.   Um-hum.

25  Q.   Would you mind removing your hand so I can hear you?

CROSS-EXAMINATION

1   A.   Yes, I do.

2   Q.   And was it -- was the stock made out of -- was it a

3   different color than that?

4   A.   It was black.

5   Q.   But the point I'm making is that that was removed well

6   before the robbery took place, right?

7   A.   Yes.

8   Q.   Okay.  That's all I have with that.  Thank you.  Now,

9   you mentioned this was Walter's shotgun.  You said

10  "Junior," and Junior is Walter, right?

11  A.   Yes.

12  Q.   And you saw Walter shoot that shotgun, right?

13  A.   Once before, yes.

14  Q.   And also, well, Tyreese didn't live with you, did he?

15  A.   No.

16  Q.   Okay.  And do you know who Tyreese's -- you mentioned

17  Tyreese's girlfriend or at least girlfriend for some period

18  of time.  Her name is Ms. Luster?

19  A.   Um-hum.

20  Q.   Do you know Ms. Luster?

21  A.   Um-hum.

22  Q.   Could you answer yes or no?

23  A.   Yes.

24  Q.   And what's Ms. Luster's first name?

25  A.   Stephanie.

CROSS-EXAMINATION

1   Q.   All right.  Now, Ms. Luster does not have a child with

2   Tyreese; is that in my understanding?

3   A.   No.

4   Q.   But Tyreese does have a child with another woman?

5   A.   Yes.

6   Q.   And who's that woman?

7   A.   Ra-Shay Patterson.

8   Q.   Have you seen Ra-Shay Patterson out here today?

9   A.   Yes.

10  Q.   Now, are you aware that Ms. Luster visited Tyreese

11  in -- when he was in Butler County Jail pursuant to this

12  case?

13  A.   No.

14  Q.   Do you know whether -- have you ever seen the -- let's

15  see -- I'm sorry -- Ms. Luster, the interactions between

16  Ms. Luster and Ms. Patterson, do you know if they get along

17  or not?

18            MS. CROSS:  Objection.  Relevance.

19            MR. FELSON:  Motive.

20            MS. CROSS:  As to who?

21            MR. FELSON:  As to Ms. Luster's motive.

22            MS. CROSS:  That's going beyond the scope of

23  direct of this witness and what she's testified about.

24            MR. FELSON:  I'm allowed to cross-examine her.

25            THE COURT:  Not about things that weren't part of

CROSS-EXAMINATION

```
 1    the direct examination.  I mean, any area that's touched
 2    upon in direct you can, but that's a whole other area.
 3              MS. CROSS:  In addition, Your Honor, for the
 4    record, this line of questioning does not go to this
 5    witness' credibility.
 6              MR. FELSON:  Okay.  Note my exception.
 7    BY MR. FELSON:
 8    Q.   All right.  Now, when you spoke on that -- when you
 9    spoke on that telephone call that we heard, you didn't hear
10    Tyreese in there.  Tyreese wasn't on that phone call, was
11    he?
12    A.   No.
13    Q.   Okay.  And as far as -- did you ever see -- Tyreese
14    never made any statements to you admitting anything, did
15    he?
16    A.   No.
17    Q.   And Walter never told you Tyreese did anything, did
18    he?
19    A.   Not specifically, no.
20    Q.   And Walter never, or I mean -- let me ask it this way.
21    You don't have any evidence from anything that you saw that
22    Tyreese had possession of any money, any unusual amount of
23    money?
24    A.   Only thing was the clothes that was in the car; that's
25    all I had.
```

CROSS-EXAMINATION

1    Q.    There were some clothes in the car?

2    A.    Yes.

3    Q.    Did you witness the purchase of these clothes?

4    A.    No.

5    Q.    Did you witness the -- did you take -- what, did you

6    look at all these clothes?  Did you witness the size of

7    them?

8    A.    No.

9    Q.    Were there any shoes in there?

10   A.    Yes.

11   Q.    Did you witness the size of the shoes?

12   A.    Yes.

13   Q.    Okay.  Now, tell me about the shoes.  Did the police

14   come and get any of these shoes?

15   A.    No.  They were all, I guess, taken out of the house

16   when they got arrested.

17   Q.    All right.  Okay.  Now, did you see any unusual amount

18   of money in Tyreese's possession at any time?

19   A.    I don't know whose possession it was in.

20   Q.    You saw some money?

21   A.    Yes.

22   Q.    How much money?

23   A.    The money that was referred to on the tape that was

24   supposedly missing.  I guess the amount was, what, $800?

25   Q.    You saw $800?

CROSS-EXAMINATION

| | |
|---|---|
| 1 | A. I don't know how much it was. It was just in a box. |
| 2 | Q. But it was -- but it was about -- you think it was |
| 3 | about $800? |
| 4 | A. I don't know. I don't know how much. |
| 5 | Q. Why do you think $800? |
| 6 | A. I don't know how much it was. That's the amount that |
| 7 | was mentioned in the tape that he was missing, if you don't |
| 8 | recall. |
| 9 | Q. All right. And as I recall, he didn't mention |
| 10 | Tyreese's name in that tape at all? |
| 11 | A. No, he did not. |
| 12 | Q. All right. Did you ever ask about Tyreese? |
| 13 | A. No, I don't think so. I don't recall. |
| 14 | Q. Do you know what residence they were at when you |
| 15 | called? Did you call him, or did he call you? |
| 16 | A. Do I know the residence? It's the residence I took |
| 17 | them to. |
| 18 | Q. Did you call them at that residence? |
| 19 | A. Yes, I did. |
| 20 | Q. How did you know the phone number? |
| 21 | A. Because Junior had been paging me from that number. |
| 22 | Q. Junior, meaning Walter? |
| 23 | A. Walter, excuse me, yes. |
| 24 | Q. Okay. And the address that was affiliated with that |
| 25 | phone number, how were you aware of that? |

CROSS-EXAMINATION

1    A.    I didn't know the address.  I just knew how to get to

2    the house.

3    Q.    Okay.  All right.  Now, when you dropped them off at

4    the house, who was -- did they just get back from out of

5    town when you dropped them off?

6    A.    Yes.

7    Q.    How did you know they had just got back from out of

8    town?  You weren't with them, right?

9    A.    Right, I was not with them, but he called me the whole

10   night before, and, when he got back into town, he went to

11   my parents' house, and, after he left my parents' house, he

12   came to Hamilton and called me.

13   Q.    Did you see him at your parents' house?

14   A.    No, but my baby did, and my father did, too.  They

15   talked to him.

16   Q.    Okay.  All right.  But they weren't with him out of

17   town, were they?  They only know that he might have been at

18   their house, right?  I'm just trying to get -- trying to

19   understand what you saw and heard.  Okay.  You didn't see

20   and hear them out of town.  You just know because of the

21   phone call you received, right, or some pages that you

22   received, right?

23   A.    Yes.

24   Q.    Okay.  And when you receive a page, that has a phone

25   number attached to it?

CROSS-EXAMINATION

1   A.    Yes.

2   Q.    And you can tell whether that phone number is from out

3   of town?

4   A.    No.  He didn't page me from out of town.  He called me

5   from out of town with an area code 404.  You know what

6   caller ID is?

7   Q.    Yes.

8   A.    It says the area Atlanta, Georgia, or whatever part of

9   Georgia they were in.

10  Q.    Was that from his cell phone?

11  A.    No.  He doesn't have a cell phone.

12  Q.    He doesn't have a cell phone?

13  A.    No.  He didn't at the time.

14  Q.    Okay.  All right.  So, did any of these phone calls

15  include Tyreese?

16  A.    No.

17  Q.    Was his number on anywhere or his name mentioned at

18  all?

19  A.    Name, yes.  Number, he didn't have a number.

20  Q.    All right.  Now, so they came up here.  You're saying

21  that they got here on -- what was it?  May 3rd, May 2nd or

22  May 3rd?

23  A.    I don't know exactly what day it was.  I know the day.

24  Q.    Was it the day that they were arrested?

25  A.    A week later, a week later they left.

CROSS-EXAMINATION

| | |
|---|---|
| 1 | Q.    Was it the day they were arrested? |
| 2 | A.    When they came back? |
| 3 | Q.    Yes. |
| 4 | A.    I guess, yes. |
| 5 | Q.    Okay.  And do you know the day they were arrested? |
| 6 | A.    Yes. |
| 7 | Q.    What date was that? |
| 8 | A.    I don't know the date. |
| 9 | Q.    You know the day of the week? |
| 10 | A.    Wednesday, late Wednesday, early Thursday, I believe. |
| 11 | Q.    Okay.  Now, this other woman, Ms. Luster, you're |
| 12 | saying was with them, right? |
| 13 | A.    Yes. |
| 14 | Q.    And she had just got back in town, too, from the best |
| 15 | of your knowledge? |
| 16 | A.    Yes, from the best of my knowledge. |
| 17 | Q.    Do you know where they were, what cities they went to |
| 18 | before they got back from out of town? |
| 19 | A.    No. |
| 20 | Q.    All you saw, what, one phone number from Atlanta? |
| 21 | A.    A few phone numbers.  I don't have my telephone paper |
| 22 | to let you know all the phone numbers, but, yes, there was |
| 23 | a few phone numbers from Atlanta. |
| 24 | Q.    Any other cities? |
| 25 | A.    No.  Kentucky on the way back, to let me know he was |

CROSS-EXAMINATION

1    closer.

2    Q.   Okay.   And, during any of these calls, did you talk to

3    Tyreese?

4    A.   No.

5    Q.   Did you talk to Ms. Luster at all?

6    A.   When she got back into town.

7    Q.   When she got back, did you talk to her?

8    A.   When they got in the car.

9    Q.   Okay.   But that's all?

10   A.   That's it.

11   Q.   Do you know who went down to Atlanta?

12   A.   No.

13   Q.   Did you know who was in the car?

14   A.   No.

15              MR. FELSON:   All right.   That's all I've got.

16              THE COURT:   Mr. Pugh or Mr. Andrews?

17                   CROSS-EXAMINATION

18   BY MR. WALTER PUGH:

19   Q.   Ms. Holston, how you doing?   How you doing?

20   A.   I'm fine.

21   Q.   Ms. Holston, how long was you and the defendant Walter

22   Pugh, Jr. together?

23   A.   Again, from August, 2000, to March, 2002.

24   Q.   And between that time, did the two of you ever travel

25   a lot?

CROSS-EXAMINATION

1    A.    Yes.

2    Q.    Was there any shopping during that time of traveling?

3    A.    Some.  Most of the shopping we did was in D.C.  We did

4    some when we were at my grandma's.

5    Q.    Where is that?

6    A.    My grandma's?

7    Q.    Yes.  For the record.

8    A.    Arkansas.

9    Q.    Ms. Holston, did Walter Pugh's company keep him out of

10   town working a lot with his own crew?

11   A.    Excuse me?

12   Q.    Did the accused Walter Pugh, Jr. company keep him out

13   of town working a lot with his own crew?

14   A.    Yes.

15   Q.    Can you recall traveling out of state with the

16   defendant Walter Pugh, Jr. to collect over $300,000 for his

17   company?

18   A.    Yes.

19   Q.    When the company had Walter Pugh, Jr. out of state or

20   town, did you stay at any motel that he stayed at?  Did you

21   travel and stay with him?

22   A.    Um-hum, yes.

23   Q.    Ms. Holston, why did you deliver Walter Pugh, Jr.

24   personal belongings to him at that address in Mt. Healthy?

25   A.    Because you wanted me to.

CROSS-EXAMINATION

| | | |
|---|---|---|
| 1 | Q. | Did you deliver any guns there? |
| 2 | A. | No. |
| 3 | Q. | Did you happen to see any guns when you was there? |
| 4 | A. | You took the guns out of the car. |
| 5 | Q. | Did you see the guns when you was there? |
| 6 | A. | Not after they had been taken into the house, no. |
| 7 | Q. | Who helped you bring the clothes into the house, the |
| 8 | | personal belongings? |
| 9 | A. | When? |
| 10 | Q. | The day that you delivered them to Mt. Healthy to the |
| 11 | | house. |
| 12 | A. | I don't remember.  I don't even know who they were. |
| 13 | Q. | You don't know who helped you? |
| 14 | A. | No.  You. |
| 15 | Q. | Did Tyreese help you? |
| 16 | A. | No. |
| 17 | Q. | Did I help you? |
| 18 | A. | No. |
| 19 | Q. | Ms. Holston, you stated to this here Court that the |
| 20 | | last time you talked to me was April the 23rd, I believe, |
| 21 | | the day before the bank robbery? |
| 22 | A. | The day before the bank robbery? |
| 23 | Q. | Yes. |
| 24 | A. | I don't know.  I didn't talk to you that day before, |
| 25 | | but I talked to you within that week. |

CROSS-EXAMINATION

1   Q.   But you stated to the Court you talked to me every

2   day, I talked to you every day, I come out every day.

3   A.   I said you kept in touch still.

4   Q.   Was I in touch with you the day before the robbery?

5   A.   Not the day before.  Maybe a day like before the day

6   before, yes.

7   Q.   You stated on the record, too, Ms. Holston, that you

8   called Bessie Pugh on the 25th and indicated that you seen

9   something in the paper indicating her car?

10  A.   Um-hum.

11  Q.   In this here report from Detective Calhoun, did you

12  tell Officer Jackson of the Hamilton police you called him

13  on April 24th, the day of the robbery, and told him that

14  Walter Pugh, Jr. is the one that robbed the bank?

15  A.   No.  The day of the robbery, no.  I didn't know then

16  that you had actually done it.

17  Q.   That I had done it?  Did you call and tell them that

18  Walter Pugh, Jr. robbed the bank on the 25th?

19  A.   No.

20  Q.   It's right here in his report.  Ms. Holston, do you

21  know if the defendant Walter Pugh, Jr. have tried to

22  contact you since he's been locked up on this crime here?

23  A.   No, I don't know.  There is no way that you can get in

24  contact with me.

25  Q.   Have the government convinced you not to contact the

CROSS-EXAMINATION

```
 1   defendant -- wait.  Excuse me.  Have you tried to contact
 2   the defendant?
 3   A.   No.
 4   Q.   So we haven't had no communication whatsoever since
 5   April the -- May the 3rd, correct?
 6   A.   No.
 7   Q.   Ms. Holston, will it be fair to tell the Court the
 8   defendant Walter Pugh, Jr. hurted you tremendously by
 9   leaving you for another; therefore, it's in your interest
10   to help destroy -- wrongfully help destroy him by any means
11   necessary?
12   A.   No.  I'm not wrongfully destroying you for you leaving
13   me for another.  I'm wrongfully destroying you for the
14   wrong you have done, not just to me within the past two
15   years, but to what you just did in this incident.
16   Q.   So you --
17   A.   I don't need -- I don't need to go into everything
18   wrong you have done towards me, or do I?
19   Q.   So you saying you done that because it was -- you feel
20   I done something, so you saying it was wrong, so that's why
21   you saying you called Officer Jackson and indicated to him
22   my name and my sister's car?
23   A.   Because you done something wrong, yes.
24   Q.   So that gave you the right to -- you said you gave
25   him -- you called him and told him that you believed that
```

CROSS-EXAMINATION

1   Bessie Pugh's car is the car that done the robbery?

2   A.   Did I call and say that?  Yes, I did.

3   Q.   You just stated that you did not call him on the 25th,

4   Ms. Holston.  It's right here on record.  I asked you --

5   A.   I called him and let him know.

6   Q.   I just asked you, Ms. Holston, it's on the record.  I

7   said I have it right here.

8   A.   I didn't call him at the time I called your sister.

9   No, I didn't.  I called your sister before I even called

10  him.

11  Q.   That's the same day, Ms. Holston, the same day.  It's

12  right here on record.  I asked you it's the same day.  Yes.

13  Is it the same day?

14  A.   No, it's not the same day.

15  Q.   According to the record, it is.  It's got to be.  The

16  same day that you called Bessie Pugh, Bessie Pugh went to

17  the police station.

18          MS. CROSS:  Your Honor, is he asking a question

19  or arguing with the witness?

20          THE COURT:  Yes.  Mr. Pugh, you need to ask a

21  question.

22          MR. WALTER PUGH:  Yes, ma'am.

23  BY MR. WALTER PUGH:

24  Q.   Ms. Holston, on April the 25th, did you call Bessie

25  Pugh on her job and tell her to look at the newspaper?

CROSS-EXAMINATION

```
1    A.    Yes, I did.  I stated this before.  I called her
2    because I had thought of everything that had been done and
3    said and people calling me.  I called after I looked into
4    the newspaper, asked her if she had got her car back,
5    because, like I said, you had her car for a while.
6    Q.    And after that, you called Agent Jackson, correct?
7    A.    Not the same day.
8    Q.    Excuse me.  What about the day after that?
9    A.    Yes.  And then he asked me if I had heard anything
10   from you, and I told him no, but if I did hear anything
11   from you to let them know.
12   Q.    Ms. Holston, you was convicted and sentenced to serve
13   two years at the Marysville Penitentiary --
14   A.    No.  One year.
15             THE COURT:  You've got to let him finish the
16   question.  Okay?
17   Q.    -- Penitentiary for Women.  One year?  Your crime
18   history is what connected you to the Hamilton Police
19   Department with polluted justice and conspiracy, Ms.
20   Holston.  This is what this is.
21             THE COURT:  You have got to ask her a question,
22   Mr. Pugh.  This is not closing argument.
23             MR. WALTER PUGH:  Okay.
24   BY MR. WALTER PUGH:
25   Q.    Ms. Holston --
```

CROSS-EXAMINATION

1   A.    Yes.

2   Q.    Who gave you -- wait a minute.  My Cadillac was

3   impounded May the 2nd by the Hamilton Police Department and

4   the FBI, VIN number 1G6CD5155K42805711, plate's number

5   BB64AF registered to Walter Pugh, Jr.

6              THE COURT:  Is that a question?

7              MR. WALTER PUGH:  No.

8   Q.    My question to you is:  Who authorized you -- who

9   authorized you the authority to sign and get my car out of

10  impound?

11  A.    Junior, Walter, I already had the title and a set of

12  keys to the car.  You had already signed it over for other

13  purposes, and, once you got locked up and they took the

14  car, that's when I got my car back.  They gave it back to

15  me.   I don't understand what this has to do with it.

16  Q.    Ms. Holston, haven't you been convicted for forgery?

17  A.    Yes.

18  Q.    Isn't it a proven fact that you stated earlier that we

19  have had no communication?  When did I authorize you the

20  authority to go and get my car out of impound and illegally

21  put your name, forged my signature, forged my signature on

22  that title and remove it?

23  A.    It was already done before you had left.  I still

24  had -- I had stuff before you had left a long time ago.  I

25  had keys and a title.  How would I have this information?

CROSS-EXAMINATION

```
 1   That's what I -- I mean.  And talking about forgery, I do
 2   believe every check that you have gotten damn near I have
 3   signed for you, signed and cashed your checks.  Matter of
 4   fact, I cashed your sister's security checks you got this
 5   year, right, social security, whatever, or state checks
 6   every year.  Didn't I cash that?
 7   Q.   Are you asking me a question?
 8   A.   Yes.  I'm asking you a question talking about forgery.
 9               THE COURT:  All right.  I have given you some
10   latitude, but we're not going to turn this into domestic
11   relations court.  If you have anything else to ask about
12   the case, Mr. Pugh, about the alleged incident, you can ask
13   that.  You can ask about what's involved in this case, but
14   that's it.
15               And let me just ask you, just try to answer the
16   question asked.  Okay?
17               THE WITNESS:  Okay.
18               THE COURT:  Thank you.
19   BY MR. WALTER PUGH:
20   Q.   Ms. Holston, my title and everything stayed in my
21   glove department.  My title, my birth certificate, my
22   social security card, my wallet, all disappeared.
23   Detective Calhoun went there when he impounded my car.  He
24   stated that there was no such thing in my glove department,
25   all disappeared.  How did you get it?
```

CROSS-EXAMINATION

| | |
|---|---|
| 1 | A.    I had it.  I had it.  I had the title and the keys, |
| 2 | Junior, Walter.  Everything I had before, because there was |
| 3 | no way I had access to the car. |
| 4 | Q.    On May the 16th, I sent my sister to get that title |
| 5 | out of that car, because the title was in there, |
| 6 | Ms. Holston. |
| 7 | A.    On May 16th, you sent your sister to call me for keys |
| 8 | and the title to the car.  She called me for both. |
| 9 | Q.    No. |
| 10 | A.    I don't understand this. |
| 11 |         THE COURT:  All right.  I think you have asked |
| 12 | all the questions about the car that you could possibly |
| 13 | ask.  You want to move on to another area, Mr. Pugh? |
| 14 | BY MR. WALTER PUGH: |
| 15 | Q.    Did you make any deal with the government, Ms. |
| 16 | Holston, to not be prosecuted and in return they gave you |
| 17 | the title and everything? |
| 18 | A.    Deal for what?  No. |
| 19 | Q.    For anything? |
| 20 | A.    No. |
| 21 | Q.    The government have accused me and my son of taking |
| 22 | $153,189 and one penny.  When you seen me, did you see such |
| 23 | money?  Did you see any money, Ms. Holston? |
| 24 | A.    I just seen a couple dollars in -- I mean, it was more |
| 25 | than a couple dollars, but it was a whole bunch of |

CROSS-EXAMINATION

1   hundreds, just dollars bunched up in a box.  That's all I
2   seen.
3   Q.   Did you see any 10's, 20's or what?
4   A.   I seen a lot of one's, a couple 10's and a couple
5   20's.
6   Q.   And the testimony that you have gave here today is
7   honest.  I'm saying, the testimony you gave here today is
8   honest to the best of your ability, right?
9   A.   Yes.
10  Q.   And you said you called the police because you wanted
11  to do what was right, right?
12  A.   Yes.
13  Q.   You said you tired of doing what's wrong, correct?
14  A.   Yes.
15  Q.   And you haven't done no wrong since you been from the
16  penitentiary, correct?
17  A.   Correct.
18  Q.   Ms. Holston, where do you live at?
19  A.   433 Knightsbridge.
20  Q.   And how -- what is your financial resources coming
21  from?
22  A.   My parents now.
23  Q.   Your parents.  You not on government funds or anything
24  like that?
25  A.   Yes.

CROSS-EXAMINATION

| | |
|---|---|
| 1 | Q. And what are you receiving this money from, for? |
| 2 | A. Going to school. |
| 3 | Q. They giving you money to go to school? |
| 4 | A. Every -- I have a child, and government social -- what |
| 5 | is it? Welfare, they give you money when you have |
| 6 | children, don't work and go to school. |
| 7 | Q. Where do your child go to school at? |
| 8 | A. She lives in Fairfield. |
| 9 | Q. Teia living with you, right? |
| 10 | A. Yes. |
| 11 | Q. But she go to school in Fairfield? |
| 12 | A. Yes. |
| 13 | Q. You live in Hamilton, and she go to school in |
| 14 | Fairfield. Is that doing what's right? You live in |
| 15 | Hamilton. |
| 16 | THE COURT: Mr. Pugh, I think you need to ask a |
| 17 | question. |
| 18 | Q. You live in Hamilton, Ohio, and -- |
| 19 | A. For the better education of my child, I'd rather her |
| 20 | go to Fairfield Schools than Hamilton City Schools, yes. |
| 21 | Hamilton City does not compare to Fairfield City Schools, |
| 22 | and I want the best for my child. |
| 23 | Q. Is not that illegal? |
| 24 | A. No, not when you have signed papers, not when you have |
| 25 | done the afroda -- what is it -- the afrodat, after you |

CROSS-EXAMINATION

1    have done that for the school system, no, it's not illegal.

2    Q.    But you're getting government funds for her?

3    A.    Because she lives with me, but she goes to Fairfield.

4    Q.    That's two different cities, Ms. Holston.

5            THE COURT:    Mr. Pugh, I think you have exhausted

6    that topic as well.

7            MR. WALTER PUGH:    Okay.

8    BY MR. WALTER PUGH:

9    Q.    Ms. Holston, are you still going to college?

10   A.    Yes, I am.

11   Q.    How many colleges have been going to since you been

12   out to get your state paper?

13   A.    Two or three.

14   Q.    How many have you been kicked out of, Ms. Holston?

15   A.    One.

16   Q.    What was you kicked out for?

17   A.    Huh?

18   Q.    What was you kicked out for?

19   A.    Almost getting ready to get in a fight.

20   Q.    Was you exported or what?

21   A.    No.    Just asked to leave the school.

22   Q.    Was the polices involved?

23   A.    They came because I made a threat.

24           MR. WALTER PUGH:    Thank you, Ms. Holston.

25           Thank you, Judge.

REDIRECT EXAMINATION

| | |
|---|---|
| 1 | THE COURT: Any redirect examination? |
| 2 | MS. CROSS: Just one question, Your Honor. |
| 3 | REDIRECT EXAMINATION |
| 4 | BY MS. CROSS: |
| 5 | Q. Ms. Holston, you have met with myself, Mr. Thapar and |
| 6 | Special Agent Terry Moran, FBI, correct? |
| 7 | A. Yes. |
| 8 | Q. And what did we basically tell you to do when you came |
| 9 | to court? |
| 10 | A. To come and do the right thing and tell the truth no |
| 11 | matter what. |
| 12 | MS. CROSS: Thank you. Nothing else, Your Honor. |
| 13 | THE COURT: Anything further, Mr. Felson? |
| 14 | MR. FELSON: No. |
| 15 | THE COURT: Anything further, Mr. Pugh? |
| 16 | MR. WALTER PUGH: No, ma'am. Thank you. |
| 17 | THE COURT: Thank you, Ms. Holston. The Court |
| 18 | appreciates your coming here today, and you are excused. |
| 19 | THE WITNESS: Thank you. |
| 20 | |
| 21 | C E R T I F I C A T E |
| 22 | I, Betty J. Schwab, the undersigned, do |
| | hereby certify that the foregoing is a correct |
| 23 | transcript from the record of the proceedings in |
| | the above-entitled matter. |
| 24 | |
| 25 | BETTY J. SCHWAB, RPR |
| | Official Reporter |