PHILPOT - DIRECT

1   they had left the bank.

2   Q.   Why don't you go ahead and take the stand?

3            THE COURT:  Mr. Snyder will take the microphone.

4            (Witness resumes the stand.)

5   BY MR. THAPAR:

6   Q.   How did you feel when all this was occurring?

7   A.   I was very afraid.

8   Q.   I'm sorry?

9   A.   I was very afraid.

10  Q.   Okay.  And how was Jenny reacting?

11  A.   Jenny was hysterical.

12  Q.   I think you might have mentioned this.  Did you hear

13  them say anything about dye or bait packs?

14  A.   When he told me to give him the money, he said, "No

15  dye."

16  Q.   And did the robber over by the office who was with the

17  bank manager say anything to you?

18  A.   He -- yes, he told me to lay on the floor.  Don't --

19  "Lay on the floor, you bitch, and don't push any buttons."

20  Q.   Okay.  And did they say anything as they left the

21  bank?

22  A.   They said, "Count to 20 and call the police -- then

23  you can get up, call the police, and have a nice day."

24  Q.   Now, when you saw them come in -- did you see them

25  come in?  Did they have anything in their hands?

| 1 | A. I didn't notice when they first come in the door. I |
|---|---|
| 2 | didn't notice the gun until he jumped up over the counter. |
| 3 | Q. Then you noticed what? |
| 4 | A. That he had a gun and that the other guy had a gun |
| 5 | walking back towards the office. |
| 6 | Q. Okay. And the gun that the gentleman that jumped over |
| 7 | the counter with, what type of gun was it? |
| 8 | A. Well, I don't really know my guns, but it looked like |
| 9 | it had a handle about like that on it. |
| 10 | Q. A handle or barrel? |
| 11 | A. The barrel. |
| 12 | MR. THAPAR: Your Honor, may the record reflect |
| 13 | she's holding her fingers about 12 inches apart? |
| 14 | MR. FELSON: I didn't see that 12 inches. |
| 15 | BY MR. THAPAR: |
| 16 | Q. However long you had your fingers apart -- |
| 17 | THE COURT: What would you estimate that to be, |
| 18 | how many inches? |
| 19 | THE WITNESS: I would say about 12. |
| 20 | BY MR. THAPAR: |
| 21 | Q. Okay. How long do you think the entire robbery took? |
| 22 | A. I would say maybe five to ten minutes. It seemed like |
| 23 | a very long time that they were in there. |
| 24 | Q. And while they were in there, did you see the mailman |
| 25 | or hear anything about the mailman? |

PHILPOT - DIRECT

1    A.    I heard him tell him that the mailman was coming, but,

2    while they were in there, no.

3    Q.    Did the mailman -- you heard him say it?

4    A.    Right.

5    Q.    Did you ever see the mailman?

6    A.    Yes.

7    Q.    Did he come into the bank?

8    A.    The mailman came into the bank after they were gone.

9    Q.    And did you talk to the mailman or did someone else?

10    A.    I just told him that we had been robbed; he just

11    needed to lay the mail down and leave.

12    Q.    Okay. Now, the robber who came over the counter, did

13    you see his face?

14    A.    No.

15    Q.    Okay. Could you tell if he had anything on his face?

16    A.    No.

17    Q.    What about the other robber that was over by the

18    office, did you notice anything about him?

19    A.    It looked to me like he had costume teeth in or

20    something in his mouth, but that was the only thing I could

21    tell about him.

22    Q.    Do you recall that after this case the police

23    interviewed you, after -- I'm sorry -- after the robbery,

24    the police interviewed you?

25    A.    Yes.

PHILPOT - DIRECT

1    Q.   Did you give them a statement at that time?

2    A.   Yes.

3    Q.   Okay.  And do you recall what you told the police

4    about how long the robbery took?

5    A.   I told them it was about ten or 15 minutes.

6    Q.   Did it seem like a long time?

7    A.   I seemed like a long time.  It probably wasn't that

8    long, but it just seemed like a long time.

9    Q.   Okay.  And do you recall just talking to the police

10   about the guns?

11   A.   Yes.

12   Q.   What did you tell them about the guns, if you can

13   recall?

14   A.   I told him that the one gun had the barrel on it, but

15   I didn't really get a good look at the other gun.

16   Q.   And so did you tell him about the other gun?

17   A.   No.

18   Q.   Did you also give them a description of the robber who

19   came over the counter, if you can recall?

20   A.   Just that he was a black male, maybe in his 30's and

21   thin.

22   Q.   I'm sorry.  And that was it?

23   A.   Yes.

24           MR. THAPAR:  Thank you, Ms. Philpot.

25           Your Honor, I have no other questions.

PHILPOT - CROSS

```
1              THE COURT:  Mr. Felson, do you wish to
2     cross-examine the witness?
3              MR. FELSON:  Yes, I do.  Thank you.
4                      CROSS-EXAMINATION
5     BY MR. FELSON:
6     Q.   Ma'am, you gave a couple of different statements or
7     one statement after the robbery.  How many people did you
8     talk to?
9     A.   After the robbery?
10    Q.   Right.
11    A.   I talked to two.
12    Q.   Who were they?
13    A.   I talked to Terry, and I talked to --
14    Q.   Is it that gentleman sitting at the end of the table?
15    A.   Yes.
16    Q.   Okay.
17    A.   And I talked with Jim.
18    Q.   Jim Connaughton, the bank manager?
19    A.   No.
20    Q.   Which Jim?
21    A.   The Hamilton detective.
22    Q.   Okay.  So you talked to two separate police officers
23    at two separate times?
24    A.   Yes.
25    Q.   Were they both taking notes?
```

| 1 | A. | Yes. |
| 2 | Q. | Did you also talk to the bank people, people from |
| 3 | | security? |
| 4 | A. | They were there but, no. |
| 5 | Q. | Did you interview with anybody even for any reason at |
| 6 | | all after the bank robbery from the bank? |
| 7 | A. | Yes. |
| 8 | Q. | Did anybody come up to you and comfort you from the |
| 9 | | bank? |
| 10 | A. | Well, they were there, yes, if we needed it. |
| 11 | Q. | You didn't need them? |
| 12 | A. | Well, we got hugs from them. |
| 13 | Q. | All right. Now, two robbers, correct? |
| 14 | A. | Yes. |
| 15 | Q. | And either of them wearing a mask? |
| 16 | A. | Not that I noticed. |
| 17 | Q. | Did you get a good look at their face, faces? |
| 18 | A. | No. |
| 19 | Q. | Did you try to describe the faces, facial features, |
| 20 | | for the detectives or for the FBI? |
| 21 | A. | No. |
| 22 | Q. | Were you given a photo lineup or a group of pictures |
| 23 | | to try to pick out which -- maybe you would see the robber |
| 24 | | again? |
| 25 | A. | No. |

PHILPOT - CROSS

1   Q.    You said the one robber that jumped over the counter

2   had a gun with a 12-inch barrel; is that correct?

3   A.    Yes.

4   Q.    The other robber, you saw a gun.  Can you describe the

5   other robber's gun?

6   A.    No.  I didn't got a close enough look at it.

7   Q.    But you did mention something about the other robber,

8   not the guy that jumped over the counter, but the other

9   guy, that he had something in his mouth, and you described

10  it as costume teeth?

11  A.    That's what it looked like to me.

12  Q.    Could they have been natural teeth?

13  A.    They were sticking out pretty far.  It looked like to

14  me, but they could have been.

15  Q.    In other words, somebody with bad teeth or else some

16  sort of a costume?

17  A.    Right.

18  Q.    But you don't know which one?

19  A.    The one that --

20  Q.    I mean you don't know whether it was fake teeth or

21  real teeth?

22  A.    Right.  Right.

23  Q.    Now, if I showed you -- I mean, my client Tyreese

24  Pugh, if I had him open his mouth, could you identify

25  whether the teeth that he's got now were the teeth that you

PHILPOT - CROSS

1   saw?  Do you remember it well enough?

2   A.   I might.

3   Q.   Okay.  I would like to try that if I may.

4          THE COURT:  How do you propose to do that,

5   Mr. Felson?

6          MR. FELSON:  I'm not sure exactly.  I haven't got

7   that far, but maybe the witness could walk up here with

8   some assistance.  We can keep him here.

9          THE COURT:  Okay.

10          THE WITNESS:  I can see from here.

11          THE COURT:  She says she can see.  Let's see if

12   that works, and then if it doesn't --

13   BY MR. FELSON:

14   Q.   You see these teeth?

15   A.   Um-hum.

16   Q.   Are those possibly the ones you saw?

17   A.   Possibly, yes.

18   Q.   They don't look like costume teeth, though, do they?

19   A.   No.  But I was pretty shook up.

20   Q.   I'm just asking you what you saw, if you can remember

21   it.  Don't make an identification you can't make.  Okay?

22   You were pretty shook up, but you said they were unusual,

23   unusual teeth, costume teeth or could have been from

24   somebody actually buying fake teeth or one of those things

25   they put it in their mouth, and sometimes they have teeth

PHILPOT - CROSS

1    where they have three different teeth sticking out

2    different ways.  Could you describe to me what these

3    costume teeth looked like?

4    A.    They just looked like teeth you buy around Halloween

5    and wear in your mouth, costume teeth.

6    Q.    Like you buy on Halloween?

7    A.    Right.

8    Q.    Where is it?

9    A.    Just like he had them in his mouth.

10   Q.    Three different teeth?  Was it ten teeth?

11   A.    A whole set of teeth in his mouth.

12   Q.    But it was something you would wear at Halloween?

13             THE COURT:  Can you keep your voice up,

14   Mr. Felson?

15   Q.    Were they white teeth?  Were they really white?

16   A.    Yes.

17   Q.    Were they like a perfect set of teeth, teeth somebody

18   would buy if they wanted to go to the dentist and have all

19   their teeth capped and have them all perfect?

20   A.    No.

21   Q.    Were they something that made them look like they

22   needed fixing, teeth that needed fixing?  If they were

23   real, would they need fixing?  Would you go to the

24   orthodontist or something?

25   A.    They didn't look to me -- they just looked like

PHILPOT - CROSS

1   plastic teeth that you buy.  They didn't look like a set of

2   false teeth or anything like that, just plastic play teeth

3   that you would put in your mouth.

4   Q.    Did you try to draw a picture of these teeth for the

5   police officers or law enforcement?

6   A.    Did I try to?

7   Q.    Yes.

8   A.    No.

9   Q.    Did they show you different types of teeth so you

10  could try to identify what they looked like?

11  A.    No.

12  Q.    Did you see any of the work that the law enforcement

13  was doing at the bank to try to investigate this case?

14  A.    No.

15  Q.    Did you notice what they were doing?

16  A.    No.

17  Q.    How many minutes were you in the area where the

18  robbery took place before you left that area?

19  A.    Once I got up from the station where I was and came

20  back out of the teller line, I did not go back out there.

21  I was out, like, in the office area.

22  Q.    Did the police cordon the area off?  Did they stop

23  people from coming in and out except for other police

24  officers?

25  A.    I don't recall.

PHILPOT - CROSS

1   Q.   Where did you give these interviews that you talked

2   about?

3   A.   They took us back in a room.  They took me back in a

4   room.

5   Q.   In the bank?

6   A.   Inside the bank.

7   Q.   And they interviewed you immediately after?  How soon

8   after the robbery?

9   A.   Five, ten minutes after the robbery I would say.

10  Q.   How many police officers were present; did you notice?

11  A.   There may have been four or five there.

12  Q.   Did you notice people taking fingerprints?

13  A.   No.

14  Q.   Did you notice whether the robbers were wearing

15  gloves?

16  A.   No.

17  Q.   Did you notice whether -- did the robbers, did they

18  have anything unusual in their voices, any accents of any

19  sort, use any --

20  A.   No.

21  Q.   Did the -- all right.  Now, in your statement, you did

22  do a written statement or you gave a statement that was

23  then typed up; is that correct?

24  A.   Yes.

25  Q.   And in that statement you were asked to read it,

PHILPOT - CROSS

1   because I can see your initials, PP.  Those are your

2   initials, right?

3   A.    Right.

4   Q.    Your initials are in various places in the statement.

5   Do you recall reading the statement?

6   A.    Yes.

7   Q.    And it says about the teeth they looked like vampire

8   teeth?

9   A.    Well, I'm meaning costume teeth like they buy when

10  they dress up for Halloween for a vampire and they buy

11  those costume teeth.

12  Q.    Okay.  All right.  Now, did you get an idea of the

13  height?  I see you have here that one of the guys was

14  wearing a thin tobaggan, t-o-b-a-g-g-a-n.  Can you tell me

15  what that is?

16  A.    Like the little thin hose hats like.

17  Q.    All right.  On his head?

18  A.    Yes.

19  Q.    And was -- which guy was that?

20  A.    The one that jumped over the counter.

21  Q.    Now, you said then it could have been his hair?

22  A.    Yes.

23  Q.    You weren't sure whether it was a toboggan or the

24  hair?

25  A.    Right.

PHILPOT - CROSS

1  Q.  And then he was about five foot six you wrote, right?

2  A.  Um-hum.

3  Q.  You didn't say -- you didn't give a range.  You

4  actually stated five foot six inches, right?

5  A.  (Nodding affirmatively.)

6         THE COURT:  You need to answer verbally.

7  A.  Yes.

8  Q.  Then he wore a dark shirt, right?

9  A.  Yes.

10 Q.  Is that the guy that jumped over the counter?

11 A.  Yes.

12 Q.  He wore a dark shirt?

13 A.  Yes.

14 Q.  Was it just a solid color shirt?

15 A.  Yes.

16 Q.  How about the other guy?  It doesn't seem in here that

17 you gave a description of the other guy, of the guy that

18 didn't jump over the counter.

19 A.  I didn't get a very good look at him.

20 Q.  All right.  Now, five foot -- let me just ask you

21 this.  In the bank -- sometimes I notice in some stores,

22 like UDF has it, they have a height marker right at the

23 door.  You can see it sort of five feet, six feet, six foot

24 five.  You know what I'm talking about?  So if somebody is

25 standing by the door, you can get and idea of how tall they

| | |
|---|---|
| 1 | are.  You know what I'm talking about? |
| 2 | A.  Um-hum. |
| 3 | Q.  That's for the purpose of identifying people that |
| 4 | might steal, correct? |
| 5 | A.  Yes. |
| 6 | Q.  Are you with me?  Do you have one of those at this |
| 7 | bank? |
| 8 | A.  No. |
| 9 | Q.  At the door, where the door is, is there any marker |
| 10 | that shows whether somebody might be over six feet or under |
| 11 | six feet or any particular height?  Have you ever measured |
| 12 | or has anybody at the bank measured the door so you can get |
| 13 | some idea of the size of a potential robber? |
| 14 | A.  No.  Not that I'm aware of, no. |
| 15 | Q.  Where did you come up with the five foot six? |
| 16 | A.  I just took a guess. |
| 17 | Q.  How tall are you? |
| 18 | A.  Four eleven. |
| 19 | Q.  So this person was about half a foot, seven inches |
| 20 | taller than you; was that your estimate? |
| 21 | A.  Yes. |
| 22 | Q.  Did you notice any shoes?  I mean maybe they were |
| 23 | wearing high shoes.  They might be shorter than that. |
| 24 | A.  No. |
| 25 | Q.  Did you notice shoes at all? |

PHILPOT - CROSS

```
1    A.    No.

2    Q.    All right.  Now, after this particular robbery, did

3    you -- have you spoken to anybody since the date of the

4    robbery about your testimony today?

5    A.    No.

6    Q.    Did Ms. Cross interview you?

7    A.    Yes.

8    Q.    So you spoke to her and maybe people from her office?

9    A.    Yes.

10   Q.    How many times?

11   A.    Once.

12   Q.    Was that just about what you testified today?

13   A.    Yes.

14   Q.    And all right.  I think that's about it.  Did they do

15   any -- they didn't do a photo lineup.  Did they have you

16   come and look at any other pictures?

17   A.    No.

18   Q.    Did you -- Ms. Cross have you look at any pictures?

19   A.    No.

20   Q.    Did they have you look at pictures out of the

21   newspaper?

22   A.    No.

23   Q.    Please?

24   A.    No.

25   Q.    Did you see the article?  There was an article about
```

PHILPOT - CROSS

1  this case in the newspaper.  Did you even see it?

2  A.   Yes.

3  Q.   You weren't able to identify pictures in that

4  newspaper; is that correct?

5  A.   No.

6  Q.   That is correct?  Yes, it is correct you were not

7  able?

8  A.   Right.

9  Q.   All right.  Now, one thing, the garbage can, was the

10  money placed in the can or was it placed in the liner of

11  the can, like a plastic liner?

12  A.   He took the bag out of the garbage can.

13  Q.   And then used the can itself?

14  A.   No.  He used the garbage bag.

15  Q.   Used the bag?

16  A.   Yes.

17  Q.   All the money went into the bag, not the can, right?

18  A.   Right.

19  Q.   Got it.  And this bag was -- that left with the

20  robbers?

21  A.   Yes.

22  Q.   Okay.  And did you notice anything else unusual about

23  the robbery?

24  A.   No.

25           MR. FELSON:  Thank you.

1        THE COURT:  Mr. Andrews or Mr. Pugh?

2        DEFENDANT W. PUGH:  Just a few questions.

3                    CROSS-EXAMINATION

4   BY MR. ANDREWS:

5   Q.   Ma'am, the gentleman that vaulted over the counter was

6   in his early 30's?

7   A.   Yes.

8   Q.   He was a young man, from my perspective at least?

9   A.   Yes.

10  Q.   And appeared to be in very good shape?

11  A.   Yes.

12  Q.   You describe him as being skinny, thin.  He wore a

13  dark shirt and long trousers, correct?

14  A.   Yes.

15  Q.   You only saw that individual, whoever he may have

16  been, for literally seconds, because, as soon as you

17  emptied your cash drawer, you were on the floor?

18  A.   Yes.

19  Q.   And you didn't look up because you were afraid?

20  A.   Right.

21  Q.   Now, the person that came over the counter, you

22  indicate never pointed the gun at you that you're aware of?

23  A.   Right.

24  Q.   Okay.  And the other individual you basically saw for

25  tenths of a second, if that; is that correct?

PHILPOT - CROSS

1    A.    Um-hum.

2    Q.    For all you know, it was -- I was going to pick

3    somebody from my era.

4              THE COURT:  Your voice is dropping off.

5              MR. ANDREWS:  I'm sorry.

6    Q.    For all you know, it was Robert Redford who walked in,

7    if Robert Redford had happened to be an Afro-American; is

8    that correct?

9    A.    No.

10   Q.    You just have no idea who the other individual was in

11   any descriptive manner?

12   A.    Right.

13   Q.    You did not see the motor vehicle that they allegedly

14   left in?

15   A.    No.

16   Q.    Or if they left in a motor vehicle?

17   A.    Right.

18   Q.    And now, the other teller that day, Jenny, was

19   extremely hysterical; is that correct?

20   A.    Yes.

21   Q.    I mean, you have been described as seeming to be in

22   shock.  Would that be correct?

23   A.    Myself?

24   Q.    Yes.

25   A.    Yes.

PHILPOT - CROSS

1   Q.   And actually, the manager, Mr. Connaughton, is that
2   correct?
3   A.   Connaughton.
4   Q.   Connaughton.  He was kind of in shock as well; would
5   that be a proper description?
6   A.   Yes.
7   Q.   I mean, neither of you were crying or hysterical, but
8   it affected you?
9   A.   Right.
10  Q.   And you, right after this, went back to the employee
11  lounge.  Let me make the time line making a little more
12  sense.  Right after this, you let the postman in, and he
13  put the mail down, correct?
14  A.   I did not let him in.  He came in.
15  Q.   Came in, put the mail down, and you locked the door
16  behind him; isn't that correct?
17  A.   Yes.
18  Q.   By that time, Mr. Connaughton was making the 911 call?
19  A.   He was already making the call when I came around the
20  teller line, yes.
21  Q.   And did you hear the 911 call?
22  A.   No.
23  Q.   You just know he was on the phone and that's what he
24  was obviously doing?
25  A.   Right.

PHILPOT - CROSS

1   Q.   You also went and got your robbery folder right away;

2   isn't that correct?

3   A.   Right.

4   Q.   And you filled it out?

5   A.   No.  I went and got the folder.  Jim wanted me to call

6   somebody, I guess from the branch, the main branch, and I

7   went and got my folder to see if I could find their number.

8   Q.   Did you call them?

9   A.   No.

10  Q.   What did you do?

11  A.   I, after I seen that the doors were not locked, I went

12  to try to lock the doors.

13  Q.   And you had difficulty locking the doors?

14  A.   Yes, because I did not know you had to push the inside

15  of the doors down to get them locked.

16  Q.   And Mr. Connaughton came and closed the doors or

17  locked them, correct?

18  A.   Right.

19  Q.   Must have seemed like hours, but shortly after that,

20  the first uniformed police vehicle rolled up?

21  A.   Yes.

22  Q.   Came in, took control of the lobby area?

23  A.   Yes.

24  Q.   Did they put the yellow tape up?

25  A.   I don't recall.

PHILPOT - CROSS

1   Q.   And they went about doing whatever they were doing out

2   there.  You didn't watch them?

3   A.   No.

4   Q.   You went back actually to the -- there is a break room

5   indicated.  I don't know if it's called a break room.

6   Employee room I think it's called.

7   A.   There is an office, like, and then there is a break

8   room behind it.  I was in the office.

9   Q.   You were in the break room; isn't that right?

10            THE COURT:  Wait a minute.  You can't both talk

11  at the same time.

12  A.   I was in the office.

13  Q.   All right.  Did you talk to the young lady in the

14  second row in the dark suit?

15  A.   She was there, yes.

16  Q.   Okay.  Did you have discussions with her?

17  A.   Maybe a hug, but that was about it.

18  Q.   Okay.

19  A.   We didn't --

20  Q.   Did you ever fill out any paperwork that day about

21  anything to do with the robbery?

22  A.   No.

23  Q.   You were interviewed at that time, correct?

24  A.   Yes.

25  Q.   You were then interviewed approximately a week later

PHILPOT - CROSS

| | |
|---|---|
| 1 | by Detective Cifuentes? |
| 2 | A.    Yes. |
| 3 | Q.    Do you recall who interviewed you right after this |
| 4 | took place? |
| 5 | A.    I talked with a detective from Hamilton. |
| 6 | Q.    Okay. |
| 7 | A.    And then I talked with Terry for just a short while |
| 8 | there at the bank. |
| 9 | Q.    Would the detective from Hamilton have been a |
| 10 | Detective Marcum? |
| 11 | A.    No. |
| 12 | Q.    Do you know the name? |
| 13 | A.    It's Jim.  Or was his name John?  I don't recall his |
| 14 | name. |
| 15 | Q.    Jim Calhoun? |
| 16 | A.    No. |
| 17 | Q.    Did you give a written statement at that time? |
| 18 | A.    I did that at the branch. |
| 19 | Q.    Okay.  On the 24th? |
| 20 | A.    Yes. |
| 21 | Q.    And you have provided that to Hamilton city police? |
| 22 | A.    Yes. |
| 23 | Q.    And then a week later Officer Cifuentes came back to |
| 24 | you.  Was that at the branch? |
| 25 | A.    No.  He came to my home. |

PHILPOT - CROSS

1   Q.   Came to your home.  And he took a second statement; is
2   that correct?
3   A.   He had me sign that, my first statement.
4   Q.   Okay.  So you had given a statement.  He reduced it to
5   a typewritten form, and then he brought it to you about a
6   week later?
7   A.   Right.
8   Q.   Okay.  So the recollections reflected in the statement
9   that's dated April 30th are actually your reflections from
10  within an hour of the actual robbery?
11  A.   Right.
12  Q.   They just happened to be signed and dated at a later
13  time?
14  A.   Right.
15  Q.   Now, since that time, you have met with the U.S.
16  attorney, correct?
17  A.   Yes.
18  Q.   Ms. Cross.  You met with Terry Moran, FBI agent?
19  A.   Yes.
20  Q.   You met with Hamilton police, correct?
21  A.   Only to come and sign my statement, yes.
22  Q.   Now, at various times, they have shown you pictures;
23  is that correct?
24  A.   No.
25  Q.   They have never shown you any of the pictures that

| 1 | were taken on the surveillance cameras? |
| 2 | A.   No. |
| 3 | Q.   They have never shown you any other pictures of any |
| 4 | other possible suspects in this robbery? |
| 5 | A.   No. |
| 6 | Q.   Okay.  They have never even shown you pictures of the |
| 7 | two men seated to my left, your right? |
| 8 | A.   No. |
| 9 | Q.   Now, I heard right after this robbery on a news report |
| 10 | that that branch was being closed.  Is that correct? |
| 11 | A.   Yes. |
| 12 | Q.   And it was closed because it had had an abnormal |
| 13 | number of bank robberies there? |
| 14 | A.   I don't know if that was the reasoning or not. |
| 15 | Q.   Okay.  Did they have an abnormal number of bank |
| 16 | robberies there? |
| 17 | A.   Yes. |
| 18 | Q.   Were you present during these bank robberies? |
| 19 | A.   Just one. |
| 20 | Q.   Just this one or one other? |
| 21 | A.   Just this one. |
| 22 | Q.   Okay.  But there had been others? |
| 23 | A.   Yes. |
| 24 | Q.   Okay.  Now, of the three people who were working that |
| 25 | day, were any of you present during the earlier robberies |

PHILPOT - CROSS

```
1   that you're aware of?
2   A.   I am not sure.  Myself, I know I wasn't, but I'm not
3   sure about the others.
4   Q.   I take it you have now left the banking field?
5   A.   Yes.
6   Q.   And are happy to be beyond it?
7   A.   Yes.
8   Q.   And after this took place, did the bank provide you
9   with some counseling for the trauma this caused?
10  A.   Yes.
11  Q.   And did you go through a good deal of counseling?
12  A.   I went to counseling once, and then I went to my
13  medical doctor.
14  Q.   Okay.
15  A.   And he prescribed me a couple prescriptions.
16  Q.   And that's because you were having nervous problems as
17  a result of this?
18  A.   Yes.
19  Q.   As one might expect.  How are you doing today?
20  A.   Today, I'm nervous, very nervous.
21  Q.   That's understandable.  How have you been doing?
22  A.   Better.
23        MR. ANDREWS:  Glad to hear that.  Thank you very
24  much.
25        THE COURT:  Ms. Cross or Mr. Thapar, anything
```

 1   further of this witness?

 2               MR. THAPAR:  Just a few questions, Your Honor.

 3                      REDIRECT EXAMINATION

 4   BY MR. THAPAR:

 5   Q.   He asked you a lot -- both defense counsel asked you a

 6   lot of detailed questions about teeth and the like.  Were

 7   you under a lot of stress when the robbery was occurring?

 8   A.   Yes.

 9   Q.   I want to show you Government Exhibit 4.1.  This is a

10   picture already admitted into evidence.  Is this a picture

11   of the robbery?

12   A.   I can't see it.

13               (Stepping down from the witness stand.)

14               MR. ANDREWS:  Your Honor, I'm going to object,

15   and it's because this witness has already professed no

16   knowledge of the individuals, any descriptive knowledge,

17   and to now show her a picture that depicts this I think

18   goes beyond her own knowledge.  She's being asked to

19   identify something that she's already, through both direct

20   and extensive cross, indicated she has no descriptive

21   powers over.  So, now to show her a picture, it could be

22   any robbery for whatever we know.

23               MR. THAPAR:  I'm asking her.  I didn't -- Your

24   Honor, first they opened the door with all these questions

25   about gloves, teeth and everything else.  And I'm not

PHILPOT - REDIRECT

1   saying this is the robbery. I asked her a question about

2   this picture, which I'm entitled to do in response to their

3   cross.

4                  THE COURT: Overruled.

5                  You may answer. You remember the question?

6                  THE WITNESS: No. Could you repeat the question,

7   please?

8   BY MR. THAPAR:

9   Q.   Is this the robbery that occurred while you were

10  working there? Is this a picture depicting the robbery

11  that occurred while you were working there? You can wait

12  until after the horn.

13                 (Sirens sounding outside.)

14  A.   It does look familiar.

15  Q.   And can I ask you, in that picture, are those robbers

16  wearing gloves?

17                 MR. ANDREWS: Objection.

18                 THE COURT: Overruled. You may answer.

19  A.   It looks like they are.

20  Q.   Now, I have one final question. You said that --

21                 THE COURT: Mr. Thapar, is this in relation to

22  the diagram?

23                 MR. THAPAR: No, no.

24                 THE COURT: You can resume the stand.

25                 MR. THAPAR: I'm sorry, Your Honor.

1              (Witness resumes the stand.)

2    BY MR. THAPAR:

3    Q.   You said in your statement that the first robber who

4    came over the counter was a male black in his early 30s in

5    your statement.

6    A.   Yes.

7    Q.   Is it possible he was older?

8              MR. ANDREWS:   Objection.

9              THE COURT:   Is that from you, Mr. Pugh?

10             MR. ANDREWS:   That is on behalf of Mr. Pugh.

11   It's my objection.

12             THE COURT:   Overruled.  You may answer.

13   A.   Yes.

14             MR. THAPAR:   No further questions, Your Honor.

15             THE COURT:   Anything further of this witness,

16   Mr. Felson?

17             MR. FELSON:   Yes.

18                     RECROSS-EXAMINATION

19   BY MR. FELSON:

20   Q.   Why did you say he was 30?  What led you to believe

21   that he was early, I guess, 30 or early 30's?

22   A.   I was just guessing at his age.

23   Q.   Okay.  But when -- the police asked you to do the best

24   you could to try to narrow it down, didn't they?

25   A.   Right.

```
 1   Q.   So your first impression of seeing the robber, the guy
 2   that jumped over the counter, I just hope --
 3             MR. FELSON:  Can we just wait a second, Your
 4   Honor?
 5             THE COURT:  Sure.
 6             (Sirens sounding.)
 7             Ladies and gentlemen of the jury if you would
 8   like to stand up and stretch, that's fine.
 9             MR. FELSON:  This may go on for hours, so I guess
10   we will go ahead and ask the last couple of questions.
11   BY MR. FELSON:
12   Q.   Was there something that the guy that jumped over the
13   counter, was there something about his facial features that
14   looked young that made you say he was 30 or in his early
15   30's?
16   A.   No.  It just looked --
17             THE COURT:  You have to keep your voice up now.
18   A.   He just looked like he could be between 30 and 35
19   years old, but he didn't look like a teenager.
20   Q.   Did you get a look at the potential age or possible
21   age of the other bank robber?
22   A.   No.
23   Q.   And when you say between 30 and 35 years old, did you
24   talk to Jenny or Mr. Connaughton about, you know, compare
25   notes?
```

PHILPOT - FURTHER DIRECT

1   A.   No.

2   Q.   The other --

3              MR. FELSON:  Well, that's all I have.  Thank you.

4   That's all I have.  Thank you.

5              THE COURT:  Mr. Pugh or Mr. Andrews, anything

6   further?

7                      RECROSS-EXAMINATION

8   BY MR. ANDREWS:

9   Q.   The gentleman that came over the counter --

10  A.   Yes.

11  Q.   He certainly did not have gray hair?

12  A.   No.

13             MR. ANDREWS:  Thank you.

14             THE COURT:  Anything further, Mr. Thapar?

15             MR. THAPAR:  A couple more.

16                 FURTHER DIRECT EXAMINATION

17  BY MR. THAPAR:

18  Q.   Did you say in your statement that he had something on

19  his head, the gentleman that came over the counter?

20  A.   Yes.

21  Q.   What did he have on his head?

22  A.   I think like a little hose or a very thin cap.

23  Q.   So could you see the color of his hair?

24  A.   No.

25  Q.   So you don't know if it was gray, black or red, do

```
1   subpoenas.
2              THE COURT:  Okay.  All right.  I'll leave it to
3   you to work out.
4              MR. ANDREWS:  I'll work it out.  That's fine,
5   Your Honor.
6              THE COURT:  All right.
7              (Luncheon recess at 12:05 p.m.)
8                       AFTERNOON SESSION
9              (Jury not present.)
10             THE COURT:  Ms. Cross, I understand that you want
11  to play a videotape next.
12             MS. CROSS:  Yes, Your Honor.
13             THE COURT:  Do you have any equipment?
14             MS. CROSS:  No, we do not.  We don't have any
15  equipment here.
16             THE COURT:  Well, you have got a problem.
17             MS. CROSS:  Right.
18             THE COURT:  I mean, we have equipment, but we
19  need notice.  There is only one for all six of us judges,
20  and we have to get it from the clerk's office, and we have
21  to -- I assume that the U.S. Attorney's Office would take
22  care of this, as they usually do.  But if you want us to do
23  it, you have got to give us notice.
24             MS. CROSS:  Okay.  I apologize for that.  That
25  wasn't my understanding, but I do apologize for that, and
```

```
 1   we will play it at a later time.
 2              THE COURT:  Normally, the U.S. Attorney's Office
 3   brings their own equipment.  Do we have some around?
 4              (Off the record.)
 5              Were you going to do some background with the
 6   witness?  I mean, Steve can go find it, but I'm not going
 7   to hold up court for it.
 8              MS. CROSS:  I'm looking, Your Honor.  We may not
 9   have to play it with this witness.  So that will give us
10   time to get our equipment here.
11              THE COURT:  All right.
12              MS. CROSS:  We'll just play it at another time in
13   our case in chief.  We will have time to get our equipment
14   here to do that.
15              THE COURT:  Are you ready to go?
16              MS. CROSS:  Yes, we are.
17              (Jury present.)
18              THE COURT:  You may call your next witness.
19              MR. THAPAR:  Your Honor, we ask you at this time
20   to read in the FDIC stipulations.
21              THE COURT:  Is there an exhibit for that?
22              MR. THAPAR:  3-A and 3-B.
23              THE COURT:  Ladies and gentlemen, I'm going to
24   tell you something about what's called stipulated facts.
25   The government and the defendants have stipulated, that is
```

CALHOUN - DIRECT

1   they have agreed, that certain facts are as counsel have

2   set forth.  You should therefore treat these facts as

3   having been proved.

4          The first stipulation says the United States and

5   Defendant Walter Meade Pugh, Jr. agree and stipulate that

6   on April 24, 2002, the deposits of First National Bank of

7   Southwestern Ohio in Hamilton, Ohio, were insured by the

8   Federal Deposit Insurance Corporation.

9          The second stipulation is as follows:  The United

10  States and Defendant Tyreese -- I have to put my glasses

11  on -- Tyreese Dorran Pugh agree and stipulate that on April

12  24, 2002, the deposits of First National Bank of

13  Southwestern Ohio in Hamilton, Ohio were insured by the

14  Federal Deposit Insurance Corporation.

15         You may call your next witness.

16         MS. CROSS:  Thank you, Your Honor.  The United

17  States calls James Calhoun.

18         (Witness sworn by the courtroom deputy.)

19                    JAMES CALHOUN

20                  DIRECT EXAMINATION

21  BY MS. CROSS:

22  Q.   Good afternoon, sir.

23  A.   Good morning or afternoon.  I'm sorry.

24  Q.   Will you please state your name for the record and

25  spell your last name?

CALHOUN - DIRECT

| 1 | A.    Jim Calhoun, C-a-l-h-o-u-n. |
| 2 | Q.    Where and how are you employed? |
| 3 | A.    I'm a detective with the City of Hamilton, Ohio, |
| 4 | Police Department. |
| 5 | Q.    How long have you been employed as a detective with |
| 6 | the Hamilton, Ohio, Police Department? |
| 7 | A.    I've been a detective now for four years. |
| 8 | Q.    How long have you been working in law enforcement? |
| 9 | A.    For thirteen years. |
| 10 | Q.    Are you familiar with the investigation of a bank |
| 11 | robbery that occurred in Hamilton, Ohio, on April 24, 2002? |
| 12 | A.    Yes, ma'am. |
| 13 | Q.    At which bank location did this robbery occur? |
| 14 | A.    It was the First National -- First Southwestern Bank |
| 15 | of Ohio located at the corner of Peck and Williams |
| 16 | Boulevard in the City of Hamilton, Ohio. |
| 17 | Q.    How is it that you're familiar with that bank robbery? |
| 18 | A.    I was the lead investigator on the case. |
| 19 | Q.    Detective Calhoun, will you please tell the members of |
| 20 | the jury how this matter first came to your attention? |
| 21 | A.    I was sent to the bank in reference to a robbery which |
| 22 | had just occurred.  This was at about 2:20, 2:30 in the |
| 23 | afternoon on the 24th of April. |
| 24 | Q.    Upon receipt of that information, what, if anything, |
| 25 | did you do? |

CALHOUN - DIRECT

1    A.    I responded to the bank with our crime scene

2    investigation van.  When I responded, I checked the outside

3    areas of the bank, looked all around, took photographs of

4    the outside of the bank.  I then went inside with other

5    detectives, got a brief synopsis or story from one of the

6    bank personnel of what had happened.  And then myself and

7    Detective Nethers immediately went to the video room where

8    they keep the video cassette recorder and the tapes.  We

9    stopped the machine, popped the tape out, broke the little

10   tab on the back so that the tape cannot be altered, and

11   then put the tape back into the machine to view the robbery

12   that had just occurred.

13   Q.    Excuse me.  At the time that you arrived, was the bank

14   already secure?

15   A.    Yes.  The doors were secured.  There was only one

16   entrance/exit manned by one of our uniformed officers.

17   Q.    You said you went immediately to the bank surveillance

18   video room, and did you review the videotape?

19   A.    Yes, I did.

20   Q.    What did you see?

21   A.    I observed two male blacks in the bank, both -- one

22   with what appeared to be a long gun, the other with what

23   appeared to be a handgun.  There were just a few frames of

24   the tape that could actually be viewed with the equipment

25   we had there.  It was tough to slow it down enough to be

CALHOUN - DIRECT

1   able to view it real well, but we attempted to get a

2   description, clothing description, height as best we could,

3   build as best we could, to get that out to our patrol

4   units.

5   Q.   And the description of the bank robbers that was given

6   to the patrol units came from what?

7   A.   From observing the videotape.  We made a call to our

8   dispatch and gave that description to dispatch to be

9   broadcast to our patrol units.

10  Q.   What description was given?

11  A.   Two male blacks, one a taller slender build wearing

12  dark clothing with a long gun with what appeared to be a

13  mask and a ball cap, something over his face.  The other,

14  another male black, shorter, with some kind of light

15  colored and dark colored checkered or some kind of print

16  shirt on and darker colored pants.

17  Q.   What was done with the videotape after you reviewed

18  it?

19  A.   It was given to another one of our detectives to be

20  taken to our headquarters to have prints made off of that

21  videotape.

22  Q.   Was the original tape returned at some point to

23  Hamilton Police Department?

24  A.   Yes, it was.  It was returned to me when I returned

25  from the bank later that afternoon.

CALHOUN - DIRECT

1   Q.   Have you reviewed the original videotape since it was

2   returned to the Hamilton Police Department?

3   A.   Yes, I have.

4   Q.   And, to your knowledge, after you reviewed it the

5   second time when it was returned, was it altered in any

6   way?

7   A.   No, ma'am.  It was the same tape that I viewed at the

8   bank.

9   Q.   Was there a copy, to your knowledge, made, a copy of

10  the videotape made?

11  A.   There was a slowed-down copy made, yes.

12  Q.   Have you reviewed that copy as well?

13  A.   Yes, I have.

14  Q.   And did it accurately reflect or depict what was on

15  the original bank surveillance videotape?

16  A.   Yes, it does.

17  Q.   I'm going to show you what's been previously marked as

18  Government Exhibit 5.1 and 5.2.  I ask you to look at

19  those, please.  Do you recognize those exhibits?

20  A.   Yes, ma'am.  These are the exhibits that I presented

21  to you, the original tape and the copy tape that we marked.

22          MS. CROSS:  At this time, Your Honor, I would

23  move to admit Government Exhibits 5.1 and 5.2.

24          THE COURT:  Any objection?

25          MR. FELSON:  No.

1               DEFENDANT W. PUGH:  No.

2               THE COURT:  Okay.  Government Exhibits 5.1 and

3    5.2 will be admitted.

4    BY MS. CROSS:

5    Q.   After you viewed the bank surveillance videotape,

6    what, if anything, did you do next?

7    A.   I went to the teller station where it appeared that

8    the one male black had jumped over the counter.  In the

9    videotape, it appeared that they were wearing gloves, white

10   possibly latex gloves, and I just went to the counter to

11   look possibly for footprints or handprints, something that

12   we might be able to lift for physical evidence.

13   Q.   Did you find anything?

14   A.   I did find a shoe print on the black marble surface of

15   the counter.  We photographed that and attempted to lift

16   that.

17   Q.   I believe you said that you observed on the videotape

18   that the robbers wore some type of gloves?

19   A.   That is correct.  It appeared they had latex gloves.

20   They were, as I said, male blacks, dark skinned, and the

21   hands were very white, light colored.

22   Q.   Did you find any latex gloves at the scene, at the

23   bank?

24   A.   No, ma'am.

25   Q.   Did you find any latex gloves outside or near the

CALHOUN - DIRECT

1    exterior of the bank?

2    A.    No, ma'am.

3    Q.    How long were you at the bank?

4    A.    I believe it was close to two hours.  Like I said, we

5    got there about 20 after 2, 2:30, something like that.  I

6    believe the robbery actually occurred at 2:20.  We were

7    there close to two hours.

8    Q.    Did you attempt to lift any fingerprints from the

9    scene?

10   A.    No, we did not.

11   Q.    Why not?

12   A.    Because, as I had stated, in the video it appeared

13   they had gloves on, and at that point there wouldn't have

14   been any prints left to lift.

15   Q.    Did you attempt to speak with any of the victims that

16   were in the bank, the tellers or the bank manager?

17   A.    I personally just had very, very limited conversations

18   with them.  The other detectives interviewed them at the

19   scene.

20   Q.    What else did you do during the two hours that you

21   were there?

22   A.    We put -- I caused a radio broadcast to be put out and

23   also a teletype to all points in southwestern Ohio,

24   northern Kentucky, southeast Indiana in reference to the

25   bank robbery, giving then a description of the vehicle

1    which had been supplied to us, the maroon Olds Cutlass

2    Ciera, also a physical description as we could get them

3    from the videotape, and I caused those to be sent out to

4    police agencies all over the area.

5    Q.    Who gave you a description of the getaway vehicle?

6    A.    That came from the bank manager.

7    Q.    What is his name?

8    A.    Jim, I believe it's Connaughton.

9    Q.    And what description did he give you?

10   A.    A maroon, he said older, he believed it was an

11   Oldsmobile, the square-type four-door. He thought maybe

12   like a Cutlass, something in that class of vehicle.

13   Q.    I believe you said that, while you were at the bank,

14   you attempted to dust for prints because you found a

15   footprint?

16   A.    That is correct.

17   Q.    And the footprint was found where?

18   A.    On the actual teller station or counter where the one

19   male black had jumped over the counter.

20   Q.    Did you dust the floor for prints?

21   A.    No, I did not.

22   Q.    Why not?

23   A.    I didn't see any prints matching what we saw on the

24   counter on the floor itself.

25   Q.    What time did you leave the bank?

CALHOUN - DIRECT

1    A.    Shortly after 4 o'clock in the afternoon.

2    Q.    And what did you do when you left?

3    A.    Returned to our police department to regroup to think

4    of where we needed to go with the investigation from this

5    point.

6    Q.    What was the next thing that happened in your

7    investigation?

8    A.    Shortly before we left the bank, we received a

9    teletype, or a -- I believe it was a teletype from a police

10   department up around the Dayton airport stating that they

11   had --

12             MR. FELSON:  Objection.  Hearsay.

13             THE COURT:  Ms. Cross?

14             MS. CROSS:  Your Honor, he hasn't testified to

15   the contents of the teletype.  He just said he received

16   one.

17             THE COURT:  Overruled.  You may answer.

18   A.    Okay.  We received that teletype, which caused us to

19   start to maybe look towards that area for the suspect

20   vehicle.

21   Q.    What did you do next?

22   A.    At that point, we had no further leads, nothing to

23   follow up on.  So myself and the other detectives went home

24   for the evening.

25   Q.    Was that the end of your investigation that day?

CALHOUN - DIRECT

1   A.    That day, yes.  What I was personally involved in,
2   yes.
3   Q.    Did your investigation continue until the next day?
4   A.    The next morning, we picked back up again, yes.
5   Q.    What happened?
6   A.    When I returned to work, I don't know who had left
7   them, but there were some pictures on my desk of possible
8   suspects.  Based on those pictures and what one of our
9   street officer's information that he supplied to us, we
10  began concentrating our efforts looking for a certain
11  subject to question him in connection with the bank
12  robbery.
13  Q.    Where did that lead you?
14  A.    It led us to a woman by the name of Bessie Pew who
15  owned an older maroon Olds Cutlass Ciera four-door.
16  Q.    Did you make any attempts to contact Ms. Pew?
17  A.    We made an attempt to locate her vehicle from
18  addresses that we had listed in our computer system for
19  her.
20  Q.    And did you locate her vehicle?
21  A.    After a period of time where we conducted
22  surveillance, yes, we were able to locate her vehicle with
23  Ms. Bessie Pew driving her vehicle.
24  Q.    When was this?
25  A.    This was the morning of the 25th around 9 a.m.

CALHOUN - DIRECT

1    Q.    This is the morning after the robbery?

2    A.    That is correct.

3    Q.    What type of vehicle does Ms. Pew drive?

4    A.    It's a maroon Olds Cutlass Ciera.

5    Q.    Explain for the members of the jury whether or not you

6    came to speak with Ms. Pew and how that came about.

7    A.    We did come to speak with Ms. Pew.  It was later on,

8    probably -- I'm not positive of the time.  Myself and

9    Detective Cifuentes were conducting surveillance on an

10   apartment, and Ms. Pew's vehicle pulled up with her

11   driving.  She picked up two subjects at her apartment.  We

12   followed her to downtown Hamilton where she dropped off the

13   two subjects.  She then continued on to a nursing home

14   where it was later determined that she worked.

15          Detective Cifuentes and I at that time returned to

16   downtown Hamilton to find out who the people were that she

17   had dropped off thinking possibly one of them might have

18   been a suspect.  We went back to downtown Hamilton to the

19   building where she dropped them off and sat and waited

20   outside.  At that time, I was notified that Ms. Pew was

21   enroute to our headquarters and wanted to speak with us.

22   Q.    What, if anything, did you do upon receipt of that

23   information?

24   A.    I returned to our police headquarters where Ms. Pew

25   was waiting for me, and I went in and spoke with her.

CALHOUN - DIRECT

| | |
|---|---|
| 1 | Q. And what did you speak with Bessie Pew about? |
| 2 | A. I wanted to know who had had her vehicle, when this |
| 3 | person, whoever had access to her vehicle, when they had |
| 4 | it, dates, times, when did she get it back, those kinds of |
| 5 | questions. |
| 6 | Q. Did you show her any photographs during the time you |
| 7 | were speaking with her? |
| 8 | A. I did. I showed her the prints that were made from |
| 9 | the bank surveillance videotape. |
| 10 | Q. When you showed her the bank surveillance video |
| 11 | photographs, what did you observe of Ms. Pew when she |
| 12 | looked at the photos? |
| 13 | A. She began to cry. She became very distraught and |
| 14 | upset, and she also supplied a name to me. |
| 15 | MR. FELSON: Objection. What she said. |
| 16 | THE COURT: Overruled. |
| 17 | Q. What did she say? |
| 18 | MR. ANDREWS: Objection. |
| 19 | THE COURT: Ms. Cross? |
| 20 | MS. CROSS: Your Honor, this is an exception to |
| 21 | the hearsay rule. It's an excited utterance that Detective |
| 22 | Calhoun observed, which is an exception to the hearsay |
| 23 | rule. |
| 24 | MR. ANDREWS: If I may be heard in response. |
| 25 | THE COURT: Sure. I'm sorry. I didn't see you. |

1        MR. ANDREWS:  Your Honor, generally, when it's
2   excepted under the excited utterance, it's an event of such
3   a nature that a person cannot clear their head and react
4   and blurts something out.  This is not that kind of event.
5   A picture, seeing a picture of anyone, you know, is not.
6   And that's not what is described here.

7        Obviously, seeing someone shot and saying -- and
8   the classic case in Ohio I know is "The bum done killed
9   Paul with the broomstick," is uttered by a child too young
10  to testify in court, is allowed into court as exception to
11  hearsay, because the child had just seen his father beaten
12  to death.

13       We don't have that here.  We have a person who
14  looks at a picture, points out to some degree, you know,
15  something, but it does not rise to the level of an excited
16  utterance.

17       THE COURT:  Anything further?

18       MS. CROSS:  Your Honor, he testified that he
19  showed her a picture and she began to cry and then made a
20  statement, which is a startling event, because she began to
21  cry.

22       THE COURT:  I'm going to sustain the objection.
23  BY MS. CROSS:
24  Q.   After you observed Ms. Pew crying, what, if anything,
25  did you do?

CALHOUN - DIRECT

1  A.   I asked her for permission to search her vehicle.

2  Q.   And did you receive permission?

3  A.   Yes, I did.

4  Q.   And what did you do next?

5  A.   Went out to her vehicle in our parking lot.  I

6  photographed her vehicle, the exterior of the vehicle, and

7  then began searching, looking under seats, in the seats,

8  glove box, trunk, any area there might be items possibly

9  that were used in the bank robbery, taken from the bank, so

10  forth.

11  Q.   What, if anything, did you find during the course of

12  your search of Bessie Pew's vehicle?

13  A.   Underneath the driver's seat, there was a partially

14  torn latex glove.  Also in the trunk there were a pair of

15  tennis shoes that somewhat matched the footprint on the

16  countertop.

17  Q.   Did you take any photographs of her car at that time?

18  A.   Yes, I did.  Before the glove was removed, I took

19  photographs of the glove in place underneath the seat to

20  preserve it.

21  Q.   What, if anything, did you do with the latex glove?

22  A.   I removed it from underneath the seat, placed it in a

23  paper bag, placed one of our departmental property tags on

24  it and gave it to Officer Payne in our property room.

25         MS. CROSS:   At this time, Your Honor, I would

CALHOUN - DIRECT

1   like to show Detective Calhoun Government Exhibits 9.1, 9.2

2   and 13.

3               THE COURT:   Mr. Snyder, are those in front of

4   him, or do you have them?

5   BY MS. CROSS:

6   Q.   Detective Calhoun, turning your attention to

7   Government Exhibit 9.1 and 9.2, do you recognize those

8   exhibits?

9   A.   Yes, I do.

10  Q.   What do you recognize them to be?

11  A.   Those are photographs of Ms. Pew's car that I took the

12  morning of the 25th.

13  Q.   And then will you look at Government Exhibit Number

14  13?

15  A.   That is the part of the latex glove that I packaged on

16  the morning of the 15th.

17  Q.   Thank you.   After recovering the torn latex glove in

18  Bessie Pew's Oldsmobile car, what, if anything, did you do

19  next?

20  A.   I asked Ms. Pew to come back into the office and give

21  me a formal written statement.

22  Q.   Did she give you a statement?

23  A.   She did.

24  Q.   What happened next in your investigation?

25  A.   We began, based upon the names that were supplied to

1    us, I caused an arrest warrant to be issued, began

2    searching for a subject, checking any addresses that we

3    had, any known associates, any place that we thought we

4    might be able to find him.

5    Q.    You testified that you caused an arrest warrant.  How

6    many?  One?

7    A.    Just one, yes.

8    Q.    And who was the arrest warrant for?

9    A.    For Walter Meade Pugh.

10   Q.    What did you do next?

11   A.    As I said, we were looking for Mr. Pugh, could not

12   locate him in Hamilton anywhere that we knew of, and we put

13   the -- entered the warrant into the LEADS NCIC system so it

14   would be nationwide.  We had a car that was associated with

15   the name that we were looking for, a maroon Cadillac.  We

16   could not locate it either.  At that point in time, the

17   trail got cold for a little while until we received some

18   more information from the street that --

19             MR. FELSON:  Objection.  Information from the

20   street is hearsay.

21             THE COURT:  Well, he hasn't related what it is.

22   He just said he got some information so far.  Overruled.

23   A.    Based on that information, I caused or had some

24   communications with police agencies and FBI agencies in the

25   Columbus, Georgia, area, the Atlanta, Georgia, area, and

CALHOUN - DIRECT

1   the Troy, Alabama, area to concentrate our efforts possibly

2   down there.

3   Q.   And did your investigation reveal anything at that

4   point?

5   A.   Nothing at that point, no.

6   Q.   What did you do next?

7   A.   Sat and waited.  Our street officers had the

8   descriptions.  We were looking.  We had information out of

9   the only places we knew where Mr. Pugh could possibly be,

10  and we were just waiting for someone to come across him.

11  Q.   At any point in your investigation at this time, did

12  you conduct any surveillance?

13  A.   Not at that time, we didn't.

14  Q.   Okay.  Did you attempt to obtain any search warrants?

15  A.   Yes, we did.  The girlfriend of another possible

16  suspect had an apartment close to our police department.

17  Based on information we had received, I went to one of our

18  state judges and submitted a request for a search warrant

19  for her apartment.

20  Q.   What is her name?

21  A.   Her name was Stephanie Luster.

22  Q.   Okay.

23  A.   And the judge granted us a search warrant for

24  Ms. Luster's apartment.  And myself, Detective Cifuentes

25  and some other uniformed Hamilton officers conducted a

CALHOUN - DIRECT

1    search of her apartment.

2    Q.   What, if anything, did you find there in regards to

3    this investigation?

4    A.   Nothing with regards to the investigation.  We got a

5    picture of Ms. Luster.  We believed that it was possible

6    she was with Mr. Pugh.  So we also had a picture of her and

7    Walter Pugh that we could supply to other agencies.  There

8    were some letters back and forth between Ms. Luster and

9    another subject, and that was about it with regard to the

10   investigation.

11   Q.   You said you believed that Ms. Luster, Stephanie

12   Luster, was with Mr. Pugh.  Which Mr. Pugh?

13   A.   With Tyreese Pugh.

14   Q.   I believe you testified that you were looking for a

15   Cadillac in regards to this investigation?

16   A.   Yes.

17   Q.   Tell the members of the jury about that, why you were

18   looking for it and whether or not you found it.

19   A.   A maroon Cadillac was registered to Walter Meade Pugh.

20   We believed that he could possibly be in that vehicle based

21   on information supplied to us by Ms. Bessie Pew.  We later

22   located that vehicle -- I believe it was May 2nd -- in the

23   area of Beckett Street and Garden back in the city of

24   Hamilton, Ohio.

25   Q.   You located it on the 2nd, the 2nd of what?

CALHOUN - DIRECT

1   A.   2nd of May of 2002.

2   Q.   Okay.  You located that vehicle?

3   A.   That is correct.

4   Q.   And what, if anything, did you do when you located it?

5   A.   We had plainclothes detectives in plain cars sit back

6   and watch the vehicle while Detective Cifuentes and I

7   followed up on some other information that had come to our

8   office in reference to this case.  They sat back and

9   watched the vehicle for an hour or so, maybe a little bit

10  longer, and at that point a determination was made that we

11  were going to impound the vehicle and get a search warrant

12  to search the vehicle.

13  Q.   Did you obtain a search warrant to search that

14  vehicle?

15  A.   Yes, I did.

16  Q.   And, pursuant to the search warrant that you obtained,

17  did you search it?

18  A.   Yes, I did.

19  Q.   What, if anything, did you find in the Cadillac

20  vehicle?

21  A.   A black bag containing some ammunition for a 12-gauge

22  shotgun, ammunition for a .22, and some larger caliber

23  ammunition for a long gun.  I'm not sure of the exact

24  caliber of that ammunition at this point in time.  We got a

25  box from Black & Mild cigars, also a parking permit that

CALHOUN - DIRECT

1   you hang from the rear view mirror for the Travelodge in
2   downtown Atlanta.
3       MS. CROSS:  Your Honor, at this time I would like
4   to show Detective Calhoun Government Exhibits 18, 19 and
5   20.
6   Q.   Detective Calhoun, have you had an opportunity to
7   review Government Exhibits 18, 19 and 20?
8   A.   Yes, ma'am.
9   Q.   Do you recognize Government Exhibit Number 18?
10  A.   Number 18 is, with the property tag that I filled out,
11  is the black bag that was found on the front seat of Walter
12  Pugh's Cadillac when I did the search warrant.
13  Q.   If you don't mind, do you have something you could
14  open it so that you can make sure that's what you recognize
15  the exhibit to be?
16          THE COURT:  You want some scissors?
17          THE WITNESS:  Sure.
18          (Opening sealed bag.)
19          THE COURT:  Sorry.  They're government scissors.
20          THE WITNESS:  That's all right.  They're just to
21  cut through the bag.
22  A.   Okay.  Exhibit 18 in the bag is a black bag containing
23  12-gauge shotgun shells, .22 caliber ammunition, and larger
24  .222 Remington ammunition.  Appears that's what the larger
25  caliber is .222 Remington.

CALHOUN - DIRECT

1    Q.    Yes, sir.  Thank you very much.  Will you turn your

2    attention to Government Exhibit Number 19?

3    A.    Number 19?

4    Q.    Yes.

5    A.    Yes.  Okay.  Number 19 is with the property tag I

6    filled out, one empty box of the Black & Mild cigars and

7    one tip.

8    Q.    Will you please open it to make sure that that's the

9    exhibit you recognize it to be?

10        (Opening sealed bag.)

11   A.    The empty box of Black & Mild cigars and the actual

12   tip of one of the cigars.

13        DEFENDANT W. PUGH:  Objection.

14        THE COURT:  What's the basis?

15        DEFENDANT W. PUGH:  According to the search

16   warrant, Your Honor, it states that he found in my car a

17   box of Black & Mild.  There is no tip in the search

18   warrant.

19        THE COURT:  Okay.  You can bring that up in

20   cross-examination.  You will get a chance to question him

21   about that at that time, Mr. Pugh.

22        Overruled.

23        DEFENDANT W. PUGH:  With exceptions.

24        THE COURT:  I understand.  Your objection is

25   noted for the record.

CALHOUN - DIRECT

1    BY MS. CROSS:

2    Q.   Detective Calhoun, will you turn your attention to

3    Government Exhibit Number 20?  Do you recognize that

4    exhibit or the property tag?

5    A.   The property tag states miscellaneous papers, glove

6    box, front passenger area of Walter Pugh's Cadillac.

7    Q.   Will you please open it to determine whether or not

8    that exhibit contains items taken out of the car?

9         (Witness opening sealed bag.)

10   A.   There is the Travelodge from downtown Atlanta parking

11   permit, April 25th and 26th.  There is --

12   Q.   2002?

13   A.   It does not have a year.  Just says April 25th and

14   26th.  It also has a -- doesn't have a tag number.  It just

15   says "Cadillac" and "wine," and the name on the name bar is

16   "Lovett."

17   Q.   But you do recognize that item as Government Exhibit

18   Number 20, which was taken from the defendant's Cadillac,

19   Walter Pugh?

20   A.   Yes, ma'am.

21   Q.   Okay.  Thank you.  What did you do with all these

22   Exhibits 18, 19 and 20?

23   A.   They were packaged as you see them here, and I wrote

24   property tags out for them, placed them in our police

25   property evidence lockers.

CALHOUN - DIRECT

1   Q.   When did the search of Walter Pugh's car take place?

2   A.   On May 2nd, 2002.

3   Q.   After that was done on May 2nd, 2002, what happened

4   next in your investigation?

5   A.   I was called back to work that evening by one of our

6   street officers who had an informant that was to meet with

7   Mr. Pugh, both Mr. Pughs, and that informant wanted to take

8   us to them.

9   Q.   Did you personally meet with the informant?

10  A.   I did.

11  Q.   Who was that person?

12  A.   Shanell Holston.

13  Q.   And who did you learn -- who do you know Shanell

14  Holston to be?

15  A.   Shanell Holston was the live-in girlfriend, common law

16  wife I guess, I guess that's what you would call her, of

17  Walter Meade Pugh.

18  Q.   And when did you meet with her?

19  A.   It was about 8:30, 9 o'clock on May the 2nd of 2002.

20  Q.   What happened when you met with her?

21  A.   Myself and Detective Cifuentes spoke with her.  Based

22  on the information she supplied to us, we determined the

23  location where Mr. Pughs, both Mr. Pughs, were to be in

24  Hamilton County.  We began driving to Hamilton County using

25  cell phones to make arrangements with the Hamilton County

| 1 | Sheriff's Department, with their SWAT team, with their road |
| 2 | patrol, with anyone that we thought might possibly be |
| 3 | needed to help us in the apprehension of both Mr. Pughs. |
| 4 | Q. Did you go to the location where you believe Tyreese |
| 5 | and Walter Pugh are? |
| 6 | A. No. We went to the Hamilton County Sheriff's |
| 7 | Department on Hamilton Avenue. |
| 8 | Q. What did do you there? |
| 9 | A. Again spoke with the on-duty sergeant, with his street |
| 10 | deputies, with the detectives that he had there trying to |
| 11 | formulate the plan of how we were going to find them and to |
| 12 | take them into custody. |
| 13 | Q. To your knowledge, was a recording made on that |
| 14 | evening? |
| 15 | A. Yes. |
| 16 | Q. Were you present when the recording was made? |
| 17 | A. I was not present when the recording was made, no. |
| 18 | Q. Was the recording given to you? |
| 19 | A. Yes. |
| 20 | Q. To your knowledge, do you know who the recording was |
| 21 | made of? |
| 22 | A. I have listened to the tape and talked with people. |
| 23 | The recording is a conversation -- |
| 24 | MR. ANDREWS: Objection. There is no indication |
| 25 | that he knows either voice on the tape, number one. Number |

1    two, "I have talked to people" leads you into clear

2    hearsay.

3                MS. CROSS:  Your Honor, I will rephrase the

4    question.

5                THE COURT:  All right.

6    BY MS. CROSS:

7    Q.   Do you have any knowledge as to whose voices are on

8    the recording?

9                MR. ANDREWS:  Objection.  It's only re-asking

10   what she affirmatively can't ask by her original question,

11   having now telegraphed how she wants the answer to be

12   prepared.

13               THE COURT:  I'll sustain it, but I think you can

14   rephrase it and ask that in another way.

15   BY MS. CROSS:

16   Q.   When were you given the recording?

17   A.   Before I left the Hamilton County Sheriff's

18   Department.

19   Q.   Okay.  And at this point I'm going to ask to show you

20   Government Exhibit Number 22.  (Opening a sealed bag.)   Do

21   you recognize that exhibit?

22   A.   Yes, I do.

23   Q.   What do you recognize it to be?

24   A.   That is the cassette tape that was handed to me by --

25   I believe it was Deputy Koo at the Hamilton County

CALHOUN - DIRECT

1   Sheriff's Department.

2   Q.   On what date?

3   A.   On May -- actually, May the 3rd now, because we passed

4   midnight.  It was May 3rd of 2002.

5   Q.   And what did you do with that tape when you received

6   it on May 3rd?

7   A.   I brought it back to our headquarters along with

8   several other items of property.

9   Q.   I believe you testified that you met with Shanell

10  Holston, correct?

11  A.   Yes, I did.

12  Q.   Did you speak with her?

13  A.   Yes, I did.

14  Q.   Do you know what her voice sounds like?

15  A.   Yes, I do.

16  Q.   Have you listened to Government Exhibit Number 22?

17  A.   I did.

18  Q.   Do you recognize her voice on that recording?

19  A.   Yes, I do.

20  Q.   Have you spoken with the defendant Walter Pugh?

21  A.   Yes, I have.

22  Q.   Do you know what his voice sounds like?

23  A.   Yes, I do.

24  Q.   Based on your listening to Government Exhibit Number

25  22, do you recognize his voice on the exhibit?

CALHOUN - DIRECT

1    A.    Yes, I do.

2    Q.    After that recording was made and given to you, what,

3    if anything, did you do next?

4    A.    In reference to the tape or --

5    Q.    What did you do next in your investigation?

6    A.    The tape was actually given to me at the end of that

7    evening when we were kind of wrapping things up to come

8    back to Hamilton with both Mr. Pughs and everything we had

9    gathered.    At that point, we returned to our headquarters

10   and tagged all the evidence or tagged everything that had

11   been given to us, placed it in our property room.

12   Q.    Okay.    At the Hamilton County Sheriff's Office, what

13   did you do there?

14   A.    While the sheriff's department were getting their

15   people in place, Detective Cifuentes and I went with one of

16   their detectives to a house on Wincanton Road.    I'm not

17   sure of the exact house.    I believe it was 11979 Wincanton

18   Drive.

19   Q.    What area is that located?

20   A.    I believe it's Mt. Healthy.    It's northern Hamilton

21   County.

22   Q.    And what did you do at that address?

23   A.    Detective Cifuentes, myself, and one of the Hamilton

24   County detectives sat and observed the house.

25   Q.    How long?

CALHOUN - DIRECT

1    A.    I believe it was close to two hours.  We observed

2    Ms. Holston come to the house, and we observed a male

3    subject come out of the house, meet her.  Items were

4    carried back into the house, and then she drove away, and

5    we stayed and watched the house a little bit longer.

6    Q.    Did you recognize that male that came out of the

7    house?

8    A.    It was too dark from our vantage point to be able to

9    recognize who came out of the house.

10   Q.    What time are we talking about that that all occurred?

11   A.    Close to midnight or a little before or a little

12   after, but right around midnight.

13   Q.    Anywhere from around midnight to 2 a.m.?

14   A.    Correct.  We -- yes, that would be correct, yes.

15   Q.    What, if anything else, did you observe after you

16   observed Ms. Holston going to the house and this male come

17   out of the house?

18   A.    They went back in with some items from the trunk of

19   her car which Ms. Holston had previously showed to us.  She

20   came back out, and she left in her vehicle, and we sat and

21   watched for a little while longer.  Then another male

22   subject came out, got into a car and drove off.

23   Q.    Was that the end of your investigation for the

24   evening?

25   A.    No, ma'am.  We followed that car and broadcasted to

| 1 | the sheriff's department to stop it, because we did not |
| 2 | know who was in the car. The car was stopped, and it was a |
| 3 | subject that none of us were familiar with. The Hamilton |
| 4 | County deputies transported him back to their sheriff's |
| 5 | department to debrief him, and Detective Cifuentes and I |
| 6 | returned to watch the house until the Hamilton County SWAT |
| 7 | team actually had the house surrounded. At that point in |
| 8 | time, Detective Cifuentes and I were asked to pull out and |
| 9 | go back to the meeting location which was the LoBill |
| 10 | Supermarket there on the corner of Kemper and -- Kemper and |
| 11 | Hamilton Avenue. And we met there with the deputies, the |
| 12 | commanders in charge of the SWAT team and so forth to |
| 13 | formulate the plans as far as what was going to happen. |
| 14 | Q.   How long were you at the LoBill Supermarket lot? |
| 15 | A.   Maybe another hour or so. |
| 16 | Q.   Tell the members of the jury what you did during that |
| 17 | time. |
| 18 | A.   We supplied pictures to the Hamilton County Sheriff's |
| 19 | Department, copies of the arrest warrant for Mr. Pugh, and |
| 20 | we supplied them with all the information that we had on |
| 21 | our case at that time that we thought might be pertinent to |
| 22 | them, the fact that Mr. Pugh possibly used a handgun in the |
| 23 | bank robbery. While we were doing that, they all packed up |
| 24 | in vehicles very quickly and took off. When they came |
| 25 | back, they had Mr. Pugh seated in the rear of one of their |

1    cruisers.  There were two other subjects in other cars, and

2    they had a little silver car, silver, real light blue,

3    light colored car with them.

4    Q.    Upon seeing Mr. Pugh in this vehicle, what, if

5    anything else, did you observe?

6    A.    The vehicle that the Hamilton County Sheriff's

7    Department brought to us was determined to belong to a

8    female subject that was there at the location.  I spoke

9    with her briefly and obtained a consent to search.  She

10   allowed me to search her vehicle.  The area that was

11   indicated where Mr. Pugh was, I recovered a hand-held

12   police scanner.

13          MS. CROSS:  Your Honor, that's all the questions

14   I have for Detective Calhoun, but at this time we're

15   prepared to play the videotape.  We have one of our AUSAs

16   here ready.  It should take just a couple of seconds to get

17   it prepared.

18          THE COURT:  That would be fine, Ms. Cross.  Has

19   the videotape been admitted?

20          MS. CROSS:  Yes, it has.

21          MR. BEHLEN:  Your Honor, if I might have the help

22   of Mr. Snyder.

23          THE COURT:  Certainly, Mr. Behlen.

24          (Setting up video equipment.)

25          MS. CROSS:  We would like to play 5.2, which

CALHOUN - DIRECT

```
 1   is -- I believe is the slower version.
 2              (Exhibit 5.2, a videotape, was played for the
 3   Court and jury.)
 4              THE COURT:  Do you want the lights out?  Can you
 5   restart it and turn all the lights out?
 6              MS. CROSS:  Thank you.
 7              THE COURT:  I apologize.  My Venetian blinds are
 8   coming next week.
 9              (The videotape was replayed.)
10              MS. CROSS:  That's it.  Thank you.
11              Thank you, Your Honor.  No further questions of
12   Detective Calhoun.
13              THE COURT:  Mr. Felson, do you wish to
14   cross-examine this witness?
15              MR. FELSON:  Yes, Your Honor.
16              THE COURT:  You may proceed.
17              MR. FELSON:  And could we have a very short
18   conference?
19              THE COURT:  Sure.
20              Ladies and gentlemen, if you want to get up and
21   stretch, this is a good chance to do that.
22              MR. FELSON:  I'm ready whenever --
23              THE COURT:  All right.  You may proceed,
24   Mr. Felson.
25              MR. FELSON:  Okay.
```

CALHOUN - CROSS

1     CROSS-EXAMINATION

2     BY MR. FELSON:

3     Q.   Officer, were you the first officer on the scene?

4     A.   No, sir, I was not.

5     Q.   How many officers were present?  How many officers

6     were present on the scene of the bank, of the bank robbery?

7     A.   I'm thinking about that, sir.  Hang on just a second.

8     Including myself, there were two, possibly three, uniformed

9     officers, myself and three other detectives, and our

10    lieutenant, and also an FBI agent.

11    Q.   About eight, eight approximately, more or less?

12    A.   Yes, sir.

13    Q.   Okay.  You mentioned a CSI van.  Can you please tell

14    me what that is?

15    A.   I mentioned a crime scene --

16    Q.   You said the CSI van pulled up.

17    A.   No, sir.  I said our crime scene investigations van.

18    Q.   All right.  Maybe I wrote that down as CSI.  What is

19    that van?  Just describe that for the jury.

20    A.   It's just a van full of all of the tools of our trade.

21    Q.   Such as?

22    A.   Fingerprint kits, evidence tagging materials, lights,

23    rubber gloves, I mean whatever we might need to process a

24    crime scene.

25    Q.   By the way, Bessie Pew, she owned the car with the

1    rubber glove found in it?

2    A.    Correct.

3    Q.    Do you know what she does for a living?

4    A.    She, I believe, works in a nursing home.

5    Q.    They use rubber gloves, don't they?

6    A.    I would assume.  I don't know, sir.

7    Q.    Okay.  So you have access to laboratories for your

8    investigation, don't you?

9    A.    I can -- what do you mean "access to," sir?

10    Q.    If you find -- let's say you find an item at a crime

11    scene and you think it might have belonged to the

12    perpetrator.  You can have that item tested for various

13    things, right?

14    A.    Yes.  There are --

15    Q.    Prints?

16    A.    Yes.  We can send items to the lab to be put through

17    certain tests.

18    Q.    DNA?

19    A.    Yes.

20    Q.    Test saliva maybe on a cigar if you find a cigarette

21    or cigar butt?

22    A.    Theoretically, yes.

23    Q.    Hair follicles?

24    A.    Yes.

25    Q.    Skin, pieces of skin that might fall off somebody?

CALHOUN - CROSS

1   A.    I don't know what all is needed.  I would assume that

2   you can test those for DNA, yes.

3   Q.    There is a set of gloves that -- I guess you're saying

4   partial glove or something.  Are you insinuating that was a

5   glove that was used in this robbery?

6   A.    I don't know, sir.  All I stated was I found a

7   partially torn piece of a latex glove in a car.

8   Q.    Fair enough.  Did you take the glove and take it to a

9   lab for analysis?

10  A.    No, I did not.

11  Q.    Okay.  Could you have done that?

12  A.    I assume we could have, yes.

13  Q.    And have you ever taken something to the lab for

14  analysis?

15  A.    Yes.

16  Q.    What is the procedure?  What do you have to do?

17  A.    To submit an item to -- there are --

18  Q.    Let me clarify.  Let's say I want to take that glove

19  and have it tested inside to see if there are any hair

20  follicles or any substance from the body of the suspect or

21  a suspect.  Even if you have an identified suspect, you

22  want to take that to the lab and find out if that person

23  touched that item, what do you do?

24  A.    Fill out a form, drive it to Columbus, Ohio, submit it

25  to the lab and let them take a look at it.

CALHOUN - CROSS

1    Q.   You have done that before?

2    A.   Yes.

3    Q.   You got the forms in your car?

4    A.   No, sir.

5    Q.   At the police station?

6    A.   At the police department, yes.

7    Q.   All right.   Now, you say you have to drive it all the

8    way up to Columbus?

9    A.   Yes, sir.

10   Q.   Can't you overnight it or something like that?

11   A.   No, sir.

12   Q.   But, needless to say, you didn't do that in this case?

13   A.   That is correct.

14   Q.   Was it somebody else's job to do that?

15   A.   No, sir.

16   Q.   I mean, you found a glove you think was used in the

17   robbery.   Makes perfect sense to test the glove, doesn't

18   it?

19   A.   I did not find a complete glove, sir.

20   Q.   Well, you found a partial glove though.

21   A.   I found a piece of a glove, yes.

22   Q.   But wait a minute.   The lab guys, they don't look at

23   the whole thing; they look at it under a microscope; isn't

24   that right?

25   A.   I don't know how they perform their examination, sir.

CALHOUN - CROSS

1    Q.    Now, I watch all those shows on TV.  One of them is

2    called -- I think it's forensic week this week.  Did you

3    know that this week is actually forensic week on Court TV?

4    Do you know what forensics are?

5    A.    Yes, sir.

6    Q.    What is that?

7    A.    Study of criminals, how they go about studying

8    criminal crime scenes, evidence and so forth, I guess.

9    Q.    Right.  And there are procedures that you're supposed

10   to do, right?

11   A.    Yes, sir.

12   Q.    Blocking off the crime seen, making sure it doesn't

13   get contaminated, things like that?

14   A.    Yes.

15   Q.    Wrapping everything up that you see that might belong

16   to the perpetrator and put it in a bag where it can't get

17   any further contamination, right?

18   A.    Correct.

19   Q.    Submitting it to a lab, and then they look at it under

20   a microscope, and then they compare hair follicles and skin

21   pieces or blood or whatever?

22   A.    Correct.

23   Q.    And sometimes they have a known.  If you have a known

24   suspect, they can compare the known with the unknown and

25   hopefully come up with a match, and then you've got your

CALHOUN - CROSS

1   perpetrator; isn't that right?

2   A.   Correct.

3   Q.   You have seen the shows?

4   A.   Some of them, yes, sir.

5   Q.   Okay.  And you are familiar, I guess, that a whole

6   bunch of people, now that we have DNA, which was not

7   available -- how long have you been a police officer?

8   A.   Thirteen years.

9   Q.   When you started, I bet DNA wasn't even available, was

10  it?  You couldn't take an item like that glove and take it

11  to the lab to look for DNA?

12  A.   I don't know, sir.  That was not in my responsibility

13  zone.

14  Q.   Okay.  That's fairly recent, the DNA testing; isn't

15  that correct?

16  A.   I believe so, yes.

17  Q.   You had the ability to test the glove, right?

18  A.   Yes, sir.

19  Q.   Is it your policy not to test evidence?

20  A.   No, sir.

21  Q.   Is it your policy to test evidence?

22  A.   If we believe it will be helpful, yes.

23  Q.   Okay.  You didn't believe it would be helpful?

24  A.   We didn't know, sir.

25  Q.   You weren't sure?

CALHOUN - CROSS

| | |
|---|---|
| 1 | A.   Correct. |
| 2 | Q.   So if you weren't sure -- this glove could have pinned |
| 3 | whoever was in that car and whoever left that glove there |
| 4 | to this terrible robbery where these young girls were |
| 5 | tormented, et cetera, right?  This glove could have |
| 6 | connected a person to that robbery, right? |
| 7 | A.   If that was the glove that was used, yes, sir. |
| 8 | Q.   But you were submitting the glove as evidence here |
| 9 | today in front of this jury, right? |
| 10 | A.   I'm not submitting anything, sir.  I'm -- |
| 11 | Q.   When you say this glove -- |
| 12 | THE COURT:  Let the witness finish his answer. |
| 13 | MR. FELSON:  I apologize, Judge. |
| 14 | THE COURT:  Mr. Felson, stop talking. |
| 15 | You want to finish your answer, Mr. Calhoun? |
| 16 | THE WITNESS:  Yes.  Could I, please? |
| 17 | A.   Sir, I'm only identifying evidence that is being |
| 18 | submitted by the prosecution, telling where I found it. |
| 19 | I'm not testifying as to what I believe it was used for.  I |
| 20 | can't say that it was for sure used in this robbery.  I |
| 21 | can't say that it wasn't.  All I'm testifying to is that I |
| 22 | found it in the car. |
| 23 | Q.   Let's just assume for a second that it might have been |
| 24 | used in the robbery, right?  Well, let me back up.  Let |
| 25 | me -- let's go to the moment when you saw the glove in the |

1   car.  Okay?  You actually obtained a search warrant to look

2   for evidence in this car; isn't that correct?

3   A.   No, sir, that is incorrect.

4   Q.   How did you get -- oh, you had permission to search

5   this car?

6   A.   That is correct.

7   Q.   So you had -- this is -- this was found in Bessie

8   Pew's car; is that right?

9   A.   Yes, sir.

10   Q.   This is an Oldsmobile Cutlass maroon, right?

11   A.   An Oldsmobile Cutlass Ciera, maroon in color, yes,

12   sir.

13   Q.   This is the vehicle that you believe you were

14   investigating was the getaway vehicle in this robbery;

15   isn't that right?

16   A.   Yes, sir.

17   Q.   I mean, that's why you looked for permission to search

18   it, and that's why you took your time and other people's

19   time to search this vehicle, right?

20   A.   Yes, sir.

21   Q.   You're looking for evidence from this robbery, right?

22   A.   Yes, sir.

23   Q.   And the evidence from the car that you thought might

24   have been used in the robbery, right?

25   A.   That is correct.

CALHOUN - CROSS

1   Q.    Then you come across this glove, and you knew from --

2   you had seen the video before, and you knew that the

3   perpetrators wore gloves, right?

4   A.    That is correct.

5   Q.    That's why you grabbed ahold of this glove and are now

6   presenting it as evidence, because that's the same type of

7   glove that might have been used in the robbery, right?

8   A.    That is correct.

9   Q.    Okay.  And even though maybe it's Bessie Pew's glove,

10  maybe it's not used in the robbery, maybe she got it from

11  work and it just happened to be there, right?  That's

12  possible, too?

13  A.    That is correct.

14  Q.    But the point I'm making is couldn't the lab determine

15  whether this was the glove used in the robbery or by

16  somebody other than Bessie?  Let's say not the robbery, but

17  let's say somebody other than Bessie.

18  A.    I don't know what the lab could determine in this

19  case, sir.

20  Q.    Because you didn't ask?

21  A.    That is correct.

22  Q.    And that's against policy, isn't it?

23  A.    No, sir.

24  Q.    What else did you find in Bessie's car?

25  A.    I stated before, a pair of tennis shoes.

CALHOUN - CROSS

1   Q.   Okay.   Now we have a pair of tennis shoes, and you
2   have a footprint in the bank, right?
3   A.   Correct.
4   Q.   Footprint is known to be the bank robber's print,
5   right?   It's up on the counter?
6   A.   Correct.
7   Q.   So you have got it, and you have got it where?   How do
8   you keep it?   Do you have that in a photograph, or do you
9   actually put tape or something and try to lift it off of
10  the counter?
11  A.   It's photographed.   It's also on a piece of -- I don't
12  know what it's called -- clear plastic.   I don't know what
13  exactly it's called, but it's transparent backing.
14  Q.   Okay.   But you have done this before.   You have been a
15  detective for four years, right?
16  A.   Yes, sir.
17  Q.   Police officer for 13 years, right?
18  A.   Yes, sir.
19  Q.   Now, did you submit the shoes?   I'm assuming, because
20  you mentioned shoes and gym shoes, that you thought, at
21  least at one time, that these gym shoes might have made
22  that print.
23  A.   The thought crossed my mind, yes, sir.
24  Q.   And you even testified that it was similar to the type
25  of shoe that might make that print, didn't you?

CALHOUN - CROSS

1    A.    That is correct.

2    Q.    So you're trying -- I guess you're -- are you trying

3    to convince the jury that this shoe made that print?

4    A.    No, sir.

5    Q.    But, in fact, the lab has the ability to determine

6    whether or not a particular shoe made a particular print;

7    isn't that right?

8    A.    Yes, sir.

9    Q.    Because shoes, when we walk in shoes, we all have feet

10   that are slightly different, and we wear -- the bottom of

11   the shoe wears slightly different, right?

12   A.    Correct.

13   Q.    And it would be pretty unique.  It would be pretty

14   difficult, put it that way, for one shoe or two different

15   shoes to make the exact same print; wouldn't that be pretty

16   unusual?

17   A.    I would assume.  I don't know for sure.

18   Q.    All right.  Now, did you take these shoes and send

19   them to the lab and try to find out if it matched the print

20   on the counter?

21   A.    No, sir.

22   Q.    Now, forgive me, but that seems to me to be the

23   appropriate thing to do to determine if the shoes in the

24   car were the same shoe that made -- one of the shoes in the

25   car was the same shoe that made the print, wasn't it?

CALHOUN - CROSS

1   A.   No, sir.  In this case, there was an easier way.

2   Q.   What was that?

3   A.   I held them up and looked at them.

4   Q.   You're not an expert, are you?

5   A.   In this case, sir, it was very easy to determine.

6   Q.   Okay.  Let's see.  Where are the shoes now?

7   A.   The shoes are -- I don't know if they're in the police

8   property room.  They should be there still.

9   Q.   Well, can you get the shoes for us?

10  A.   Yes.  It would take a day to get them, sir.

11  Q.   Maybe we'll do that.  But the point is you have to

12  look at this.  There are experts that do this kind of work;

13  isn't that true?

14  A.   Yes, it is.

15  Q.   The reason why people look at it under the microscope

16  and why the experts have training is because it's difficult

17  to tell with the naked eye.

18  A.   Not in this case, sir.

19  Q.   So you're saying these are the shoes that were used?

20  A.   No, sir.  I never said these were the shoes that were

21  used.

22  Q.   Okay.  Forgive me.  I'm getting confused.  Were the

23  shoes that you found in Bessie's car the same shoes that

24  made the prints on the counter?

25  A.   No, sir.

CALHOUN - CROSS

1  Q.    Okay.  Did you ever find the shoes that made the print

2  on the counter?

3  A.    No, sir.

4  Q.    Now, let's move on.  And you have no evidence that the

5  latex gloves were the same gloves in the photo we saw

6  today?

7  A.    No, sir.

8  Q.    Now, let's talk about the vehicle.  You searched

9  Bessie Pew's vehicle, correct?

10  A.    Yes, sir.

11  Q.    Did you find any property of Tyreese Pugh, this young

12  gentleman sitting to my right, any property that belonged

13  to him?

14  A.    I don't know, sir.

15  Q.    Did you find any property that has any of his hair

16  follicles or DNA or any fiber from any of his clothes on

17  it?

18  A.    No, sir.

19  Q.    This was allegedly the getaway vehicle, right?

20  A.    Yes, sir.

21  Q.    In that getaway vehicle, I imagine there was, at some

22  point, there might have been some money all over that

23  vehicle, because they took the money from the bank and left

24  with it, right?

25  A.    That is correct.

CALHOUN - CROSS

1    Q.    So if this was the getaway vehicle, you might find

2    money, but of course you didn't, right, didn't find any

3    money?

4    A.    No, sir.

5    Q.    But you might have found something that might have

6    been in the bank; in other words, some sort of hair

7    follicles or fibers that might be in something that was

8    unique in the bank that somehow got transferred to the

9    inside of this vehicle?  It's certainly possible?

10   A.    I suppose anything is possible, sir.

11   Q.    That's what forensics is about, right, to find out if

12   somebody was or a person or some thing was in one place and

13   that same person or thing is in another place where it

14   shouldn't be; that's one of the things that forensics does,

15   right?

16   A.    I would assume, yes.

17   Q.    So at least let's agree on one thing, that maybe you

18   might have had the ability to determine if that money had

19   been in that car or if some microscopic fibers might have

20   been, something from the bank might have been in that car,

21   which was not where it was supposed to be, right?

22   A.    I don't know if it should have been there or not, sir.

23   I don't know if she banked there.  I don't know --

24   Q.    Well, in all that stuff that you picked up out of that

25   car, did you make any effort to send any of it to the lab?

CALHOUN - CROSS

1   A.    There were only two items recovered, sir.

2   Q.    I know.  But there were other things in the car.

3   There were only two items that you recovered?

4   A.    Correct.

5   Q.    Did you take anything from that car to the lab for

6   analysis?

7   A.    No, sir.

8   Q.    All right.  Now let's talk about the second car.  You

9   got a search warrant to search the second car; is that

10  right?

11  A.    Correct.

12  Q.    So, all right.  Now, you found some items in the

13  second car, and I think you said some Black & Milds?

14  A.    No, an empty box of Black & Milds.

15  Q.    Cigars, right, some sort of cigars?

16  A.    Correct.

17  Q.    Black & Mild.  Now that's -- why do you think that's

18  relevant?  In other words, did you see one of the robbers

19  wearing that or somebody having one in this mouth; is that

20  why that's relevant?

21  A.    That is.  If you look at the still pictures and also

22  the video, Mr. Pugh, when he went over the counter --

23  Q.    Which one?

24  A.    Mr. Walter Pugh.

25  Q.    You're saying Walter Pugh?  You're assuming --

CALHOUN - CROSS

1   A.    You said --

2   Q.    You are accusing Mr. Walter Pugh of going over the

3   counter, and at the same time he had that cigarette in his

4   mouth; is that what you're saying?

5   A.    Yes, sir.

6   Q.    That's not a cigarette but a Black & Mild?

7   A.    Actually, the white tip itself, sir.

8   Q.    Now, you're stating that that white tip was actually

9   in Walter Pugh's mouth.  Is that what you're saying, that

10  was him?

11  A.    Yes, sir.

12  Q.    Now, did you locate some of those white tips?

13  A.    Yes, sir.

14  Q.    Were they used, smoked?

15  A.    Yes, sir.

16  Q.    Did you take them to the lab?

17  A.    No, sir.

18  Q.    You believe the lab could find out whether or not

19  Walter Pugh or Tyreese Pugh, or anybody for that matter,

20  had chewed on the end of that plastic cigar?

21  A.    Yes, sir.

22  Q.    They could have determined that?

23  A.    Um-hum.

24  Q.    Which you chose not to send?

25  A.    For a reason.

CALHOUN - CROSS

1  Q.   There is a reason why you chose not to send them?

2  A.   Yes, sir.

3  Q.   Okay.  I guess I'm going to have to hear it.

4  A.   We already knew that Mr. Pugh and Mr. Tyreese Pugh and

5  also Stephanie Luster smoked those Black & Mild cigars, and

6  it was recovered from the Cadillac, which all three of

7  them, according to Ms. Luster, had been in.

8  Q.   Well, let me ask you this.  First of all, you never

9  saw anybody in the Cadillac, right?

10 A.   No, sir.

11 Q.   So you you're going by rumor and inuendo, right?

12 A.   I'm going by another person's statement, yes.

13 Q.   And you prefer to go by that type of evidence rather

14 than scientific evidence from your own lab?

15 A.   Sir, I don't know what the fact that a Black & Mild

16 tip with either Mr. Pugh's DNA on them found in Mr. Pugh's

17 car where it should be would prove at that point in time to

18 me.

19 Q.   Well, it might help you eliminate or make it more

20 likely than not, more likely that one of them smoked those

21 type of cigars and somebody in those pictures smoked those

22 cigars, too.  You took the cigars out of the -- you pulled

23 the cigars out of the car for a reason, because you were

24 insinuating to the jury that whoever was driving in this

25 car, that these are the cigars that were in that picture