WITTICH - DIRECT

1    break.  Is Mr. Wittich a quick witness?

2              MS. CROSS:  Yes.

3              THE COURT:  Because I would like to get him done.

4              I'm sorry.  Let's take another five-minute break.

5              (Recess.)

6                            AFTER RECESS

7              THE COURT:  You may proceed, Ms. Cross.

8    BY MS. CROSS:

9    Q.   I believe you stated, Deputy Wittich, that the arrest

10   occurred at approximately 2 a.m. on May 3rd.

11   A.   It's approximately around that time is when we got --

12   we got called out, and that was the approximate time that I

13   arrived up there, around there.

14   Q.   Will you describe what your involvement that early

15   morning was?

16   A.   Do you want me to take you through step by step as

17   soon as I got there?

18   Q.   Yes.  As soon as you arrived on the scene, where did

19   you go?

20   A.   I believe it's called LoBill's Kemper.  Kemper and

21   Hamilton Avenue is where our staging area was.  I was

22   probably only there 15 minutes, and there was about six or

23   seven others that got there pretty fast.  I responded

24   pretty fast.  About 20 minutes, about 15 or 20 minutes

25   later, my lieutenant was briefing me about why we were

1   there and what the situation was.  They said they had the

2   house, 11979 Wincanton Drive, supposedly there were two

3   subjects there who robbed a bank up in Hamilton and were

4   staying at that house, and they were surveilling.  There

5   was guys on surveillance around the house.

6        Like I said, about 15 to 20 minutes after I arrived,

7   there was a radio -- on our radios, there was a call saying

8   that there were three individuals getting into the car, and

9   they mentioned Walter's name, Walter Pugh.  They didn't say

10  Pugh.  They just said Walter was one of the three getting

11  in the car.  It was a Neon.  I believe the car was a Neon.

12  And they were heading out.  They were leaving.

13       So my lieutenant told us, he grabbed three or four of

14  us and said get in his Navigator, his SUV.  We got in, and,

15  as they were coming out of Wincanton, they were coming down

16  towards Kemper, we went up Kemper.  And they got to the

17  little -- there is a stop sign right there.  As you're on

18  Wincanton and you're turning onto Kemper, there is a stop

19  sign.  They had just pulled up to the stop sign, and we

20  went right in front of them at the same time.  And, before

21  the vehicle even stopped, we jumped out of the car.  All of

22  us jumped out of the car doors and surrounded the Neon at

23  the stop sign.

24  Q.   Did you assist in effecting the arrest of Walter Pugh

25  at that time?

1   A.   Yes, I did.

2   Q.   And did you speak with Walter Pugh?

3   A.   I personally wasn't talking to Walter.  I believe it

4   was my lieutenant and my sergeant was there.  And before we

5   even did that, before we even get Walter, we were making a

6   plan to go and get into the house.  We were forming an

7   entry team, and I was one of the five or six on the entry

8   team that was going in to where the gun was supposed to be.

9   There was supposed to be a gun involved, and I was one of

10  the ones on the entry team to go in for that.

11       And so my sergeant, who was the head of our team, was

12  talking to Walter, was interviewing him.

13  Q.   Were you present?

14  A.   I was standing right there, and he wanted the whole

15  team there so we could know what was going on, be informed

16  about it.

17  Q.   In your presence, what did Walter say?

18  A.   Walter said that his son Tyreese --

19              MR. FELSON:  Objection.

20              THE COURT:  Yes.

21              MR. FELSON:  I object to the hearsay.  He wasn't

22  conducting the interview.  I'm not sure if that's an

23  exception or not, but let me just mark the record to

24  object.

25              THE COURT:  Do you want to respond, Ms. Cross, at

1   all?

2           MS. CROSS:  It's a statement of the defendant,

3   and it's Walter Pugh and not Tyreese Pugh.  Mr. Felson

4   objected.

5           MR. ANDREWS:  Your Honor, I objected as well, but

6   you probably couldn't hear it back here in the corner.

7           THE COURT:  Oh, I'm sorry.  I didn't hear it,

8   Mr. Andrews.

9           Your objections are noted for the record.

10  They're overruled.

11          You may continue.

12  A.   Walter was telling us that there was a gun.  He kept

13  saying, "I don't want my son to get hurt."  That was his

14  big thing.  He was telling us that there was a gun in the

15  house, and he did have a gun.  He said Tyreese was a very,

16  very hard sleeper, and, if we could sneek in the house, he

17  was telling us that the doors were unlocked.  He gave us

18  directions into the house.  You go in the door, up the

19  steps.  They're right in front of you.  You go up the

20  steps, take a right, and you'll walk straight back into a

21  door, which that's where Tyreese and his girlfriend were,

22  and they were asleep.

23          And the whole time he was saying I don't -- he told us

24  or he was telling us, I overheard it, he was saying that

25  Tyreese does have a gun and he would use it if he knew we

1   were coming and he would not go peacefully.

2   Q.   With that information, after hearing that information

3   from Walter Pugh, what, if anything, did you do or the team

4   do?

5   A.   We did exactly as Walter told us.  He was very helpful

6   in that regard.  We went in the door, unlocked the front

7   door, or didn't unlock it.  It was unlocked.  We opened the

8   front door.  We were totally black.  We had no lights on or

9   nothing.  Walked up steps, took a right-hand turn, walked

10  straight to the back door where there was a bedroom, just

11  like he said, opened the back door.  We had flashlights on

12  our MP5 machine guns that are already in the gun, and we

13  had flashlights also.

14       I was the hands-on guy.  So there was a shield, a

15  bulletproof shield in front of me.  Then I was the

16  hands-on, which meant I had nothing but my side holster .40

17  caliber, and I was to make the arrest and handcuff Tyreese.

18  And there was another guy behind me, and then they had the

19  machine guns.

20       So, anyway, the lights -- as soon as we opened the

21  door, it was dark.  The TV was on.  We shined the lights.

22  Everybody put the lights on them.  The girl that was

23  sleeping next to Walter, his girlfriend, she woke up.

24  Q.   Next to Walter?

25  A.   I'm sorry.  I apologize.  Next to Tyreese.  I

1   apologize.

2        The girl laying there, she woke up.  We yelled,

3   "Sheriff's Department.  We got a search warrant.  You know,

4   wake up."  He did not wake up.  We said it two to three

5   times, and Tyreese still was laying flat on his stomach as

6   if he were sleeping.

7        My sergeant told me to get him off the bed.  I took my

8   left hand, put it on his shirt, pulled him off the bed, and

9   he landed flat.  He, like, he was stiff as a board almost.

10  I pulled him straight off, and he landed face first onto

11  the floor.

12       I holstered my gun, took his right arm, put it in the

13  handcuffs, went around to get his left arm.  And the whole

14  time he was laying down, his hands were underneath him like

15  this, like laying on his chest.  I reached around to get

16  his left arm, and I felt a gun.  I felt the barrel of what

17  I thought was a gun.  So I yelled "gun," pushed him over.

18  They finished handcuffing him, and there was a shotgun on

19  the floor that he was laying on.  I racked the chamber

20  back, got the round out of the chamber and cleared the gun

21  and then handed it off so they could safety the gun and get

22  all the other ammunition out of it.

23  Q.   I'm going to show you what has previously been marked

24  as Government Exhibit Number 10.  Do you recognize

25  Government Exhibit Number 10 as it is before you?

WITTICH - DIRECT

1   A.   Excuse me?

2   Q.   Do you recognize that exhibit?

3   A.   Yes, I do.

4   Q.   What do you recognize it to be?

5   A.   This is the gun that I took from Tyreese while he was

6   on the ground.

7   Q.   That you pulled him off of?

8   A.   Yes, I did.  Yes, it is the same gun.

9   Q.   Thank you.  The person that you arrested that night as

10  Tyreese Pugh, do you see him in this courtroom today?

11  A.   Yes, I do.

12  Q.   And would you identify where he is by where he's

13  sitting and what he has on?

14  A.   He's sitting at the defense counsel table.  He has a

15  tan suit on, black shirt.

16          MS. CROSS:   Your Honor, may the record reflect

17  that he's identified the defendant Tyreese Pugh?

18          THE COURT:   The record will so reflect.

19          MS. CROSS:   Thank you.

20  BY MS. CROSS:

21  Q.   Deputy Wittich, what, if anything, did you do after

22  you pulled Tyreese Pugh off of this Exhibit Number 10?

23  A.   What happened to him, I'm not sure, because I handed

24  him off.  They cuffed him and took him out, put the other

25  cuff on and took him out.  The gun was handed off also, and

WITTICH - CROSS

| | |
|---|---|
| 1 | it was taken downstairs, outside. And then, after that, we |
| 2 | did a secondary search, meaning we checked for anybody else |
| 3 | that was hiding in the house and also any contraband, since |
| 4 | we did have a consent to search the home. |
| 5 | Q.   The person that you spoke with that you knew as Walter |
| 6 | Pugh, you see him in the courtroom today? |
| 7 | A.   Yes, ma'am, I do. |
| 8 | Q.   Will you please identify him by where he's sitting and |
| 9 | what he's wearing? |
| 10 | A.   He's sitting to my left, your right of Tyreese, |
| 11 | wearing an orangish-brown vest and pants and a black |
| 12 | long-sleeve shirt with glasses. |
| 13 | MS. CROSS:   Thank you. |
| 14 | Your Honor, may the record reflect he's |
| 15 | identified the defendant Walter Pugh? |
| 16 | THE COURT:   The record will so reflect. |
| 17 | MS. CROSS:   Your Honor, that's all the questions |
| 18 | I have for Deputy Wittich.   Thank you. |
| 19 | THE COURT:   Thank you, Ms. Cross. |
| 20 | Mr. Felson, do you have any cross-examination of |
| 21 | this witness? |
| 22 | MR. FELSON:   Yes, I do.   Thank you. |
| 23 | CROSS-EXAMINATION |
| 24 | BY MR. FELSON: |
| 25 | Q.   All right.   Officer, how many police officers were in |

WITTICH - CROSS

1   the room where the arrest took place?

2   A.   On our search team?

3   Q.   Yes.

4   A.   Approximately five or six.

5   Q.   Okay.  And when you pulled Tyreese off the bed, he was

6   lying on his stomach, you said, right?

7   A.   Yes, he was.

8   Q.   How did you pull him off, one hand on his back, or was

9   he wearing a shirt?

10  A.   Yes.

11  Q.   What kind of shirt?

12  A.   I can't recall.

13  Q.   Pajamas or something?

14  A.   No.  Just like a jersey almost, I think.

15  Q.   And you lifted him off with one hand there, and where

16  was the other hand?

17  A.   No, I didn't lift him off nothing.  I had my .40

18  caliber pistol in my right hand.  I grabbed the middle of

19  his jersey, the back of his shirt with my left, and just

20  pulled him off the bed.

21  Q.   Pulled him off to the left or right or pulled him off

22  towards you?

23  A.   Towards me, which is -- the bed was, as you walk into

24  the room, the door was straight ahead.  You make a

25  right-hand turn when you get into the door, and the bed is

1   off to the right there a little bit.

2   Q.   Okay.  So you pulled him towards you?

3   A.   Towards me, and he fell onto the floor.

4   Q.   Okay.  And where was the girl?

5   A.   She was next to him.

6   Q.   Okay.  On his right or his left?

7   A.   As he was laying down?

8   Q.   Yes, as he was laying down.

9   A.   As he was laying down, it would be to his left.

10  Q.   Okay.  And he was on his stomach?

11  A.   Yes.

12  Q.   Okay.  And then when he hit the ground, then, well, of

13  course he hit the ground, I guess?

14  A.   Right.

15  Q.   Was carpet on the ground, or was there a wood floor?

16  A.   You know, I don't really recall that.  The only thing

17  I recall when he hit the ground was a sound other than just

18  a body hitting the floor, like almost a metallic sound

19  hitting the ground, but I, like I said, I didn't see.

20  That's what I heard.

21  Q.   So you are implying that he was sleeping in the bed on

22  his stomach with the gun, I guess, almost -- was the barrel

23  pointed upward toward his face?

24  A.   I'm not implying that.  I'm not sure.  But if you're

25  asking me what my theory is --

| 1  | Q.    No.    I'm just asking what you saw and heard. |
|----|------------------------------------------------------|
| 2  | A.    What I saw was him sleeping on his stomach.  I pulled |
| 3  | him off the bed.  He hit the ground.  And, when I cuffed |
| 4  | him is when I noticed the gun, is when I felt the gun. |
| 5  | Now, as far as that gun being on the ground before I |
| 6  | walked up to the bed, I don't know, because, logically, I |
| 7  | would think that I would see that gun, and I would have |
| 8  | stepped on that gun, because that's where I stepped and |
| 9  | pulled him is where he landed. |
| 10 | Q.    It was dark in there? |
| 11 | A.    Well, it was before we lit it up with flashlights and |
| 12 | guns. |
| 13 | Q.    But when you lit it up with flashlights, you're |
| 14 | pointing at him.  I mean, you're -- I assume you're |
| 15 | pointing at him. |
| 16 | A.    Correct.  But we have a shield.  The light on the |
| 17 | front of the shield is a mounted light on the bullet-proof |
| 18 | shield, and it lights up the room. |
| 19 | Q.    Now, the shield was in front of you, right? |
| 20 | A.    Yes. |
| 21 | Q.    Does the shield have a window in it? |
| 22 | A.    Yes, it does. |
| 23 | Q.    And that's where you looked out? |
| 24 | A.    No.    The guy carrying the shield, one guy carries the |
| 25 | shield.  Okay? |

| 1  | Q.    Was what you? |
|----|---------------------|

1   Q.    Was what you?

2   A.    No, no, no.  I'm behind the shield, and I'm the

3   hands-on guy.  When I was told to pull him off the bed, I

4   had to step out from around the shield, grab him and pull

5   him in.  So I was not protected by the shield at all at

6   that time.

7   Q.    All right.  So you stepped out from behind the shield.

8   Did you step out to the left or right?

9   A.    To the right.

10  Q.    Okay.  Here's the shield.  You step out to the right?

11  A.    Correct.

12  Q.    Then did you come back around?  Were you right in

13  front of him at that time, or were you right -- in other

14  words, he was lying on the bed.  Were you with the same, I

15  guess, the same plane as him at that time, or did you have

16  to then come in front of the shield?

17  A.    Can I get up and show you?  You want me to get up and

18  show you?

19          MR. FELSON:  Sure, if that's okay with the Court.

20          THE COURT:  Yes.

21  A.    I was coming in the room.  I guess the bed would be

22  over here right where the projector is a little bit.  Come

23  in the room, the shield was here.  We're behind the shield.

24  I step over to the right.  He says grab him.  I get him,

25  grab him with my left hand, pull him straight towards me.

1    The whole time I got my gun in my right hand.  And he hits

2    the ground, his head being here, face down there.

3    Q.    Okay.

4    A.    His body is laying this way.

5    Q.    Okay.  That's why I was confused.  So you pull him

6    sideways off the bed?

7    A.    Correct.  This is the side of the bed.  I pull him

8    off.  As soon as he hit the ground, I immediately holstered

9    my weapon, got on him.  Then I started handcuffing him.

10   Q.    So he could have fallen on the gun, or he could have

11   had the gun underneath him.  He could have hit the gun when

12   you pulled him, or it could have been underneath him; is

13   that right?

14   A.    Well --

15   Q.    One of those two?

16   A.    Yes.  If you ask me, I don't -- okay.

17   Q.    I'm just asking what you saw and heard.

18   A.    Yes.  That's correct.

19   Q.    All right.  Now, whose house was it?

20   A.    Cortes Renfro.

21   Q.    And how many other people were at the house, are you

22   aware?

23   A.    At what time of the night?

24   Q.    Well, when you came in.

25   A.    That was the only two people that I was aware of in

WITTICH - CROSS

1   the house when we walked in that house.

2   Q.   But you went directly to that room?

3   A.   That's right.  When we went in there, we went in there

4   with -- there was five or six with us.  There was probably

5   10 to 12 people that went in that house from the SWAT team.

6   We were the arresting directly for Tyreese.  That was our

7   only mission in there, to get Tyreese, because of the

8   weapon.  That was our main concern.  We went up the stairs,

9   to the right, and the other guys, they went their own way.

10  They had their own team leader telling them where to go in

11  the rest of the house.

12  Q.   I got it.  But as far as who owns the place, it's not

13  Tyreese, right?

14  A.   No, sir.

15  Q.   And whose room was that?  Did you look in the room to

16  see who may stay in that room?

17  A.   We looked in that whole house, sir.

18  Q.   Did you find any, like, envelopes or letters or bills

19  that people typically get at home?

20  A.   That wasn't my concern to find out whose house it was.

21  Q.   Do you know?

22  A.   I mean, we know whose house it was, well, according to

23  the guy who signed the consent to search form.  Is that

24  what you're trying to get at?

25  Q.   I'm just trying to understand who stays in that room

WITTICH - CROSS

1   when Tyreese wasn't in it.

2   A.    I don't know, sir.  I have no idea.

3   Q.    Tyreese doesn't live there, correct?  Tyreese doesn't

4   live there, agreed?

5   A.    I have no idea.

6   Q.    Are you aware that somebody else might live there at

7   that house?

8   A.    Cortes Renfro.

9   Q.    And maybe other people that Cortes Renfro either rents

10  to or relatives thereof?

11  A.    No.  I have no idea.

12  Q.    Was there any evidence that this was a room where

13  Tyreese regularly stays?

14  A.    Was there any evidence?

15  Q.    Yes, such as bills, his clothing in the closet, stuff

16  like that.

17  A.    No, sir.

18  Q.    Okay.  All right.  Were there other guns found in the

19  house?

20  A.    Not by myself and not that I know of.  There was

21  ammunition, I believe, that was found in that house, not to

22  fit that gun, not 12-gauge ammunition.

23  Q.    All right.  Were the other guns -- I mean, well, put

24  it this way.  Does Mr. Renfro own any guns; do you know

25  that?

WITTICH - CROSS

| | | |
|---|---|---|
| 1 | A. | Not that I know of, sir. |
| 2 | Q. | So he might. You just don't know? |
| 3 | A. | That's correct. |
| 4 | Q. | Did you check that out at all? |
| 5 | A. | That's not my job. |
| 6 | Q. | I'm not saying. I'm just asking if you did or not. |
| 7 | A. | No, sir. No. |
| 8 | Q. | Okay. And do you know whether any of your fellow |
| 9 | | officers investigated that fact as to who -- whether there |
| 10 | | were other guns there and who might own them? |
| 11 | A. | I don't know, sir. |
| 12 | Q. | Okay. So you pull him off the bed, and he lands on |
| 13 | | this weapon. And the weapon was -- |
| 14 | A. | I didn't say that. I didn't say that, sir. |
| 15 | Q. | But somehow he was on top of the weapon when you |
| 16 | | pulled his hands back and cuffed him and all that? |
| 17 | A. | Correct. |
| 18 | Q. | And this weapon was actually a loaded weapon? |
| 19 | A. | Yes, it was. One was in the chamber, and there was |
| 20 | | more ammunition in the tube prior. |
| 21 | Q. | All right. Was there a safety on the gun? |
| 22 | A. | There is a safety on the gun. If it was -- I didn't |
| 23 | | check to see if it was, the safety was on or off. My main |
| 24 | | concern was to get the round out of the chamber, to see if |
| 25 | | there was one in the chamber, to get it out before I could |

```
1    hand it off.
2    Q.   Do you have to flip the safety to get -- I mean, do
3    you have to undo it or engage the safety in order to get
4    the chamber out -- the round out of the chamber?
5    A.   Repeat that.
6    Q.   Is it required -- I assume you know something about
7    guns, being on the SWAT team.
8    A.   That is correct.
9    Q.   Does one have to engage the safety or disengage the
10   safety in order to get the round out of the chamber, in
11   order to take the bullets out?
12   A.   There's a slide release on a shotgun, a pump shotgun
13   like that, that has to be pushed or depressed, and then the
14   slide comes down.  That opens up the chamber.  That makes
15   the chamber come back, and it kicks anything that's loaded
16   in the chamber, it will kick it out.
17   Q.   Okay.
18   A.   And that is a safe weapon.  For my purpose, that's a
19   safe weapon.  Then I can hand it off.  And whoever takes
20   it, my main concern is anything in front of me.  If I hand
21   that weapon off, they can deal with it in the back where
22   there is no action really in the back.
23   Q.   Okay.  But did you have to engage or disengage the
24   safety to do that?
25   A.   Sir, I don't remember if I even touched the safety.
```

WITTICH - CROSS

1    Q.    So you don't remember whether it was on or off?

2    A.    No, I don't remember.

3    Q.    And it's not required to pull it on or off, or you

4    don't know whether it's required too pull it on or off in

5    order to do what you did with it?

6    A.    With our shotguns, it's not.  That's a different kind

7    of a shotgun.  With our shotguns that we use, it doesn't

8    matter.  It can be on or off; it doesn't matter.  That's

9    just the safety is for the trigger mechanism that you pull,

10   the trigger.  That's what that safety does.  It stops that

11   trigger from being pulled.

12   Q.    All right.  But -- okay.  So you pulled him off the

13   bed.  Was he sleeping, to the best of your ability to tell

14   if somebody is sleeping?  When you came in the room, he

15   didn't get up and turn around and look at you or anything?

16   A.    No, sir.

17   Q.    You were told he was a heavy sleeper?

18   A.    Yes, sir.

19   Q.    Okay.  So it's very possible that he was sound asleep

20   when you came in the room, up until the moment he hit the

21   floor?

22   A.    You're asking me a broad question.  If you're asking

23   me, I'm going to say no.

24   Q.    You think he wasn't sleeping?

25   A.    I don't believe -- I mean, I believe he was sleeping,

| | |
|---|---|
| 1 | but, when somebody pulls somebody on the floor and they hit |
| 2 | as hard as he hit and he was face first, I don't believe |
| 3 | there is any way somebody can sleep through that.  I even |
| 4 | got one cuff on him, handcuff, and, when we pulled the |
| 5 | other arm, I felt the gun.  And when they got him, he was |
| 6 | still -- I don't know if he was acting or actually |
| 7 | sleeping, but that's the hardest I have ever seen anybody |
| 8 | sleep if he was still sleeping when we got both hands |
| 9 | cuffed. |
| 10 | Q.   Well, is it possible he hit his head on the ground? |
| 11 | A.   It's possible, and most probably he did. |
| 12 | Q.   Well, he could have been stunned? |
| 13 | A.   Yes.  If you want to do that, that's fine. |
| 14 | Q.   I mean, the sound of a head hitting the ground -- what |
| 15 | was on the ground again?  I'm sorry.  Was it carpet?  No |
| 16 | carpet? |
| 17 | A.   I don't remember that. |
| 18 | Q.   All right.  Okay.  So then you pull him up.  Did he |
| 19 | say -- did you ask him if it was his gun? |
| 20 | A.   I didn't ask him anything, sir. |
| 21 | Q.   Just arrested him? |
| 22 | A.   Yeah.  That was my job. |
| 23 | Q.   All right. |
| 24 | A.   To arrest him.  To make the arrest and make sure there |
| 25 | was no weapons and get in and out of there alive. |

```
 1    Q.    Okay.  And that you did.  Right?

 2    A.    That is correct.

 3    Q.    Well, he never -- nobody pointed a gun at you?

 4    A.    No, sir.

 5    Q.    Okay.  Okay.  So you took him out of there.  Who took

 6    charge of the weapon at that time?

 7    A.    It was passed.  Sir, I have no idea.  It was passed

 8    off, and somebody had taken it and walked it downstairs and

 9    outside.

10    Q.    All right.  And did you happen to talk to the young

11    woman who was there?

12    A.    No, I did not.

13    Q.    Do you know if any officers talked to her?  Did you

14    see anybody interview her?

15    A.    No.  I have no knowledge of that, sir.

16    Q.    Did you see anybody interview Tyreese?

17    A.    I have no knowledge of that.  I wasn't there to see

18    anybody interview Tyreese.

19    Q.    All right.  And that's the time you just left, right?

20    A.    We did a secondary search of the house.  We were there

21    for maybe, maybe an hour looking around, looking for the

22    supposed money.

23    Q.    No money found?

24    A.    No, sir.

25    Q.    Okay.  How about other weapons?
```

| | |
|---|---|
| 1 | A.    No, sir.  No. |
| 2 | Q.    How about any of the clothing that may have been used |
| 3 | in the robbery, the checkered shirt, the hat, weren't you |
| 4 | looking for those, too? |
| 5 | A.    I personally never found -- I found nothing in that |
| 6 | house but some, like, .22 caliber rounds. |
| 7 | Q.    When you say "I found nothing," are you also speaking |
| 8 | for your team? |
| 9 | A.    No.  I'm speaking for myself.  When I say "I," I'm |
| 10 | speaking for myself. |
| 11 | Q.    All right.  Was your -- one of the instructions for |
| 12 | you and your team was to search the house; is that a fair |
| 13 | statement? |
| 14 | A.    That is correct. |
| 15 | Q.    And, in order to search the house now, you weren't |
| 16 | looking just for only weapons, but also for evidence; is |
| 17 | that right? |
| 18 | A.    That's called a secondary search. |
| 19 | Q.    Fair enough.  But did you conduct a secondary search? |
| 20 | A.    Yes. |
| 21 | Q.    And a primary search, which would be for the weapon |
| 22 | and the people? |
| 23 | A.    Tyreese, right. |
| 24 | Q.    So you effectively did everything you were trained to |
| 25 | do that night, or you were ordered to do that night; is |

1   that right?

2   A.    That is correct.

3   Q.    Did you find any evidence from the bank, in other

4   words, any money, any ties that might go around the money

5   that might have been pulled off the money from the bank?

6          MS. CROSS:  Objection, Your Honor.  Asked and

7   answered.  He already testified as to what he found.

8          THE COURT:  Sustained.

9   BY MR. FELSON:

10  Q.    Okay.  Did you have any discussions with your fellow

11  officers about what they may have found?

12  A.    No, I did not.

13  Q.    Now there -- okay.  Did you hear anybody yell out,

14  maybe that they had found something or they hit on

15  something or, you know, somebody making an excited

16  utterance saying that they came across some big piece of

17  evidence that was important?

18  A.    No, sir.

19  Q.    Do you know if any evidence was bagged or tagged or

20  anything like that, other than this weapon?

21  A.    Not as far as I know, no.

22  Q.    Now, you said earlier you were talking to Walter

23  earlier that evening, and did you make -- you arrested

24  Walter.  I think you were present?

25  A.    Correct.

WITTICH - CROSS

1    Q.    Did you actually make the arrest?

2    A.    I can explain the whole scenario if you would like me

3    to.   No.   I didn't place him in cuffs.  My cuffs weren't on

4    Walter.   Mine were on the driver.  I was to stop the

5    driver.   Somebody else got Walter, and somebody else got

6    Cortes.

7    Q.    And who was the driver?

8    A.    I believe her name was Kimberly Hinton.

9    Q.    Was she released right away?

10   A.    She had a warrant on her.  I believe she had a warrant

11   on her.   I could be mistaken, but I think she had a

12   warrant.

13   Q.    So she was taken into custody?

14   A.    Yes.

15   Q.    How about Mr. Renfro, was he there?

16   A.    I'm not too -- he was there.

17   Q.    Yes.

18   A.    He was there.

19   Q.    Not taken into custody?

20   A.    I have no idea.  I didn't deal with him.

21   Q.    All right.  Okay.

22   A.    That happened so fast, the car and getting them in and

23   out of that car, that happened within probably ten to 15

24   seconds that they were -- the car was stopped.  By the time

25   we got there, we jumped out of the car while it was moving,

1    got them out of the car, and had them shipped away

2    within -- I would say within 15 seconds we were done, and

3    by 30 seconds we were getting out of there.  I mean it was

4    fast.

5    Q.   Okay.  So you stop the car.  You stop the car by the

6    overhead lights, police officer --

7    A.   No.  We were undercover.  It's a Lincoln, a Lincoln

8    Navigator SUV.

9    Q.   So how did you pull this car over?

10   A.   We didn't pull them over.  We blocked them off.  They

11   were coming to the stop sign.  We were coming up Kemper.

12   They were coming down Wincanton.  They stopped, and we

13   pulled in front of them.  On Kemper, as we were just like

14   going straight, we stopped.  Before it even stopped, we

15   jumped out of the car.

16        And, matter of fact, when I got her out of the car,

17   out of the driver's seat, she had the car in reverse,

18   because, when I yanked her out of the car, the car started

19   backing up, and I had to get in the car and shove it in

20   park.

21   Q.   She was trying to get away, I guess.

22   A.   I'm not saying that, but it was -- the car was in

23   reverse.  And, when I pulled her out of the car, the car

24   was moving backwards.

25   Q.   Okay.  You pulled her out physically?

WITTICH - CROSS

1   A.   Yes.   I had to, because she wasn't complying with my

2   commands.   I almost had to break the window to get her out,

3   to open, but she opened the door.

4   Q.   Did you have the same problem with Mr. Renfro, or did

5   you notice?

6   A.   I'm not the one that had the hands-on with either one

7   of Mr. Renfro or Walter.

8   Q.   But you saw what was going on and you heard?

9   A.   No.   Sir, when I'm dealing with something like that

10  and she's got get car in reverse and she's not complying

11  with my commands, I'm worried about the people, my

12  teammates who are behind the car.   If she was going to back

13  up and, you know, run them over, that's my concern.   She's

14  my concern.   I'm focused on her.   I'm not focused on what

15  anybody else is doing.

16  Q.   I get it.   So somebody else was focused on Walter, and

17  somebody else was focused on Renfro?

18  A.   Correct.

19  Q.   Did you have your assignment before you got out of the

20  Navigator?

21  A.   I was assigned to go to the driver.

22  Q.   To the driver?

23  A.   Right.   It's pretty much, when you get out of the car,

24  you go and you pick a spot.   And I was out first.   I got

25  the driver.

```
 1   Q.   All right.  So you pull her out of the car.  The other
 2   gentlemen, I assume, were pulled out of the car at some
 3   point.  And then 15 seconds later they were off, arrested;
 4   is that what you're saying?
 5   A.   It was fast.
 6   Q.   Sir, I think you said 15 seconds and 30 seconds,
 7   right?
 8   A.   That's a fair estimate.
 9   Q.   And that was for the driver and the other two people,
10   or just the driver, this 30 seconds?
11   A.   What are you talking about?
12   Q.   Once you got everybody out of the car, you're saying
13   it was very quick.  Everybody was arrested and on their
14   way.  I thought you meant on their way to jail.
15   A.   No.  Away from the scene, trying to get away from the
16   scene.
17   Q.   But in police custody?
18   A.   Correct.
19   Q.   All right.  So in that 15 seconds --
20   A.   I'm talking that 15 seconds is when we stopped the car
21   and they were all out of the car and we had custody of
22   them.
23   Q.   Okay.
24   A.   And control.
25   Q.   And then they were taken away right away?
```

WITTICH - CROSS

1   A.   I don't know where -- I don't know where the other two

2   were taken.

3   Q.   You don't know where which other two?

4   A.   The driver.  Walter was the only one that I knew where

5   he was.

6   Q.   And where was he?

7   A.   He was in handcuffs, and he was telling us -- he was

8   getting ready to be escorted.  He was telling us exactly

9   where Tyreese was and how to get into the house.

10  Q.   Now, when did you stop concentrating on the driver?

11  When did you focus back on Walter?

12  A.   When I pulled the driver out of the car, I pulled her

13  out of the car, and the car started to go in reverse.  I

14  yelled, "The car's in reverse."  My buddy grabbed the

15  driver, and I had to jump in the car.  And at that specific

16  point is when I lost focus on the driver, because I was

17  worried about the car.  I had to put it in park.

18  Q.   Okay.  And that's -- and then subsequent to this,

19  there was this conversation that you overheard between

20  Walter and your fellow officer?

21  A.   That is correct.

22  Q.   That you relayed earlier?

23  A.   Yes.  They called us over there.  They called us over.

24  Q.   Who is "they"?

25  A.   My sergeant called us over to listen to what he was

WITTICH - CROSS

1    telling him about the house so we could all know the layout
2    of the house and where we were going.
3    Q.   Anything written out?
4    A.   No, sir.
5    Q.   Okay.  Okay.  So then you got a layout of the house,
6    and that's the directions you followed to go in the house
7    and find Tyreese, right?
8    A.   Yes, it is.
9              MS. CROSS:  Your Honor, I've tried to give
10   Mr. Felson some latitude, but he's asking the same thing
11   over and over.  I object.
12             THE COURT:  You about done, Mr. Felson?
13             MR. FELSON:  I'm almost done.  Actually,
14   mercifully, I am done.
15             THE COURT:  Thank you, Mr. Felson.
16             Mr. Pugh, do you have any questions?
17             DEFENDANT W. PUGH:  I'll let my attorney ask.
18                       CROSS-EXAMINATION
19   BY MR. ANDREWS:
20   Q.   In your short contact with my client, everything he
21   told you was true.
22   A.   Absolutely.
23   Q.   He was absolutely honest with you?
24   A.   Yes.  With us, he was.
25   Q.   And absolutely cooperative?

WITTICH - REDIRECT

1    A.    Yes, he was.

2              MR. ANDREWS:   Thank you.  I have no further

3    questions.

4              THE COURT:   Anything further, Ms. Cross, of this

5    witness?

6              MS. CROSS:   Just four questions, Your Honor.

7                        REDIRECT EXAMINATION

8    BY MS. CROSS:

9    Q.    Deputy Wittich, how far from the bed did Tyreese Pugh

10   land, approximately?

11   A.    From where he was sitting to the bed, maybe a couple

12   inches.  I didn't pull him.  I just pulled him enough to

13   get him off the bed.

14   Q.    And when you walked up to the bed to take him off of

15   the bed, did you step on a gun?

16   A.    No, ma'am, I did not.

17   Q.    Was Cortes Renfro in the house when you effected the

18   arrest of Tyreese Pugh?

19   A.    No, ma'am, he was not.

20   Q.    Was Cortes Renfro in that room?

21   A.    No, ma'am, he was not.

22             MS. CROSS:   Thank you.  No further questions.

23             THE COURT:   Thank you.

24             Anything further, Mr. Felson?

25             MR. FELSON:   No thank you.

1    THE COURT: Mr. Pugh, anything further?

2    DEFENDANT W. PUGH: No.

3    THE COURT: Mr. Wittich, the Court appreciates

4    very much your coming here, and you are excused.

5    Thank you, ladies and gentlemen. I apologize for

6    keeping you a half hour over the regular lunch hour, but

7    maybe the restaurants will be a little less busy.

8    I just want to remind you of the admonition as I

9    have previously given you. Please don't discuss this case

10   with anyone.

11   At this point in time, I'll ask that you be back

12   here so we can start promptly at two p.m.

13   (Jury excused from the courtroom.)

14   THE COURT: I just wanted to inquire about the

15   schedule for a minute. Are we off schedule at this point?

16   MS. CROSS: Actually, we are, Your Honor. I

17   thought that perhaps we could get three witnesses in this

18   morning and then three this afternoon, but what we have

19   left is five witnesses left.

20   THE COURT: Okay. All right. I don't know what

21   the status of your expert is.

22   MR. FELSON: He's loose, so he can come today or

23   tomorrow. I would like as much notice as I can give him.

24   THE COURT: I would say stay in contact with

25   Ms. Cross and Mr. Thapar.

```
 1              MR. FELSON:  We will.  One issue would be let's
 2   say we set aside two hours for the expert, my expert.  How
 3   late would we keep the jury?  If we started at three, would
 4   we keep the jury until five?
 5              THE COURT:  When?  Today?
 6              MR. FELSON:  Today.
 7              THE COURT:  I'll have Vicki ask.  When the jury
 8   comes back after lunch, I'll ask if anybody has a problem
 9   with staying later.  Because, you know, I'm glad to stay
10   later if the jury can do it.  I can't stay late tomorrow
11   evening, and I assume you can't either.
12              (Luncheon recess at 12:30 p.m.)
13                     AFTERNOON SESSION
14              THE COURT:  Ladies and gentlemen of the jury, I
15   want to explain to you what happened to Steve and why we're
16   so lucky to have Vicki Penley as our courtroom deputy this
17   afternoon.
18              Steve had a problem with his son at school, and
19   he had to leave.  Vicki Penley, who has been Judge
20   Spiegel's courtroom deputy, is here to fill in for Steve
21   this afternoon.  Vicki and I have known each other for 15
22   years, and it's good to have her in the courtroom.
23              You want to swear the witness?
24              (Witness sworn by the courtroom deputy.)
25              THE COURT:  Who is going to do the examination of
```

CIFUENTES - DIRECT

1    this witness?

2                    MR. THAPAR:  I am, Your Honor.

3                    THE COURT:  You play proceed, Mr. Thapar.

4                    MR. THAPAR:  Thank you, Your Honor.

5                         JAMES CIFUENTES

6                         DIRECT EXAMINATION

7    BY MR. THAPAR:

8    Q.   Detective, will you please introduce yourself to the

9    jury and spell your last name for the court reporter?

10   A.   My name is James Cifuentes.  Last name is spelled

11   C-i-f-u-e-n-t-e-s.

12   Q.   And, Detective Cifuentes, where do you work and what

13   is your position?

14   A.   I am a detective with the City of Hamilton, Ohio,

15   Police Department in Butler County.

16   Q.   Detective Cifuentes, I want to talk to you about

17   something very specific, and that is the evidence that was

18   gathered from Mr. Cortes Renfro's house in Mt. Healthy on

19   May 3rd of this year.

20   A.   Yes, sir.

21   Q.   Were you part of the search of that house?

22   A.   I was.

23   Q.   And I want to go through what was discovered at that

24   house and whether you had any hand in it.  Okay.  I want to

25   talk to you first about Exhibit 10.  Hopefully, all the

| 1 | exhibits are behind you. So Exhibit 10 is the shotgun. |
| 2 | A. Okay. |
| 3 | Q. Okay. Did that exhibit or that shotgun come out of |
| 4 | Mr. Renfro's house? |
| 5 | A. I did not see it come out of the house. It came out |
| 6 | of the yard when I approached the house. |
| 7 | Q. Okay. Can you explain what you mean by that? |
| 8 | A. Yes. This was a Hamilton County SWAT operation, not a |
| 9 | Hamilton police operation. We were kept at the staging |
| 10 | area until the house was secured by the Hamilton County |
| 11 | SWAT team. At that time, I was given the okay to approach |
| 12 | the house, and I did. I met Lieutenant Wilner -- Willen of |
| 13 | Hamilton County Sheriff's Office who had the shotgun in his |
| 14 | hand and handed it to me on the premises at the driveway. |
| 15 | Q. What did you do with the shotgun at that time? |
| 16 | A. It was explained to me the round was missing out of |
| 17 | the chamber. I verified there was another round in the |
| 18 | magazine. Did not inspect it at that time. I did not |
| 19 | unload it. I handed it to Detective Mark Hayes, asked him |
| 20 | to put it in my cruiser because I was going inside the |
| 21 | house. And it was placed in my cruiser, in the trunk. |
| 22 | Q. In the trunk. Okay. What did you do with it after |
| 23 | that? Did you ever touch it again? |
| 24 | A. Yes, I did. |
| 25 | Q. What did you do with it? |

CIFUENTES - DIRECT

| | |
|---|---|
| 1 | A.    Took it to police headquarters when we were finished |
| 2 | with Hamilton County.  I finished unloading it and took |
| 3 | photographs of it, placed a property tag on it, and placed |
| 4 | it into the property room at Hamilton police station. |
| 5 | Q.    I'm now going to ask you about Exhibit 11, which is a |
| 6 | pistol you will see behind you, I think in a white box. |
| 7 | And I want you to grab Exhibit 11-A as well, and please |
| 8 | tell the ladies and gentlemen of the jury what those are, |
| 9 | where they were found, and by whom they were found. |
| 10 | A.    This is a revolver.  It is a Spesco .22 caliber |
| 11 | six-shot revolver, and it has six live rounds to it which |
| 12 | were in the cylinder when it was recovered.  This was |
| 13 | inside the house on Wincanton where Renfro Cortes lives. |
| 14 | It was downstairs in a finished, like, family room in a |
| 15 | large brown, like, leather satchel.  This pistol and |
| 16 | another pistol were inside that satchel, as were some other |
| 17 | items, and I left the pistols as they were until I returned |
| 18 | to headquarters.  I photographed them.  I unloaded the |
| 19 | pistols, verified that those were live rounds, and put them |
| 20 | in the police property room. |
| 21 | Q.    And when you say pistols, will you please pick up |
| 22 | Exhibit 12 and 12-A as well and show that to the ladies and |
| 23 | gentlemen?  Is that the other pistol to which you refer? |
| 24 | A.    This is the other pistol to which I referred, and this |
| 25 | is an ARM1.F Tanfoglio six-shot revolver with five live |

CIFUENTES - DIRECT

1   rounds and one spent case.

2   Q.   You say you found them in the bottom level of the

3   house.  Is that the lowest level of the house?  Can you

4   explain that to the ladies and gentlemen of the jury?

5   A.   Yes.  It's a bi-level.  We make an entry into the

6   front door.  You're not on ground floor.  You either go

7   down or you go up.  I went downstairs into the basement

8   area.  Like I say, there was a finished room.  There was a

9   large brown satchel that was laying on top of the coffee

10  table, and inside that satchel were these handguns and

11  bullets.

12  Q.   I want you to now look at Exhibit 14, which is the

13  bag, the brown satchel.

14  A.   This is it.

15  Q.   Why don't you, just for the record, state what it is

16  and where you found it, or you stated where you found it.

17  Why don't you state what it is?

18  A.   It's a brown case, and it has 37 bullets inside of it,

19  an Air Touch phone and three photographs and these two

20  pistols that were loaded, like I said.

21          THE COURT:  Can you keep your voice up a little

22  bit?

23          THE WITNESS:  Yes, ma'am.

24  Q.   Detective, when you picked up that bag with those

25  pistols, was it in your custody at all times until it got

CIFUENTES - DIRECT

1   to the locker?

2   A.   Yes.   I took it to my car, placed it in the trunk.   I

3   took out several items, so I made a couple different trips.

4   And I placed them in my trunk, and I'm the only one that

5   has a key to my car.

6   Q.   Okay.   And then you drove it to Hamilton?

7   A.   Yes.   Unloaded it.

8   Q.   And placed it in the locker?

9   A.   Took it to my office so I could tag them and process

10  them and placed them in the evidence lockers, yes, sir.

11  Q.   Just very briefly, explain what you do when you place

12  them in the evidence locker for all of the exhibits we're

13  talking about.

14  A.   Actually, some of the items might have went actually

15  right into the hands of the property officer.   Depends on

16  what time of day that is.   I believe I made more than one

17  deposit.   I think the clothing was actually placed in the

18  hands of Jim Colwell, who was Officer Colwell.   That's the

19  property officer for Hamilton.   I believe the guns were

20  placed into a locker after I placed them in the box.

21  There's a secure area where there are lockers with one key.

22  You place the item in the locker.   You lock it up so nobody

23  can gain access.   And we have a drop safe.   You put the key

24  in there, turn it.   The only one with the combination are

25  the people in the property room.   They're the only ones

1    that can get the key out and open the lockers.

2    Q.   So, once you put it in there, you can't get the key

3    out?

4    A.   I can't get it.

5    Q.   Now, I want to talk to you about Exhibit 15, which is

6    ammunition.  You should see it there.

7    A.   Okay.

8    Q.   Who recovered that ammunition?

9    A.   This ammunition was in the shotgun in front of

10   Wincanton.  One shell was handed to me.  Then the others

11   were in the magazine, I believe.  And I unloaded these

12   rounds from the magazine at police headquarters, my police

13   headquarters.

14   Q.   At Hamilton police headquarters?

15   A.   Yes, sir.

16   Q.   And then did you again put them in the locker?

17   A.   Yes, same procedure.

18   Q.   Exhibit 16, which is a cell phone.  It should be

19   marked.  Do we have it?  I may have missed it when I was

20   grabbing the other ones.

21   A.   This is not a cell phone.  This is a police scanner.

22   I'm sorry.

23   Q.   I'm sorry.  Why don't you tell us about that?

24   A.   This is a Radio Shack Pro-75 Scanner.  When Walter

25   Pugh was arrested, he was arrested from a certain vehicle.

| | |
|---|---|
| 1 | I believe it was a Neon, a Plymouth Neon. That vehicle was |
| 2 | taken to the staging area at LoBill's at Kemper and -- |
| 3 | Kemper and Hamilton Avenues, and this scanner was taken by |
| 4 | me out of the back seat of the car. |
| 5 | Q. Okay. What did you do with the scanner? |
| 6 | A. Same thing. I took -- kept it in my possession, |
| 7 | property tag on it, put it in property. |
| 8 | Q. I'm now going to ask you about exhibits, and you don't |
| 9 | have to pick them up actually. Exhibits 23, 24, 15, 26 and |
| 10 | 27, which are: There is a Nike box back there. Why don't |
| 11 | you pick that up and just show it to the ladies and |
| 12 | gentlemen of the jury. 24 is a Value City bag. 24 is a |
| 13 | Value City white bag. 25 is a green suitcase. 26 is a |
| 14 | black garbage bag. And 27 is a white bag with gym shoes. |
| 15 | Okay. |
| 16 | Can you tell us where you found -- did you find all of |
| 17 | these items? |
| 18 | A. I did. |
| 19 | Q. Where did you find them? |
| 20 | A. Those items were in the same room with the guns, |
| 21 | downstairs just at the bottom of the stairs off to the |
| 22 | side. |
| 23 | Q. And what is in the Value City white bag, the green |
| 24 | suitcase and the black garbage bag? |
| 25 | A. Clothing, new clothing with tags still on them. |

CIFUENTES - DIRECT

1  Q.  And is it men's, women's, children's?  What type of

2  clothing is it, if you recall?

3  A.  I believe it's mostly men's and men's shoes.  It may

4  or may not be some women's clothing in there.

5  Q.  And the Nike box, what's in the Nike box, which is

6  Exhibit 23?

7  A.  A Nokia phone and an Expedition walkie-talkie.

8  Q.  And Exhibit 27, which is the white bag, the smaller

9  white bag, what's in that?

10  A.  Has miscellaneous clothing, but there is at least one

11  pair of shoes in here, some socks, shoes and socks.

12  Q.  And all of that evidence, did you gather all of those

13  items from the house?

14  A.  Yes.  I picked them up.

15  Q.  Were they in your custody at all times?

16  A.  Yes.

17  Q.  Okay.  And you took them back, and would these -- did

18  you put them in a locker, or did you hand them to someone?

19  A.  I believe these were handed to Officer Colwell, but,

20  if not, they were placed in a locker.  That's the way it

21  is, either one or the other.  You give them to somebody in

22  property or you put them in a locker.  There is no other

23  way.

24           MR. THAPAR:  No further questions.  Thank you.

25           THE COURT:  Thank you, Mr. Thapar.

CIFUENTES - CROSS

1    Do you wish to cross-examine, Mr. Felson?

2              MR. FELSON:  Yes, Your Honor.  Thank you.

3                       CROSS-EXAMINATION

4    BY MR. FELSON:

5    Q.   Okay, Officer, what day did you recover these items?

6    A.   They should have all been recovered or were recovered

7    on May the 3rd, 2000 --

8    Q.   2000?

9    A.   -- 2.

10   Q.   About what time?

11   A.   At 1:30 a.m. to 2 o'clock a.m.

12   Q.   Okay.  And the first item I think we talked about, you

13   talked about the bullets.  Let me withdraw that.  As far as

14   weapons go, we're talking about two handguns and a shotgun?

15   A.   Yes, sir.

16   Q.   Correct?  And you -- let's talk about the first

17   handgun.  Pick either one.  What's the name of the lowest

18   exhibit number?

19   A.   Lowest exhibit number is 11 and 11-A.

20   Q.   That would be one of the handguns?

21   A.   Yes, sir.

22   Q.   Was it loaded when it got into your possession?

23   A.   Yes, it was.

24   Q.   Okay.  Who gave it to you?

25   A.   I picked it up.

CIFUENTES - CROSS

1    Q.    You picked it up from the house?

2    A.    I picked it up from the house.

3    Q.    Now, how did you pick it up?  Do you have gloves, or

4    how do you --

5    A.    No.  The brown case, that was unzipped.  It was

6    actually open.  I peered inside, saw the guns, closed it.

7    I took it back to headquarters with me.

8    Q.    In the bag?

9    A.    Yes.

10   Q.    Okay.  And then, when you took it out of the bag at

11   headquarters, did you -- were you wearing gloves?

12   A.    No, sir.

13   Q.    Did you handle the things without gloves?

14   A.    Yes, sir.

15   Q.    Did you submit it for any kind of testing?

16   A.    No, sir.

17   Q.    How about the other handgun, did you submit it for any

18   kind of testing?

19   A.    No, sir.

20   Q.    It was also in the bag as well?

21   A.    Yes, sir.

22   Q.    Again, you got it from the same location, that same

23   location as the first handgun, right?

24   A.    Yes, sir, in the house downstairs in a brown bag.

25   Q.    Was it also loaded?

| | |
|---|---|
| 1 | A.    Yes, sir, it was. |
| 2 | Q.    And then there was this shotgun, and you got that. |
| 3 | Where did you get that from? |
| 4 | A.    From the operations lieutenant.  I'm having trouble |
| 5 | with his name. |
| 6 | Q.    Well, can you spell it or tell me what? |
| 7 | A.    I have his card. |
| 8 | Q.    Sure. |
| 9 | A.    Lieutenant Brad Winall, W-i-n-a-l-l. |
| 10 | Q.    Okay.  Was it also loaded? |
| 11 | A.    The chamber, I believe, was empty.  The magazine had |
| 12 | four live rounds in it when I removed them from |
| 13 | headquarters. |
| 14 | Q.    When you say "magazine," what do you mean by that? |
| 15 | I'm not familiar with guns. |
| 16 | A.    Okay.  A shotgun has several parts.  This is the |
| 17 | chamber area.  When your slide action goes forward, there |
| 18 | is a round here, places it into the chamber.  When you pull |
| 19 | the trigger, the firing pin goes forward, hits the |
| 20 | projectile, fires it, and the shot is fired. |
| 21 | This, under here, is the magazine, underneath the |
| 22 | weapon, this whole area.  And this is what is called an |
| 23 | extended magazine.  It's larger than normal.  Normally, you |
| 24 | can put four rounds in an extended magazine.  I think this |
| 25 | will hold two more, six.  You put the rounds up inside |

CIFUENTES - CROSS

1   here.   They push against each other and they seat up in

2   here.   When you fire the weapon and you bring the action

3   down, it brings another round from the magazine into the

4   chamber, expels the first shell, puts the slide action back

5   forward, and you now have another round inside the chamber

6   ready to fire.

7   Q.   That's why they call it a pump.   Is that the pumping

8   action when you get rid of the old shell and get the new

9   one in?

10  A.   Yes, sir.

11  Q.   Okay.   And so this one did not have a shell ready to

12  shoot.   You would have to pump it once before it would

13  shoot, is that my understanding from what you said?

14  A.   I was handed the other shell that had been told to me

15  was in the chamber.   So there was one round out.

16  Q.   That was handed to you by?

17  A.   Lieutenant Winall.

18  Q.   Is he from Hamilton County?

19  A.   Hamilton County Sheriff's Office, yes, sir.

20  Q.   Was he the guy that just testified before you?

21  A.   No.

22  Q.   Earlier today?

23  A.   No.

24  Q.   Okay.   All right.   So now you have got the weapon.

25  Was it your responsibility to make sure these weapons

1   weren't loaded?

2   A.   I think it's -- my understanding is, during the

3   operation, the shotgun was unloaded for safety, the round

4   taken out of the chamber.  I did unload the other two

5   pistols.  They were handed to me untouched by anybody that

6   I'm aware of, so it become my responsibility to unload the

7   weapons, yes, sir.

8   Q.   When you say the shotgun was unloaded, what do you

9   mean by "unloaded"?  Because I thought you just said that

10  there were four shells in the magazine.

11  A.   I did.  And I chose my word poorly, I think.  The

12  chamber was empty.  I could see there was no round ready to

13  fire, but, if I move the slide action forward, that would

14  chamber another round, and it would be ready to fire.  So

15  the chamber was empty.

16  Q.   But in the jargon of police officers, and obviously

17  I'm a lay person, when you say a gun is unloaded, that

18  would mean there are no bullets in it at all or no shells

19  in it all.  That wouldn't mean there is just no shell in

20  the -- I'm sorry -- the word I'm looking for -- chamber, as

21  opposed to the magazine.  Let me withdraw that, ask it the

22  right way.  If I hand you a gun and say this gun is

23  unloaded, would it be your understanding that there is no

24  bullet in that chamber or that magazine?

25  A.   Yes.

CIFUENTES - CROSS

| | |
|---|---|
| 1 | Q.    Okay.  So, if I hand you a gun and say, well, it's |
| 2 | loaded but there is no bullet in the chamber but it's |
| 3 | loaded, you would understand that to mean it's just like |
| 4 | this gun was, no bullet in the chamber, but the magazine |
| 5 | may have bullets in there? |
| 6 | A.    Yes. |
| 7 | Q.    Okay.  All right.  So, in fact, when you received this |
| 8 | gun, it was loaded?  The shotgun we're talking about. |
| 9 | A.    Yes. |
| 10 | Q.    And when you received all the guns, they were all |
| 11 | loaded? |
| 12 | A.    Yes. |
| 13 | Q.    All right.  Now, you also received the cell phone; is |
| 14 | that right? |
| 15 | A.    Yes.  There was a cell phone in the Air Jordan |
| 16 | suitcase. |
| 17 | Q.    Do you know who that was registered to, or was there |
| 18 | an investigation done to locate the owner? |
| 19 | A.    Not by me. |
| 20 | Q.    Is there anywhere marked somewhere who it's -- you |
| 21 | know, or a piece of paper that might have come with it from |
| 22 | an investigation that you keep in the ordinary course of |
| 23 | business that would tell us who that cell phone is |
| 24 | registered to? |
| 25 | A.    Not that I'm aware of. |

CIFUENTES - CROSS

1   Q.    Was it a working cell phone?

2   A.    I don't believe I checked.

3   Q.    All right.  Were any calls received on the cell phone

4   while you had it in your possession?

5   A.    No.  I don't think it was on, either.

6   Q.    Okay.

7   A.    It was off.

8   Q.    All right.  And you don't even know if it could be

9   turned on or if it was shut off?

10  A.    That is correct.  I did not mess with it.

11  Q.    All right.  Let's see.  What else was found?  You

12  found some bullets or shells.  I'm not sure.  Is a shell

13  the same thing as a bullet?

14  A.    They could be called that way.  Generally, you say

15  bullets or shotgun shells, but they're interchangeable.

16  Q.    All right.  And now, there were some shotgun shells

17  and pistol bullets for the pistols that you found in those

18  bags?

19  A.    I found bullets in the bag.  I don't believe I found

20  shotgun shells in that bag.

21  Q.    Okay.

22  A.    Talking about the brown bag.

23  Q.    Let me ask you a question about the shotgun.  Is

24  there -- is there any wood -- what's that shotgun made out

25  of?  I can almost hardly tell from here.  I know there's

CIFUENTES - CROSS

1   metal on it.

2   A.    That's pretty much what it is.  The slide, I believe

3   is plastic.

4   Q.    Is there any wood on it?

5   A.    No.

6   Q.    Okay.  Those things usually have, like, a -- what do

7   you call the part that would fit under your arm?

8   A.    A stock.

9   Q.    Don't shotguns routinely have stocks on them?

10  A.    I believe that's the way they're manufactured and

11  sold, yes.

12  Q.    Okay.  But this one doesn't?

13  A.    Correct.

14  Q.    Okay.  And is the stock generally made out of wood?

15  A.    Generally, but they can also be plastic, some kind of

16  plastic composite.

17  Q.    All right.  But many shotguns I have seen -- all

18  right.  Go ahead.

19  A.    A metal stock, a folding stock, or something like

20  that.

21  Q.    But many shotguns I have seen, and correct me if it's

22  the same for you, have a wooden stock on it?

23  A.    That is correct.

24  Q.    And it looks like wood.  It's nicely shined and maybe

25  hand carved, maybe machine made but looks like you can see

1    the wood grain and that type of thing?

2    A.    It's like a wood stock, yes, sir.

3    Q.    Okay.  And that part of the gun is, I guess if you're

4    shooting the gun, is carried underneath where -- would that

5    be underneath the arm?

6    A.    Depends on how you're shooting.

7    Q.    But it could be?  Certainly it could be?

8    A.    Could be under your arm, yes.

9    Q.    Okay.  Now, do you know what happened to the stock on

10   this gun?  Can you tell?  Was it sawed off?  Maybe this was

11   made without a stock ever.

12   A.    When I recover the shotgun, the stock was not on it.

13   I don't have a clue what happened to it.

14   Q.    But when you inspect the gun, does it look like it's

15   been sawed off or unscrewed, or is there any -- you know,

16   there was malfeasance that may have come upon this gun to

17   cause the stock to fall off as opposed to it just being

18   made that way?

19   A.    I didn't inspect it that closely to see why the stock

20   is not there.

21   Q.    Is it possible to tell if a stock as been sawed off?

22   A.    Anything is possible, I guess.

23   Q.    Have you heard the term "sawed-off shotgun"?

24   A.    Yes.

25   Q.    Now, correct me if I'm wrong, but I always thought

CIFUENTES - CROSS

1   that that used to mean that people would saw off the other

2   side, like the metal side, to make it shorter and keep the

3   stock.

4   A.    The barrel, yes, it is.

5   Q.    The barrel.  Would this be considered a sawed-off

6   shotgun?

7   A.    No.

8   Q.    Because?

9   A.    Not to me.

10  Q.    Not to you, okay.  But the reason, I imagine, for

11  somebody to change the gun around might be so it would make

12  it shorter to make it easier to hide?

13              MR. THAPAR:  Your Honor --

14              THE COURT:  I'm sorry.  Are you --

15              MR. THAPAR:  Are you done?

16  Q.    Was that a fair assessment, fair statement?

17              THE COURT:  Are you objecting, Mr. Thapar?

18              MR. THAPAR:  Yes.

19              THE COURT:  What's the basis?

20              MR. THAPAR:  This witness was called solely as a

21  chain of custody witness.  This seems well beyond the scope

22  of direct.  I would agree, just for the record, that he is

23  an expert, so I don't dispute that there is a basis for the

24  questions, just not at this time.  If they want to call

25  him, they can call him and ask those questions.