PEW - CROSS

```
 1    or from him?
 2    A.    Both.
 3    Q.    And did you figure these could be serious problems,
 4    like relationship-threatening problems?
 5    A.    No, because they always had them.  They argued.  They
 6    always had problems.
 7    Q.    Get back together and fight and get back together?
 8    A.    Yes.
 9    Q.    So we have never heard that story before, I guess.
10    All right.  So bottom line is you're not sure exactly what
11    time Walter came to the nursing home on the day he
12    delivered the car, but you're not even -- so it could have
13    been a little after 3; it could have been a little before
14    3?
15    A.    Could have been.  I want to say it was around first
16    shift, somewhere in there.  First shift ended between 2:30
17    and 3:30, somewhere in there.  That's first shift.
18    Q.    But it could have been on the date of the robbery; it
19    could have been the day before, like you said before; isn't
20    that right?
21    A.    Yes.
22    Q.    Okay.  Could it have been two to or three days before?
23    A.    Two or three days before --
24    Q.    The robbery?
25    A.    That he --
```

PEW - CROSS

| 1 | Q.   Dropped the car off to you? |
| 2 | A.   Are you saying two or three days before I received the |
| 3 | call that the car could have been dropped off? |
| 4 | Q.   Yes. |
| 5 | A.   I seen him before that, in that period of time. |
| 6 | Q.   Okay.  But could it -- could he have come to you at |
| 7 | the nursing home two or three days before the robbery, the |
| 8 | date of the robbery? |
| 9 | A.   Yes.  I think, if I recall, I think I did see him a |
| 10 | couple days before that, because I was having car problems |
| 11 | and I was switching with him. |
| 12 | MR. FELSON:  Great.  All right.  I thank you for |
| 13 | your testimony. |
| 14 | THE COURT:  Thank you, Mr. Felson. |
| 15 | Mr. Pugh or Mr. Andrews? |
| 16 | CROSS-EXAMINATION |
| 17 | BY DEFENDANT W. PUGH: |
| 18 | Q.   Ms. Pew, in the early part of April, 2002, do you |
| 19 | remember parking your car at 476 Brookfield Drive, |
| 20 | Fairfield, Ohio, and you took my Cadillac because your car |
| 21 | needed mechanic attention? |
| 22 | A.   Yes. |
| 23 | Q.   If your car needed mechanic attention and you took my |
| 24 | Cadillac, can you explain to the Court if the defendant was |
| 25 | without a car to drive? |

PEW - CROSS

```
1    A.    Excuse me?
2    Q.    It was confusing, wasn't it?  If you took one of my
3    cars -- your car needed mechanic attention, right?
4    A.    Right.  Right.
5    Q.    And by you taking one of my cars, was I without a car
6    to drive?
7    A.    No.
8    Q.    So then what would I need your car for, to be driving
9    your car?  They accusing me of driving your car.
10   A.    Well, but you wasn't driving my car all the time that
11   you had it.  My car was also parked.
12   Q.    Was your car parked in the same location you parked it
13   in?
14   A.    On Brookfield in Fairfield?
15   Q.    Yes, ma'am.
16   A.    It might'a been a couple of spots away from there.
17   Q.    Ms. Pew, did you tell the grand jury or make a
18   statement that I borrowed your car?  Did you tell anyone
19   that I borrowed your car?
20   A.    I don't -- you haven't borrowed my car.  My car, you
21   always was repairing it, or you and Shanell was having
22   problems and you thought she was going to do something to
23   your car.  But, as far as you borrowing my car, no, you
24   didn't borrow my car.
25   Q.    Ms. Pew, who interrogated you at the Hamilton Police
```

1   Department and for how long?

2   A.    Who questioned me?

3   Q.    Yes, ma'am.

4   A.    I don't see the detective in here.

5   Q.    Do you remember his name; can you recall?

6   A.    Calhoun, somebody.

7   Q.    Detective Calhoun?

8   A.    Yes.

9   Q.    Did he make you feel like you was a citizen or like

10  you had committed a crime or something of that nature?

11  A.    I was nervous at the time.

12  Q.    Did he tell you that this is Walter Pugh and Tyreese

13  Pugh?  Did he show you the pictures and ask you is this

14  Walter Pugh and Tyreese Pugh?  Did he tell you that this is

15  Walter Pugh and Tyreese Pugh?

16  A.    When he showed me the pictures, I started to cry.

17  When he put the pictures in front of me and I started to

18  cry, and there was another detective in there with him --

19  I'm not for sure; it might have been that detective over

20  there.  I'm not for sure.  And when I started to cry, I

21  remember him nodding his head at the other detective and

22  saying to put a AB out or something on you and Tyreese.

23  Q.    Did you start crying because you seen the picture or

24  something to that nature?

25  A.    Yes.

PEW - CROSS

1   Q.    Why did you start crying because you seen that
2   picture?
3   A.    Because they had a large picture of you, probably
4   about 11 by 14, a large picture of you.
5   Q.    A large picture of me?
6   A.    And he asked me -- there was a large picture, and he
7   asked me could I -- was this -- did I recognize the
8   picture.
9   Q.    So it wasn't -- it wasn't one of these pictures?
10  A.    I want to say it was possible, the one that's up there
11  on the screen.
12  Q.    And you told him that that was Walter Pugh?
13  A.    I think Mr. Calhoun -- I'm not for sure -- I want to
14  say that he asked me did I recognize you; was this Walter.
15  Do you recognize Walter?
16  Q.    Do you believe that was Walter Pugh?
17  A.    I can't be for sure, but it looks like it.
18  Q.    You stated that Shanell Holston called you and told
19  you that the police was looking for your car?
20  A.    Yes.
21  Q.    Did the police tell you that they was looking for your
22  car?
23  A.    I went to my administrator and told him that I had
24  received a call that the police was looking for my car, and
25  my administrator was working at another facility which was

PEW - CROSS

| | |
|---|---|
| 1 | a half mile down the road.  I had called him on the phone. |
| 2 | He told me to come down there and he would go with me. |
| 3 | When I got to the other facility, we called the Hamilton |
| 4 | police station, and I told them I heard they was looking |
| 5 | for my car.  And they asked who were I, and I told them, |
| 6 | and they asked me if I could come up to the station. |
| 7 | Q.   You heard that -- Shanell is the one who told you that |
| 8 | the police was looking for your car, correct? |
| 9 | A.   Yes. |
| 10 | Q.   Did Shanell tell you also that the police was looking |
| 11 | for another car of the same identical as your car, a stolen |
| 12 | car identical to yours?  Did they give you that |
| 13 | information? |
| 14 | A.   No. |
| 15 | Q.   Ms. Pew, do you agree that similarities do exist? |
| 16 | A.   Yes. |
| 17 | Q.   But "positively" outranks "maybe", could be", |
| 18 | possibility", looks like," yes? |
| 19 | A.   Yes. |
| 20 |       DEFENDANT W. PUGH:  From what exhibit is this? |
| 21 |       THE COURT:  4.1. |
| 22 | Q.   4.1, take a look at 4.1, Ms. Pew.  Take a look at it |
| 23 | and explain to the Court and the jury -- look at it close |
| 24 | up to the face.  And can you see what's missing on that |
| 25 | face?  Something missing. |

PEW - CROSS

```
 1   A.   You telling me to look at -- there is four pictures
 2   here.  Which one you want me to look at?
 3   Q.   The one that's with the guy on the -- I think it's a
 4   teller counter.
 5            THE COURT:  The one on the teller -- do you mean
 6   the one on the screen?
 7            DEFENDANT W. PUGH:  The guy on the counter.
 8            THE COURT:  In the witness book, there are four
 9   photos.  For the record, the one you're referring to, which
10   has been marked as 4.2, is in the lower right-hand corner
11   of that exhibit.
12            MS. CROSS:  Does he want it on the screen?
13            DEFENDANT W. PUGH:  Yes, ma'am.
14   BY DEFENDANT W. PUGH:
15   Q.   Can you see that face better, Ms. Pew?
16            THE COURT:  You can get down if you would like to
17   see.
18   A.   I can see it from here.  Not very clear.
19   Q.   I'm saying in your statement, it states in your
20   statement, it says "looks like," "looks like."  That
21   statement alone, there is something behind "looks like."
22   You know what I'm saying?  Like some more words, because
23   you said "it looked like."  Somebody got to be telling you
24   this is Walter Pugh to make you say "looks like."
25   Something behind "looks like."
```

PEW - CROSS

1   A.    The detective asked me if it was you.

2   Q.    He said, "Is this Walter Pugh, Jr.," correct?

3   A.    Walter.

4   Q.    And you said "looks like"?

5   A.    I said "looks like."

6   Q.    What do you see on that face that, in any photo that I

7   take, it show up --

8           MR. THAPAR:  Your Honor, this has been asked and

9   answered.

10          THE COURT:  Overruled.  You may answer.

11  A.    What do I see in the photo that -- repeat it, please.

12  Q.    What do you see in this photo on this here guy's

13  face -- it's a close-up shot.  That's a clear shot.

14  Detective says that's a good pic ID.  That's a good

15  picture.  What did you see on that face that's missing

16  compared to your brother?

17  A.    Glasses.

18  Q.    And what else?  Take a look at that picture, Ms. Pew,

19  and tell this Court what's missing that you compare it to

20  your brother.  You got the one right in front of you?

21  A.    It's not a very clear shot.  I see the glasses

22  missing.  I can step down and see.

23  Q.    Do you see a scar coming down his left face, Ms. Pew?

24  A.    Yes, I see a scar coming around here.

25          THE COURT:  The jury can't hear you.

PEW - CROSS

1    A.    There is a scar coming down right here on the side.

2    Q.    A scar on that guy's face?

3    A.    Yes.

4    Q.    I don't see no -- you say.  You asked me the question.

5    Do you wear glasses, Ms. Pew?

6    A.    No.  I was supposed to years ago, and I just never did

7    wear them.

8    Q.    So you saying you need glasses?

9    A.    It's possible.

10   Q.    Ms. Pew, Detective Calhoun removed a piece of glove

11   from your car.  Was you standing there when he removed it?

12   Did you witness him remove it?

13   A.    No.

14   Q.    I'm not going to say that's my glove.  I can't deny

15   it.  I can deny it, and I can't say it is, because I have

16   used gloves before.  Isn't it a proven fact, Ms. Pew?

17   A.    Yes.

18   Q.    Did you tell them that?

19   A.    Yes.

20   Q.    Why do I use gloves?

21   A.    Whenever you worked on the cars, you know, you never

22   did want do get your nails dirty.

23   Q.    Did they test that glove -- I can't ask you that.  Did

24   they ever give you your shoes and things back that they

25   took?

PEW - CROSS

1    A.    No.

2    Q.    Did they tell you they matched?

3    A.    No.

4    Q.    Did they dust your car for fingerprints, Ms. Pew?

5    A.    I have no idea what they done to my car, because I was

6    taken inside the facility, the police station.  So they

7    searched my car.  I wasn't there when they searched it.  I

8    was there for probably about five or ten minutes, and then

9    I was escorted into the police department.

10   Q.    You mentioned something about they put out something

11   on Walter Pugh and Tyreese Pugh on the day I went in for

12   questioning on the 25th of April.  What you say they was

13   doing?

14   A.    I don't know the police terms.  Said they was going to

15   go nationwide or something.  I don't know what it was.

16   Q.    Did they say anything about a third suspect or

17   anything?

18   A.    I don't recall.  I do remember them saying there was a

19   third person.

20   Q.    Ms. Pew, do you believe I robbed that bank?

21   A.    I don't know.

22   Q.    Did you see me with any money?  When I came and got my

23   Cadillac, did I have any money?

24   A.    No.

25   Q.    Did I have those clothes on like that suspect there

PEW - CROSS

1    got on, the alleged robber?

2    A.    No.

3    Q.    Have you ever seen me with those clothes that that

4    alleged robber wearing?

5    A.    No, because you really didn't like checkered in

6    clothes.

7    Q.    Ms. Pew, why would Shanell call you?  Do you know why

8    Shanell would call you and tell you -- I strike that.  What

9    time of morning did Ms. Shanell Holston call you, Ms. Pew?

10   A.    It was before 9 o'clock, because I have to be at work

11   at 9 o'clock.  So I know it was before 9, and I had only

12   been at work approximately 10 minutes when I received the

13   call.  And she asked me if I had a newspaper, and we have a

14   newspaper at the facility, and I said yes.  And she said

15   look at the paper, and she said that's your car described.

16   Q.    That was on the 25th, correct?  That's the day you

17   made your statement, the 25th?

18   A.    Yes.

19   Q.    And did she call you any other time than that?

20   A.    Yes.  She called me several times.

21   Q.    What did she say when she called you?

22   A.    She called me and asked me if I had heard from you,

23   and she called me and told me to come over.  She was upset.

24   And she told me that she loved you, and she asked me if I

25   was all right.

PEW - REDIRECT

1       DEFENDANT W. PUGH:  I have no more further

2   questions.  Thank you, Ms. Pew.

3       THE COURT:  Thank you, Mr. Pugh.

4       Anything further, Mr. Thapar?

5       MR. THAPAR:  Just a few questions.

6                   REDIRECT EXAMINATION

7   BY MR. THAPAR:

8   Q.   Ms. Pew, Ms. Cross and I met with you as well, right?

9   A.   Yes.

10  Q.   And I've spoken with you a couple other times since we

11  met with you, correct?

12  A.   Yes.

13  Q.   What did we tell you was the most important thing you

14  do when you talked to us or came down here and testified?

15  A.   Tell the truth.

16  Q.   And now I want to talk about the car.  Mr. Pugh, the

17  defendant Walter Pugh, took your car a lot and fixed it for

18  you, right?

19  A.   Yes.

20  Q.   And he did that because he loved you, right?

21  A.   Yes.

22  Q.   And you love him, right?

23  A.   Yes.

24  Q.   And he would take your car and fix it, and he would

25  bring it back to you, right?

PEW - REDIRECT

1   A.    Sometimes.  My car, not all the time.  He would leave

2   it sometimes parked in front of his house also.

3   Q.    Okay.  But he always would fix it for you?

4   A.    Yes.

5   Q.    And you went down to the police station the same day

6   you got that call from Shanell, correct?

7   A.    Right.

8   Q.    Okay.  And you went down to the police station to talk

9   about your car, right?

10  A.    I went down to see if they was looking for my car,

11  yes.

12  Q.    And at that time you met with Detective Calhoun and

13  another detective, your brother wasn't sitting there, was

14  he?

15  A.    No.

16  Q.    He is sitting here today, however, right?

17  A.    Yes.

18  Q.    And between the time you met with those detectives and

19  now, you have talked to your brother, correct?

20  A.    I have visited my brother, yes.

21  Q.    And you brought him things when he needed them, right?

22  A.    No, I haven't brought him -- I brought his clothes for

23  him to go to trial.

24  Q.    Okay.  And on April 25th, you swore to tell the truth

25  when you signed this statement, right?  It says at the

PEW - REDIRECT

1   bottom:  I have read the statement and it is true and

2   correct, correct?

3   A.   Yes.

4   Q.   Just like today, you swore to tell the truth, right?

5   A.   Yes.

6   Q.   And the truth doesn't vary from day to day, does it?

7   I mean, it doesn't change on April 25th to today?

8   A.   No.

9   Q.   And you didn't want your brother to be arrested,

10  right?  You never wanted your brother to be arrested, did

11  you?

12  A.   I never wanted him to be arrested?

13  Q.   Well, you don't want your brother to be arrested,

14  right?

15  A.   No, I don't want anybody in my family arrested.

16  Q.   And when you gave this statement -- I'm going to

17  direct you to the first -- the second paragraph.  Okay?  It

18  says in the first sentence, "My brother, Walter, has had my

19  car for over three weeks," right?

20  A.   Yes.

21  Q.   "And I heard his daughter was driving it, too,"

22  correct?

23  A.   Yes.

24  Q.   And then it says, "I'm not sure who all had my car,"

25  right?

Case 1:02-cr-00054-DB   Document 83-6   Filed 07/21/2003   Page 15 of 43

644

PEW - REDIRECT

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Then you go on to explain about Shanell, like you have |
| 3 | talked today, that he and Shanell were having problems, and |
| 4 | thus he gave you his car? |
| 5 | A. Yes. |
| 6 | Q. Because he was worried that something would happen to |
| 7 | his Cadillac? |
| 8 | A. Yes. |
| 9 | Q. Then, the next sentence you say, "Yesterday he showed |
| 10 | up at my job with Tyreese Pugh," correct? |
| 11 | A. Yes. |
| 12 | Q. "He wanted his car, and I asked him where was mine," |
| 13 | right? |
| 14 | A. Yes. |
| 15 | Q. And it says at the bottom, this statement -- right |
| 16 | before it says "I have read the statement and it is true |
| 17 | and correct," it states: This statement was completed at |
| 18 | 11 M on 4/25/02, correct? |
| 19 | A. Yes. |
| 20 | Q. That means April 25th, in other words, right? |
| 21 | A. Yes. |
| 22 | Q. And so, when you say "yesterday," you mean April 24th, |
| 23 | right? |
| 24 | A. This was the day -- yes. |
| 25 | Q. Now, the first time Ms. Cross and I met with you after |

PEW - REDIRECT

1   we talked about the importance of telling the truth and

2   everything else, I showed you the exhibit that's been

3   marked as 4.1, right?  I handed you that picture?

4   A.    Yes.

5   Q.    And I asked you who is that gentleman, right?

6   A.    Yes.

7   Q.    Just like that.  And you said, "That's my brother."

8   And you immediately handed it back to me, right?

9   A.    I think so.  Yes.

10  Q.    And I said, "How can you be sure that's your brother?"

11  And you said, "Because I know my brother," right?

12  A.    Yes.

13  Q.    Right.  And then on your statement here, and if you

14  want to read through it, it's fine, you didn't say -- you

15  mentioned during cross-examination that the police asked

16  you if that was the face, or I think Mr. Felson asked you

17  if that was the face of Tyreese Pugh.  But nowhere in here

18  does it say anything about Tyreese Pugh, you identifying

19  Tyreese Pugh on this statement, right?

20  A.    I was asked if that was Tyreese when they talked to

21  me.

22  Q.    Okay.  And was that when the police talked to you, or

23  was that when I talked to you?

24  A.    When the police talked to me.

25  Q.    I also asked you if you knew who the other gentleman

PEW - RECROSS

| 1 | was, right? |

1   was, right?
2   A.    And I told you it looks like my nephew.
3   Q.    I didn't ask you about the face of that gentleman; I
4   just asked you if you knew who that was?
5   A.    Right.
6           MR. THAPAR:  Your Honor, that's all the questions
7   I have.  Thank you.
8           THE COURT:  Thank you, Mr. Thapar.
9           Anything further of this witness, Mr. Felson?
10          MR. FELSON:  Yes.
11          THE COURT:  You may proceed.
12          MR. FELSON:  Thank you.
13                    RECROSS-EXAMINATION
14  BY MR. FELSON:
15  Q.    When you were talking to the prosecutor, were you
16  shown paragraphs again?
17  A.    When I was talking to the prosecutor?
18  Q.    Yes, as well as the police.  You were shown
19  photographs, right?
20  A.    Yes.
21  Q.    And you --
22  A.    You mean when I went up to meet with them at the
23  police station?
24  Q.    Yes.
25  A.    Yes.

PEW - RECROSS

1   Q.    I'm curious.  You said -- I thought you said a 14-inch

2   photograph.

3   A.    It was a clearer shot.  It was larger than the one in

4   the book here.  It was one that came off a copy machine.  I

5   remember it coming off the copy, and it was a large picture

6   of him.

7   Q.    Was it in the bank?  Was there a bank teller there?

8   Was there a bank, like you see here, with the chairs and

9   all that stuff?  Was that in the picture, or was it just a

10  picture of Walter or a picture of somebody that looked like

11  Walter?

12  A.    Yes.

13  Q.    Which one?

14  A.    A picture of someone who looks like Walter.

15  Q.    Okay.  Did it have chairs in it like you see these

16  chairs?

17  A.    It's possible.  I don't recall.  I was so upset that

18  day.

19  Q.    Okay.  So is it possible that they just showed you a

20  picture of your brother and it wasn't from the bank, and

21  they just asked you is this Walter?

22  A.    It's possible.

23  Q.    And you said, "Well, it looks like him"?

24  A.    Yes.  Yes.

25  Q.    But it wasn't necessarily the pictures from the bank,

PEW - RECROSS

1   from the bank robbery, was it?

2   A.    It did look like the pictures.  I'm not for sure.  It

3   looks like them.

4   Q.    But the actual picture that you were shown when you

5   were asked -- the actual picture you -- the actual picture

6   is not one of those four that you see in front of you now;

7   isn't that right?  It's bigger than that?

8   A.    Yes.

9   Q.    That's correct, right?

10  A.    Yes.

11  Q.    Okay.  Does your brother have gray hair?  Walter Pugh

12  have gray hair?

13  A.    Gray hair?

14  Q.    Yes.

15  A.    Yes.

16  Q.    In any of these pictures, were you able to see the

17  hair color in any of those photos?

18  A.    No.

19  Q.    Now, on this statement that we keep referring to, did

20  you type this?

21  A.    Did I type it?

22  Q.    Yes.

23  A.    No.

24  Q.    Okay.  You just signed it.  I looks like your initials

25  are various places in it, but somebody else typed it,

PEW - RECROSS

1    right?

2    A.    Yes.

3    Q.    Okay.   Now, did you just -- it sort of strikes me as

4    it looks like there are three paragraphs.   Are we looking

5    at the statement?   Do you have a copy of it?

6    A.    Yes.

7    Q.    It looks like there are three paragraphs, but is it

8    safe to say -- did this just come out of your mouth; in

9    other words, he typed it as you spoke?   Or was this -- you

10   understand what I'm saying?

11   A.    Yes.

12   Q.    Is that exactly how it came out of your mouth when you

13   were talking to the officer?   Or was it in response -- did

14   he ask you questions, and then you responded to the

15   questions?

16   A.    Yes.

17   Q.    So and the questions aren't on here, right?   The

18   questions that he asked aren't on here?

19   A.    No.

20   Q.    So I guess what I'm getting at is, is this how it came

21   out of your mouth, or was there other things that you might

22   have said that didn't get typed up for whatever reason?

23   A.    It's possible.

24   Q.    In other words, how long was your discussion with the

25   officer?

PEW - RECROSS

1   A.   I was up there a long time.  I was up there --

2   Q.   An hour, a couple hours maybe?

3   A.   Over a couple hours.

4   Q.   So, needless to say, you said more than three

5   paragraphs of language?

6   A.   Yes.

7   Q.   Okay.  And have you seen any statement or any

8   recording or anything of the rest of what you said?

9   A.   I haven't seen anything to today.

10  Q.   All right.  Now, did they -- well, is it safe to say

11  and would you agree with me that these are only partial

12  answers to what the whole conversation was that day?

13  A.   It would be safe to say that.

14  Q.   And, as far as the date goes, did you type the date in

15  here?

16  A.   No.

17  Q.   In other words, was this the date that the detective

18  typed this stuff up, or was it the date that you actually

19  gave it, the statement, or do you know?

20  A.   I don't know.

21       MR. FELSON:  All right.  All right.  Thank you.

22  That's all.

23       THE COURT:  Anything further, Mr. Pugh, with this

24  witness?

25       DEFENDANT W. PUGH:  No, ma'am.

PEW - FURTHER DIRECT

1        THE COURT:  Anything further, Mr. Thapar?

2        MR. THAPAR:  Just a couple questions.

3        THE COURT:  You may proceed, Mr. Thapar.

4              FURTHER DIRECT EXAMINATION

5    BY MR. THAPAR:

6    Q.   This statement, you read it, right?

7    A.   Yes.

8    Q.   And you initialed it, correct?

9    A.   Yes.

10   Q.   At the beginning and the end?

11   A.   I initialed it, and I signed my signature, yes.

12   Q.   And you signed that it was true and correct?

13   A.   Yes.

14   Q.   And you didn't ask the officer to put anything else in

15   it that was left out, right?

16   A.   No.

17   Q.   And then again, and I'm sorry to go over this, I met

18   with you with Ms. Cross, correct?

19   A.   Yes.

20   Q.   And I showed you this statement, and I said this is

21   true, right?

22        MR. ANDREWS:  Objection.  Your Honor, this has

23   been -- I mean, this horse is really getting beaten.

24        MR. THAPAR:  That's my final question, Your

25   Honor.

PEW - FURTHER CROSS

1        THE COURT:  All right.  Overruled.

2        MR. THAPAR:  Do you want me to repeat it?  I'm

3   sorry.

4   BY MR. THAPAR:

5   Q.   I also showed you this statement the day that we met

6   with you, correct?

7   A.   Yes.

8   Q.   And I wanted to make sure it was still true, and you

9   said it was, right?

10  A.   Yes.

11       MR. THAPAR:  Thank you, Ms. Pew.

12       THE COURT:  Anything further?

13       MR. FELSON:  Just one question about the timing

14  here.

15                  FURTHER CROSS-EXAMINATION

16  BY MR. FELSON:

17  Q.   It says that the statement was taken by Detective

18  Calhoun, started at 10:45 a.m. and completed at 11.  It

19  says "M."  I assume that means 11 a.m.  Was the -- but you

20  spoke for more than 15 minutes, right.

21  A.   I was there a good couple of hours or so, because my

22  administrator had come up with me, and they had asked him

23  to leave, because they told him I was going to be there for

24  a while.

25  Q.   All right.  But you weren't there until 11 at night,

1   were you?

2   A.   No.

3   Q.   Okay.  So this is incorrect then that it was a

4   15-minute statement?

5   A.   Yes.

6               MR. FELSON:  Okay.  That's all.

7               THE COURT:  Anything further?

8               MR. THAPAR:  Nothing further, Your Honor.

9               THE COURT:  Thank you, Mr. Thapar.

10              Ms. Pew, the Court appreciates very much your

11  coming here today, and you are excused.  Thank you.

12              I know the government has got a couple witnesses

13  left.  Are any of them very, very short witnesses?

14  Otherwise we will just continue it tomorrow.

15              MS. CROSS:  The gun expert, Special Agent Gwen

16  Gregory, her direct is very short.

17              THE COURT:  I'm not sure about the cross.  She's

18  only across the street.  She can come back tomorrow.

19              All right.  We're going to recess for the day.

20  Let me tell you where we're at.  We have a couple of

21  government witnesses left.  One of them, I hope, it sounds

22  like will be fairly short.  I don't know.

23              How long do you expect your direct examination

24  will be of the other witness?

25              MS. CROSS:  The other witness is Shanell Holston.

1   I anticipate her testimony being about 35 minutes.  We have
2   to play a tape.
3              THE COURT:  Okay.  All right.  So it sounds like
4   the evidence will continue probably at least tomorrow
5   morning.
6              I don't know how much, if anything, the
7   defendants have planned for the defenses.  They may be
8   formulating that yet, which is natural.  So we will find
9   out tomorrow.
10             But I think it's very likely that the case will
11  be submitted to you sometime tomorrow afternoon.  We're
12  having -- I'm having a meeting with the attorneys right
13  after you leave today to go over the jury instructions, so
14  these will be ready.  And I don't anticipate that the
15  arguments of counsel will be very long.  So I think you
16  should have the case by mid-afternoon.
17             The other thing is that normally I'm willing to
18  go real late, but -- I know this is going to disappoint
19  you -- tomorrow afternoon or tomorrow evening is the
20  beginning of Rosh Hashana, which is the Jewish New Year,
21  and I have to be in the synagogue early.  So I will let you
22  go at the normal time tomorrow at 4:30, and, if you haven't
23  finished your deliberations, then we will continue it until
24  Monday.
25             Please remember not to discuss the case with

1    anyone, including members of your family, people involved

2    in the trial or anyone else.  If anyone tries to talk to

3    you about the case, please let me know about it

4    immediately.  And, finally, keep an open mind until all the

5    evidence has been received and you have heard the views of

6    your fellow jurors.

7                See you tomorrow morning, same time, same place.

8                (Jury excused from the courtroom.)

9                THE COURT:  We have got a draft of the jury

10   instructions.  Mike ran over to chambers to get those.

11               I think, why don't we start the charge conference

12   at 5, 5 o'clock?  That will give you 25 minutes for

13   bathroom breaks and to take a look at it.  Since there were

14   no proposed jury instructions from either side, we just

15   used pattern instructions.  So I assume it won't be a very

16   long charge conference.

17               MR. FELSON:  Your Honor, can I ask one question?

18   My client is very much interested and I'm interested in him

19   making some notes when he goes back to his jail cell, and

20   he doesn't have any paper to write on.  So I'm thinking

21   maybe you can give him a yellow pad.

22               THE COURT:  The Court will be glad to supply him

23   with a pad.

24               Is there any problem with that, Brad?

25               MR. FELSON:  But I guess it's getting into the

1    jail.

2            THE DEPUTY MARSHAL:  I'll talk to Boone County,

3    but I don't see any problem with that.

4            THE COURT:  Tyreese, do you prefer a long pad or

5    short pad?

6            DEFENDANT T. PUGH:  Doesn't make no difference,

7    Miss.

8            THE COURT:  As far as something to write with,

9    Brad, can we work something out with Boone County?

10           THE DEPUTY MARSHAL:  I'll also talk to them about

11   that.

12           THE COURT:  He's got to have something to write

13   with.

14           THE DEPUTY MARSHAL:  Understood.

15           THE COURT:  All right.  We will stand in recess

16   until 5 p.m.

17                           * * *

18           (Jury charge conference at 5:10 p.m.)

19           (All attorneys and both defendants present.)

20           THE COURT:  Let's do some housekeeping things

21   first.

22           Argument.  I assume we're going to have argument

23   tomorrow.  How long do you all want for argument?  I would

24   like to sort of set the amounts of time or give you an idea

25   so you can prepare tonight knowing how much time you have

```
 1   got.
 2              What's the government want?  And, if the
 3   government wants to split your argument, you can.
 4              MS. CROSS:  I think 30 minutes total, and I will
 5   split it.
 6              THE COURT:  Okay.  U.S. 30 minutes.
 7              And what about --
 8              MR. FELSON:  I would like an hour if I could.  I
 9   know that sounds like a lot, but, if I might, I would like
10   to cut it back, but I certainly wouldn't like to make a
11   mistake the wrong way and I'm in mid-sentence and I'm cut
12   off and forget to say something.  I would like to keep it
13   moving along the best I can.  I'm a little wordy.  I have
14   been having problems with this since I was a little boy.
15              MR. ANDREWS:  For the record, your co-defendant's
16   counsel has noticed the wordiness.
17              Walter and I have decided I will do closing, and
18   I figure probably 20 to 30 minutes, right in that range.
19              THE COURT:  All right.  Good.  That will help me
20   kind of figure out when we will do breaks and stuff.
21              Let me just also go over exhibits that have been
22   admitted into evidence for the government so we don't have
23   to do that tomorrow when the government rests.
24              According to my records, the only exhibits that
25   have not been admitted are Government Exhibit 3, which is
```

```
 1   the FDIC certification; Government Exhibit 21, the
 2   certified conviction of Tyreese Pugh; and Government
 3   Exhibit 22, which is the audiotape.
 4            MS. CROSS:  Regarding Number 3, Your Honor, we
 5   had planned to bring in the FDIC certificate, but we
 6   stipulated.
 7            THE COURT:  I know you got a stipulation.  No.  I
 8   just want to make sure we're all on the same page.  This is
 9   all I have got if your records show something different.
10            Were you going to move the admission of the
11   audiotape or not?
12            MS. CROSS:  Yes.
13            THE COURT:  So okay.  And then 23, 24, 25, 26 and
14   27 have also been admitted.
15            MS. CROSS:  Yes.
16            MR. THAPAR:  Did you say 21, because 21 won't be,
17   because that's also a stipulation.
18            THE COURT:  21 is not admitted.  That's one of
19   the stipulations.
20            MR. RICH:  One other question on the audiotape,
21   are you going to have a transcript of that, or is it just
22   going to be the tape?
23            THE COURT:  You guys are bringing the equipment?
24            MS. CROSS:  Yes.
25            THE COURT:  Okay.
```

```
 1              MR. THAPAR:  We learned our lesson.  It's
 2   different than D.C. and the Eastern District of Kentucky.
 3              THE COURT:  I was just going to say that you were
 4   used to the courtroom of the future.  This is the courtroom
 5   of the past, way past.
 6              MR. THAPAR:  Not for long.
 7              (Off the record.)
 8              THE COURT:  All right.  Then let's go through the
 9   instructions.  For the record, the Court did not receive
10   any proposed instructions from either side, so we have
11   relied almost exclusively on the Sixth Circuit pattern
12   instructions, O'Malley.  And anything else?
13              MR. THAPAR:  Harris.
14              THE COURT:  I'm sorry?
15              MR. RICH:  My omission.  The Supreme Court case
16   of Harris, brandishing, whether you have to show
17   brandishing or not.
18              THE COURT:  I just asked you whether you have any
19   objections anywhere.  I'll tell you the first part is
20   boiler plate up to -- it's boiler plate up through "Number
21   of Witnesses," which is page 13.  And the only thing that's
22   then different on page 14 is "Separate Consideration About
23   Multiple Defendants."  And I always put that in if we have
24   multiple defendants.  That's just a standard charge.  So 15
25   begins the specific instructions.
```

```
1              I ask you, why don't we just -- let me just ask,
2    you tell me when you have got the first objection, if any.
3              MS. CROSS:  Your Honor, my first objection, it's
4    not really an objection, but involves page 22, and that's
5    the listing the elements, basic elements of conspiracy.
6              THE COURT:  Um-hum.
7              MS. CROSS:  And the third element, which is
8    subparagraph C, we could just add the word "at least," so
9    that it would read:  And third, that a member of the
10   conspiracy did at least one of the overt acts described in
11   the indictment.  Which would be consistent with how it's
12   worded on page 26, the last paragraph.  Because that is a
13   correct statement of law.
14             THE COURT:  Any objection?
15             MR. ANDREWS:  None.
16             MR. FELSON:  I'm just trying to find out --
17   you're saying that the words "at least" are on page 26?
18             MR. THAPAR:  The last paragraph.
19             MR. ANDREWS:  The last paragraph, right after
20   "that."
21             MR. FELSON:  All right.  No objection.
22             THE COURT:  Okay.  So there will be no objection
23   to that.
24             All right.  We're going to insert on page 22
25   there and in the Conspiracy Basic Elements charge at C,
```

1    it's going to read:   And third, that a member of the
2    conspiracy did at least -- we're going to insert the words
3    "at least" there, and that will continue with the text that
4    we've got.
5            MR. ANDREWS:   Your Honor, let me ask one thing.
6    Would it be too much inconvenience to at least, once we're
7    done today, to keep it open until tomorrow morning to let
8    me look at when I haven't gone through eight hours of
9    trial?
10           THE COURT:   We'll do, hopefully, everything
11   tonight, but, if you have something tomorrow that you want
12   to bring to the attention of the Court, I'll entertain
13   that.
14           MR. ANDREWS:   I appreciate that.  I'm just very
15   tired right now.
16           THE COURT:   I probably ought to just revisit it
17   anyway at the conclusion of all the evidence, just to make
18   sure that we have pulled out, you know, things that need to
19   be pulled out.
20           For instance, we have got all kinds of optional
21   things in there, like if the defendants testify or they
22   don't testify, what we're going to say.  So, just to make
23   sure that at the end of the day we have got everything we
24   should and have deleted everything we shouldn't, we will do
25   that.

1          If there is something specific that you want to

2    bring to the Court's attention tomorrow morning, let's do

3    that before 9 o'clock just in case it requires any

4    research.  My law clerks can be looking at that while we

5    listen to the rest of the evidence.

6          MR. FELSON:  So 8:30?

7          THE COURT:  And you don't need to put it on the

8    record then.  You can just advise Mike or Aly at that

9    point, and, if you need to put it on the record, later at

10   the close of the evidence, we will have, you know, a

11   supplemental charge conference for anything that needs to

12   be added or deleted because of the additional evidence.

13         MR. FELSON:  I appreciate that.

14         THE COURT:  Okay.  Anything else?

15         MR. ANDREWS:  Not until we get to the specific

16   charges that relate to the what if's that still have to

17   come in the case.  I don't see any real problem with the

18   instructions.

19         MS. CROSS:  I just have two.

20         THE COURT:  Go ahead.

21         MS. CROSS:  Page 39, last paragraph, first

22   sentence says:  The government is not required to show that

23   the defendant in question actually displayed or fired the

24   weapon.  If we could add the word "or could fire the

25   weapon," it's not a requirement that we prove in our case

```
 1    that the weapon could be fired.
 2              MR. THAPAR:  Judge, and just to be clear, it's
 3    not a requirement to 924(c).  It is a requirement, we
 4    believe or we think, to 922(g).
 5              MS. CROSS:  Correct.  And we're talking about the
 6    instruction for "Uses or Carries a Firearm," which is part
 7    of the 924(c) elements.
 8              MR. THAPAR:  And I believe --
 9              THE COURT:  It's 924(c) versus which one?
10              MS. CROSS:  922(g).
11              MR. THAPAR:  Which is count five.  I agree there
12    is case law on toy guns.
13              THE COURT:  Any objection to that?
14              MR. FELSON:  I would like to leave that open.
15              THE COURT:  Tell me what your proposed language
16    is again, and we will also take a look at it.
17              MS. CROSS:  The last paragraph on page 39, if
18    we -- the first sentence, if we can add on the words "or
19    could fire" the weapon.
20              THE COURT:  Displayed or fired the weapon, or
21    could fire the weapon.  Okay.
22              MR. FELSON:  Those words come after.
23              MR. THAPAR:  The way I would probably do it is:
24    The government is not required to show that the defendant
25    actually displayed, comma, fired, comma, or could fire the
```

1   weapon.

2           THE COURT:  Okay.  All right.  Anything else from

3   the government?

4           MR. THAPAR:  Just on page 41, regarding count

5   five, just the wording of it.  Count five of the indictment

6   charges that on May 3, 2002, in the State of Ohio, Southern

7   District of Ohio, Defendant Tyreese Pugh, a convicted

8   felon, knowingly possessed a firearm in -- it says in

9   commerce or affecting commerce.

10          It sounds like the possession was in commerce.

11  So we propose to make it say:  Possessed a firearm which

12  affected commerce, period.

13          THE COURT:  Any objection to that?

14          MR. FELSON:  No.

15          THE COURT:  Okay.

16          MS. CROSS:  Your Honor, at the end of our case,

17  we will be asking the Court to take judicial notice that

18  the county, Butler County, is in the Southern District of

19  Ohio, and I didn't see any instruction.  I don't know if

20  you put a judicial notice instruction.

21          THE COURT:  Yes.  We should put that in there.

22  We will put it in somewhere, probably somewhere where the

23  elements are.  Yes.

24          Is that all from the government?

25          MS. CROSS:  Yes.

```
 1              THE COURT:  Okay.  Mr. Felson, Mr. Andrews,
 2   anything from you right now?
 3              MR. ANDREWS:  Nothing at this moment, Your Honor.
 4              MR. FELSON:  Not at this moment, but, again, I
 5   really appreciate the door being left slightly ajar.
 6              THE COURT:  Okay.
 7              MR. RICH:  Judicial notice instruction.  The
 8   instruction simply says:  I have decided to accept as
 9   proved the fact that, then we will insert the fact.
10              THE COURT:  Butler County is located in the
11   Southern District of Ohio.
12              MR. RICH:  Even though no evidence was presented
13   on this point, you may accept this fact as true, but you
14   are not required to do so.
15              THE COURT:  Okay?
16              MS. CROSS:  That's acceptable.
17              MR. FELSON:  No objection.
18              THE COURT:  Is that all right with the defense?
19              MR. ANDREWS:  That's fine.
20              THE COURT:  Mr. Felson?
21              MR. FELSON:  That's fine.
22              THE COURT:  I'm wondering, or is it obvious to
23   everybody which ones we're going to pull or which ones are
24   optional?  All right.
25              And Mike informs me that he's got the words "if
```

1    necessary" under the ones that are optional, depending on

2    how the evidence comes in.

3            I guess, finally, the last question about your

4    expert, Mr. Felson, do you intend to call him?

5            MR. FELSON:  Well, that's a good question.

6            THE COURT:  I mean, I haven't heard any eye

7    witness identification yet.

8            MR. FELSON:  I haven't either, and I explained

9    that to him, and then he explained -- then I said that they

10   might be calling a witness back for a voice identification.

11   And he said -- he directed me to a particular case where

12   he's been qualified as an expert in that regard, too.

13           THE COURT:  With regard to, let's say, putting

14   aside for a minute the voice identification, I'm not sure.

15           MR. FELSON:  Jenny Tettenhorst said she --

16           MR. THAPAR:  She said putting aside the voice,

17   what is he rebutting?  She said, what I recall, that she

18   looked in the newspaper and identified -- I think it was

19   Tyreese.  She actually got it wrong.

20           THE COURT:  She said she got it wrong.  Her

21   testimony is she got it wrong, not the right one.

22           MR. THAPAR:  He would support us.  He would

23   actually support the government in that.

24           MR. FELSON:  No.  Wait a minute.  Then she came

25   back.  I thought she tried to clear that up.

1              MR. THAPAR:  No.  She said she couldn't.  You

2    asked her, and she said, "I can't identify."

3              MR. FELSON:  Then she came back later on and

4    talked about the voice identification.

5              THE COURT:  The jury hasn't heard that.

6              MR. FELSON:  The jury hasn't heard that yet.  I

7    guess it depends on that.  I may call that guy off.

8              THE COURT:  Do you intend to call her?

9              MS. CROSS:  It's likely.

10             THE COURT:  So he would just testify to voice

11   identification?

12             MR. FELSON:  If that's the case, depending on who

13   else they call tomorrow.  I agree with you.  I thought

14   originally they had people at the bank who were identifying

15   this guy, and this guy, it turns out that they don't have

16   anybody.

17             THE COURT:  So far, there has been no eye witness

18   ID.

19             Okay.  All right.  I just wanted to check that

20   out, because I think that will save us.  I'm just trying to

21   figure out timing tomorrow.

22             What about the defense's case; do you have

23   someone?

24             MR. ANDREWS:  We may have two witnesses, Walter.

25             DEFENDANT W. PUGH:  How many you contact?

1          MR. ANDREWS:  Three witnesses.

2          THE COURT:  You may have three?

3          MR. ANDREWS:  Yes.  I don't think any are

4    terribly long.

5          MR. FELSON:  Are you talking about the same ones

6    I am?

7          MR. ANDREWS:  No.

8          MR. FELSON:  I may have two.

9          THE COURT:  How long do you anticipate yours

10   being?

11         MR. FELSON:  Pretty short.  I don't see any

12   direct more than 15 or 20 minutes.  I don't know about

13   cross.

14         THE COURT:  And are you anticipating, at this

15   point, at least as a possibility calling the defendants or

16   not?

17         MR. FELSON:  I am not at this point.

18         THE COURT:  Okay.

19         MR. FELSON:  But, of course, that can change.

20   All he's got to do is tug on my arm and say he wants to

21   testify.

22         THE COURT:  I understand.  No, I know.  Just

23   again for timing.

24         Mr. Pugh or Mr. Andrews, are you anticipating

25   Walter Pugh testifying at this point in time?

```
1                    MR. ANDREWS:  No.

2               THE COURT:  All right.

3               MR. ANDREWS:  Although Walter would like me to

4    testify.

5               THE COURT:  Walter's doing a very effective job

6    by acting as his own lawyer.  He doesn't need to testify.

7               MS. CROSS:  Is there any Jencks for any of their

8    witnesses?

9               MR. THAPAR:  Or Giglio?

10              MS. CROSS:  Or Giglio?

11              MR. ANDREWS:  Not that I know at this point, but,

12   as soon as I have it, I'll give it to you.  I have no prior

13   statements by any of these witnesses, I can tell you,

14   because I have not even talked to two of them.

15              MS. CROSS:  There may be Giglio.

16              MR. FELSON:  Juvenile, one girl's a juvenile.

17              MR. THAPAR:  Giglio is everything.  The question

18   is whether it comes in.  That's a question for the judge.

19              THE COURT:  You want to explain for the record

20   what Giglio is, just in case Mr. Pugh doesn't understand?

21              MR. THAPAR:  Giglio is anything that either

22   side -- well, pro Giglio is anything the defense can use to

23   impeach a government witness, and then reverse Giglio is

24   the opposite, so anything the government can use to impeach

25   a defense's witness.  And you have an obligation to turn it
```

1   over.

2           MR. ANDREWS:  If I find out there is anything bad

3   to say about any of those people, I'll let you know.

4           MR. FELSON:  Actually, juvenile wouldn't be,

5   because juvenile can't be used for that, at least in Ohio.

6           MR. THAPAR:  Federal law, it's up to the judge.

7           THE COURT:  All right.  Okay.  We'll see you

8   tomorrow.  Actually, I don't think we need to convene court

9   until 9, but Mike will meet with you.

10          MR. RICH:  I'll be here at 8:30.

11          THE COURT:  So if you have a lot on the jury

12  instructions, just come over to chambers and let Mike know

13  what you have got.

14          MR. THAPAR:  Should we just plan on being here at

15  8:30, and then, if we have anything, we will go over it?

16          THE COURT:  Sounds fine.  Thanks, everybody.

17          MS. CROSS:  Your Honor, do you instruct and then

18  we argue, or do we argue first?

19          THE COURT:  I'm sorry.  That's a great question.

20  I usually instruct first, and then there is argument.  And

21  you can quote the charges in argument, which is why we're

22  holding the charge conference now.  The only time I don't

23  instruct first is if we can't physically get the copies

24  made, because the jury, we distribute copies to everyone,

25  including the jury.

1     MR. THAPAR:  They can take them back?

2          THE COURT:  They can make notes on them.  They

3     each have their own individual copy of the instructions.

4     So it's just a matter of getting 25 times 60 pages copied

5     in time for instructions.

6          MS. CROSS:  Okay.

7          MR. FELSON:  As far as my expert, I'm going to

8     call him in then.  I'm going to call him in.  Should I tell

9     him --

10         MS. CROSS:  Why don't we talk?

11         THE COURT:  Why don't you all talk?  If they give

12    you a promise they're not going to call her for voice ID,

13    you don't need him.  And if they can call you at home

14    tonight, you could call your expert off then.

15         MR. FELSON:  I just -- I don't know how he's

16    going to bill, in other words, if he's cancelled everything

17    for tomorrow morning.  Of course I'm not paying for it, but

18    I have some -- I mean, it's my tax dollars.  I guess I feel

19    some responsibility not to waste the money.  So just, we'll

20    try our best not to waste it.

21         THE COURT:  No.  I understand.  For me, it's more

22    of a time consideration.

23         PROCEEDINGS CONCLUDED AT 5:50 P.M.

24

25

1          C E R T I F I C A T E

2               I, Betty J. Schwab, the undersigned, do

3     hereby certify that the foregoing is a correct

4     transcript from the record of the proceedings in

5     the above-entitled matter.

6

7                          *Betty J. Schwab*
                   BETTY J. SCHWAB, RPR
8                   Official Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25