1           UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO          03 JUL 21 PM 2:00

3                  WESTERN DIVISION
                       - - -

4

5   UNITED STATES OF AMERICA,    :  CRIMINAL ACTION CR-1-02-054
                                 :
            Plaintiff,           :  Cincinnati, Ohio
6                                :  Monday, September 9, 2002
       -vs-                      :
7                                :
                                 :
   WALTER PUGH, JR, and          :  Day 5 of jury trial
8   TYREESE PUGH,                :
                                 :
9          Defendants.           :  9:00 a.m.

10                     - - -

11                   VOLUME V

12             TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE,
13                   AND JURY

14                     - - -

15   For the Plaintiff:     Wende Cross, Esq.
                            Amul Thapar, Esq.
16                          Asst. U.S. Attorney
                            Atrium II, Suite 400
17                          221 East Fourth Street
                            Cincinnati, Ohio  45202
18
    For the Defendant:      Pro Se
19    (Walter Pugh, Jr.)
                            J. Robert Andrews, Esq.
20    (Legal advisor)       Schuh & Goldberg
                            2662 Madison Road
21                          Cincinnati, Ohio  45208

22    (Tyreese Pugh)        Edward J. Felson, Esq.
                            Felson & Felson
23                          CBLD Center, Suite 1650
                            36 East Seventh Street
24                          Cincinnati, Ohio  45202.
    Law Clerk:  Mike Rich
25  Courtroom Deputy:  Steve Snyder
    Court Reporter:  Betty Schwab

85

I N D E X

| DEFENSE WITNESSES: | DIRECT | CROSS | RD | RC | FD |
|---|---|---|---|---|---|
| JAMES CALHOUN | | | | | |
| (by Mr. Andrews) | 795 | | 834 | | |
| (by Mr. Felson) | | 811 | | 838 | |
| (by Mr. Thapar) | | 818 | | 842 | |
| ADRIAN JACKSON | | | | | |
| (by Mr. Andrews) | 845 | | 853 | | |
| (by Mr. Felson) | | 851 | | 854 | |
| (by Mr. Thapar) | | 851 | | | |
| CORTES RENFRO | | | | | |
| (by Mr. Andrews) | 856 | | 873 | | |
| (by Mr. Felson) | | 864 | | 874 | |
| (by Ms. Cross) | | 869 | | | |

* * *

JURY INSTRUCTIONS              PAGE 885

CLOSING ARGUMENTS:            PAGE:

  United States by Ms. Cross    927, 979

  Tyreese Pugh by Mr. Felson    943

  Walter Pugh by Mr. Andrews    967

```
1                          PROCEEDINGS
2              THE COURT:  Okay.  Good morning, everybody.
3    Let's do the jury instructions first so we can get copies
4    of those made.
5              My law clerk, Mike Rich, has talked to all
6    parties, and I think we have agreement on the additions and
7    deletions and changes to the jury instructions.  So I'm
8    going to ask Mike to go over it with you, and, if there are
9    any objections as he does each individual instruction, let
10   us know if there is any objection to it.
11             Mike, I'm wondering if you can be heard.
12             MR. RICH:  I'll move up there then.
13             Okay.  The following jury instructions have been
14   added to the set that we had given you.
15             First, this is one entitled "Judicial Notice."
16   This states:  I have decided to accept as proved the fact
17   that Butler County is in the Southern District of Ohio even
18   though no evidence was presented on this point.  You may
19   accept this fact as true, but you are not required to do
20   so.
21             THE COURT:  Is that all right with everybody?
22             MR. FELSON:  No objection.
23             MS. CROSS:  No objection.
24             MR. RICH:  The next charge is entitled "Defense
25   Theory."  It reads:  That concludes the part of my
```

1    instructions explaining the elements of the crime.  Next I

2    will explain the defendants' position.  The defense says

3    that the defendants were not present at the bank at the

4    time of the robbery and that the robbery was committed by

5    other individuals.

6              MS. CROSS:  No objection.

7              THE COURT:  Any objection?

8              MR. FELSON:  No objection, except we were talking

9    about maybe separating the defendants.  I think he's not

10   there yet.

11             MR. RICH:  And then the instruction following

12   that would be entitled "Presence of the Defendants at the

13   Scene of the Crime," and that instruction would read:  One

14   of the questions in this case is whether the defendants

15   were present at the bank at the time of the robbery.  In

16   order to find Defendant Tyreese Pugh guilty, the government

17   must prove that he was present at the time and place in

18   question.  Unless the government proves beyond a reasonable

19   doubt that Defendant Tyreese Pugh was present at the bank

20   at the time of the robbery, you must find him not guilty.

21   In order to find Defendant Walter Pugh guilty, the

22   government must prove that he was present at the time and

23   place in question.  Unless the government proves beyond a

24   reasonable doubt that Defendant Walter Pugh was present at

25   the bank at the time of the robbery, you must find him not

1   guilty.

2           MS. CROSS:  No objection.

3           MR. FELSON:  No objection.

4           DEFENDANT W. PUGH:  No objection.

5           THE COURT:  Okay.  Fine.  Is that everything?

6           MR. RICH:  One or two more.

7           THE COURT:  Sorry.

8           MR. RICH:  There was also a change to the

9   instruction that was originally entitled "Possession

10  Defined."  It will now be entitled "Possession" and will

11  read:  Next I want to explain something about possession.

12  The government does not necessarily have to prove that

13  Defendant Tyreese Pugh physically possessed the firearm

14  described in the indictment for you to find him guilty of

15  this crime.  The law recognizes two kinds of possession,

16  actual possession and constructive possession.  Either one

17  of these, if proved beyond a reasonable doubt by the

18  government, is enough to convict.

19          To establish actual possession, the government

20  must prove that Defendant Tyreese Pugh had direct physical

21  control over the firearm described in the indictment and

22  knew that he had control of it.

23          To establish constructive possession, the

24  government must prove that Defendant Tyreese Pugh had the

25  right to exercise physical control over the firearm

1    described in the indictment, and knew that he had this

2    right, and that he intended to exercise physical control

3    over the firearm at some time either directly or through

4    other persons.  For example, if you left something with a

5    friend intending to come back later and pick it up or

6    intending to send someone else to pick it up for you, you

7    would have constructive possession of it while it was in

8    the possession of your friend.  But understand that just

9    being present where something is located does not equal

10   possession.

11          THE COURT:  Why don't you slow down a little?

12          MR. RICH:  The government must prove that

13   Defendant Tyreese Pugh had actual or constructive

14   possession of the firearm and knew that he did for you to

15   find him guilty of this crime.  This, of course, is all for

16   you to decide.

17          MS. CROSS:  No objection.

18          MR. FELSON:  My only thought is maybe "beyond a

19   reasonable doubt" has to be put in after at least one of

20   the "proved" words.

21          MR. RICH:  It is in the first paragraph.  It

22   states:  Either one of these, if proved beyond a reasonable

23   doubt by the government, is enough to convict.

24          MR. FELSON:  All right.

25          MR. RICH:  Then, finally, there is, and this will

1    be entitled "Impeachment of a Witness Other Than

2    Defendant."  It reads:  You have heard the testimony of

3    Ra-Shay Patterson and Shanell Holston.  You have also heard

4    that Ms. Patterson knows of an outstanding warrant for her

5    arrest and that before this trial she was convicted of a

6    crime.  Further, you have heard that before this trial

7    Ms. Holston was convicted of a crime.  This evidence was

8    brought to your attention only as one way of helping you

9    decide how believable their testimony was.  Do not use it

10   for any other purpose.  It is not evidence of anything

11   else.

12             MS. CROSS:  No objection.

13             THE COURT:  Any objection?

14             MR. FELSON:  No.

15             MR. ANDREWS:  We have an addition as it relates

16   to Ms. Patterson.  I have no problem -- actually, I have a

17   problem with the whole thing.  I object for the record in

18   general, because we objected to the testimony in total on

19   this issue.

20             THE COURT:  I'm not sure what you're saying you

21   are objecting to.

22             MR. ANDREWS:  Let me start out by saying we

23   object to anything to do with this bit of testimony that

24   came in as to Ms. Patterson.  I just want to make that

25   clear before I go ahead and state what I would like done

1    with this.

2              THE COURT:  Okay.

3              MR. ANDREWS:  In addition to the line "you have

4    also heard Ms. Patterson knows of an outstanding warrant

5    for her arrest and before this trial she was convicted of a

6    crime," I would ask for the addition "for which she still

7    owed a fine," which was the testimony that she only owed a

8    fine, which is somewhat different than her running from an

9    open warrant for aggravated murder or running from a

10   warrant for doing time in prison.  Her statement from the

11   stand is she owed a fine.

12             MS. CROSS:  Your Honor --

13             MR. ANDREWS:  Which I think is significantly

14   different than --

15             MS. CROSS:  Your Honor, that's for the jury to

16   find.  He can raise that in closing, and the jury can hear

17   it that way.  Also, if Mr. Andrews has an objection to the

18   instructions, the United States would not have any

19   objection to taking out the entire instruction.

20             MR. ANDREWS:  Well, we're caught in a Hobson's

21   choice in this instruction, Your Honor, as the Court's well

22   aware.  We would object to any of this being in the record.

23   We believe it was good grounds for a mistrial.  Now we're

24   trying to mitigate the harm done by this being admitted.

25   We believe the instruction is probably necessary under the

1  circumstances, though we don't believe any of this should

2  have been in front of the court, and, in that regard, we

3  would ask that the true nature of her testimony, which not

4  only was she had a warrant outstanding in Colorado in a

5  particular county, but what that warrant was for.  It was

6  for nonpayment of fines.  I mean, that's the totality of

7  her testimony on that issue.

8         THE COURT:  I understand your position.  I agree

9  with Ms. Cross that that's an issue of fact for the jury to

10  find.  You have asked that question on cross-examination,

11  and she testified to that.  And it's up to the jury to

12  decide whether they believe that or not.  I don't want to

13  insert that.

14         I'll be glad to delete the instruction entirely

15  if you want it.

16         MR. ANDREWS:  As I said, it's a Hobson's choice

17  for us.

18         THE COURT:  So you want the instruction?

19         MR. ANDREWS:  I believe we have to have the

20  instruction to mitigate somewhat, but I believe it should

21  have the further language.

22         THE COURT:  Okay.  I think we're ready to bring

23  in the jury.

24         Who's going to be your next witness for the

25  defense?

1          MR. ANDREWS:  I will be doing the last few

2    witnesses, Your Honor.  I want the Court to be aware it's

3    my understanding that the subpoenas we issued on Friday did

4    not get to the Hamilton Police Department until Saturday

5    for whatever reason, that present this morning is Officer

6    Calhoun.  He is already here.  Officer Jackson is on his

7    way and will be here, I'm sure, before Officer Calhoun's

8    testimony is completed is basically our understanding at

9    this point.

10          MR. THAPAR:  Your Honor, I don't know if they

11    arrived there -- I'll address each of the points.  I don't

12    know if they arrived there Friday or Saturday.  The point

13    is the officers did not receive them in hand.  He served

14    three subpoenas, I understand from --

15          THE COURT:  I don't want to hear -- just tell me

16    who is here.

17          MR. THAPAR:  Calhoun is here.  Jackson is on his

18    way.  And I have no idea about Nugent.  He's retired and

19    doesn't work there.

20          THE COURT:  Who?

21          MR. THAPAR:  Detective Nugent.

22          THE COURT:  You were going to take care of that.

23          MR. ANDREWS:  We can go ahead without Nugent.

24    He's the most minimal of the officers.  If he did not get

25    the subpoena and is not aware of it, we can't do anything

1    about that.

2          The final witness was Mr. Renfro.  I contacted

3    Mr. Renfro yesterday afternoon, spent about an hour with

4    him at his house.  He tells me that he will be brought here

5    by his brother.  His brother has a special needs son who he

6    is driving to school as we speak and then will come here.

7    He felt that he would be here between 9:30 and 10 o'clock.

8    I told him, the way the witnesses were set up, that would

9    work fine.

10          THE COURT:  All right.  Then we are ready to

11    proceed.  Who is your next witness?

12          MR. ANDREWS:  Officer Calhoun.

13          MR. FELSON:  Your Honor, while he's doing that,

14    could I bring one other point to your attention?

15          THE COURT:  Yes.  Quickly.

16          MR. FELSON:  There was an issue coming up about

17    the testimony.  I'm moving to strike some testimony, but

18    it's only relevant if Walter doesn't testify.  Would you

19    like to address that now, or should we wait for the break

20    on that?  It's probably not relevant now, because he has

21    chosen not to testify.

22          THE COURT:  Let's deal with it later.

23          MR. FELSON:  Okay.

24          (Jury present.)

25          THE COURT:  Goot morning to everyone.  I

CALHOUN - DIRECT

1    apologize for the late start.  There were some matters

2    regarding the jury instructions that we needed to get done

3    so we could have them.  They will be printed up and ready

4    for the charge later on today.

5           The next witness of the defense is Officer

6    Calhoun.  And, Officer Calhoun, you were already sworn in

7    previously in this case, so we don't need to do it again.

8           Mr. Andrews, you may proceed.

9                   JAMES CALHOUN (Recalled)

10                   DIRECT EXAMINATION

11   BY MR. ANDREWS:

12   Q.   Officer, state your name for the record just in case

13   the jury forgot who you are.

14   A.   Jim Calhoun.

15   Q.   Officer, how are you employed?

16   A.   I'm a detective with the City of Hamilton, Ohio,

17   Police Department.

18   Q.   And you have four years of experience, as I recall, as

19   a detective?

20   A.   That is correct, sir.

21   Q.   Okay.  On this present case that we're here in court

22   about, you initially were called out on that case on what

23   date?

24   A.   The actual day that the robbery happened on the 24th.

25   Q.   Okay.  In your notes, the first notes that I have of

1    yours start on the 26th.  Was that just a mistyping on your

2    part?

3    A.    That's the first time I actually typed notes into the

4    computer was that day on the 26th.

5    Q.    Okay.  So you date the notes the date you type them,

6    not the date that things took place?

7    A.    That is correct.

8    Q.    Am I correct?  In your initial investigation at the

9    bank, we have talked all about that, and I'm not going over

10   that again.  One piece of information that you picked up

11   was that there was a four-door Olds Cutlass maroon in color

12   that had been used in this alleged, well, in this robbery;

13   is that correct?

14   A.    That is correct, yes, sir.

15   Q.    You also found that same day or somewhere between the

16   24th and 26th that an identical vehicle had been stolen

17   from Trotwood, Ohio; is that correct?

18   A.    That is --

19         MR. THAPAR:  Your Honor, I'm sorry, Your Honor.

20   I'm just going to object.  This is their witness.

21         MR. ANDREWS:  I understand.

22         THE COURT:  All right.

23         MR. ANDREWS:  You can answer that.

24         THE COURT:  Well, no.  No, he can't.

25         MR. ANDREWS:  Excuse me.  Let me back up.

CALHOUN - DIRECT

1    THE COURT:   I'm going to sustain the objection.

2    BY MR. ANDREWS:

3    Q.   Did you become aware of another vehicle being stolen

4    from Trotwood, Ohio?

5    A.   Yes, I did.

6    Q.   That was a vehicle of what description?

7    A.   I believe it was a maroon four-door Olds Cutlass.

8    Q.   Okay.  And that would then match the vehicle you have

9    been told had been used in this robbery?

10   A.   It would match the description we had at that time,

11   yes.

12   Q.   Okay.  Now, did you pursue that lead?

13   A.   Yes, we did.

14   Q.   And what did you do to pursue that?

15   A.   Sent a teletype to the Dayton Police Department, or I

16   don't know exactly if it was Dayton or who covers the

17   Trotwood area.  Our communications center would know that.

18   But they sent a teletype to that area requesting that, if

19   the vehicle was found, to notify us, also giving them the

20   information we had on our bank robbery so that they would

21   know, I mean, the vehicle possibly matched our suspect

22   vehicle.

23   Q.   Now, you had additional information relating similar

24   crimes in the Dayton area?

25   A.   No, sir.

CALHOUN - DIRECT

1   Q.   In your notes typed on that same date, there is a

2   notation relating to supposedly two people traveling from

3   Dayton to Hamilton.  You want to see your notes to refresh

4   your memory on that?

5   A.   Yes, if I could.

6        MR. ANDREWS:  Steve, would you mark that?  Sorry

7   I didn't make a copy.

8        THE COURT:  Has the government seen these?

9        MS. CROSS:  Yes.

10       THE COURT:  Or do you have a copy of them?

11       MR. ANDREWS:  Yes.  They were produced by the

12  government for us.

13       THE COURT:  You have a set for yourself,

14  Mr. Andrews?

15       MR. ANDREWS:  No, I don't.  I think maybe

16  co-counsel has a set.

17  BY MR. ANDREWS:

18  Q.   Detective, I draw your attention to the last paragraph

19  on the first page.

20  A.   Yes, sir.

21  Q.   And you had information of -- what, at that time, is

22  reflected by that note?

23  A.   That these two, meaning Walter and Tyreese, were

24  allegedly going back and forth between Cincinnati and

25  Dayton.

CALHOUN - DIRECT

1    Q.    Engaged in what activity?

2    A.    Knocked off a bank and recently knocking off drug

3    dealers in Dayton.

4    Q.    And this would have been banks other than the one

5    we're talking about; is that correct?

6    A.    I would assume that.

7    Q.    Dayton and Trotwood are in close proximity; is that

8    correct?

9    A.    I'm not real familiar.  I know Trotwood is in the area

10   of the Dayton airport.  I don't know --

11   Q.    I just mean if, geographically, you looked at Dayton,

12   Ohio, they're in the same general geographic area?

13   A.    I would assume so, yes, sir.

14   Q.    As a suburb of Cincinnati would be?

15   A.    I would assume that, yes, sir.

16   Q.    You received that information from whom?

17   A.    One of our retired detectives.

18   Q.    And his name is?

19   A.    James Nugent.

20   Q.    Okay.  And you had also been supplied, earlier on that

21   same date it appears, information from another police

22   officer; is that correct?

23   A.    Yes, sir.

24   Q.    And who was that?

25   A.    Police Officer Adrian Jackson.

1  call?

2  A.    I didn't at the time, no.

3  Q.    Did he know?

4  A.    I don't know what he knew at the time, sir.

5  Q.    Did you also receive -- did you receive any phone

6  calls from any other officers that day in relation to this

7  case?

8  A.    Later on that evening, yes, sir.

9  Q.    From whom?

10  A.    Police Officer Adrian Jackson.

11  Q.    And what did he tell you, if anything, at that time?

12  A.    He told me that his informant was with him and wanted

13  to take us to Walter and Tyreese.

14  Q.    Okay.  And his informant was whom?

15  A.    When I arrived at our agreed meeting location, it was

16  Shanell Holston.

17  Q.    She had been his informant from the beginning of this

18  investigation; is that correct?  Let me withdraw that.  Do

19  you know who his informant had been since the beginning of

20  the investigation?

21  A.    I don't know positively.  I believe it was her, but I

22  don't know.

23  Q.    And he supplied information, by my count, on

24  approximately five different occasions?

25  A.    If that's your count, sir, that would seem reasonable.

1  Q.    Okay.  Now, did you know Shanell Holston prior to
2  that?
3  A.    No, sir.
4  Q.    And had no -- you had no knowledge of her background?
5  A.    No, sir.
6  Q.    And you did not know at that time what her
7  relationship, if any, with Walter Pugh was?
8  A.    No, sir.
9  Q.    Now, on -- when did you first meet Stephanie Luster?
10  A.    The night the Pughs were arrested.
11  Q.    Okay.  And on that evening, did you take a statement
12  from her?
13  A.    No, sir.
14  Q.    And when was the first statement that you took from
15  Stephanie Luster?
16  A.    I would have to look at the date on the statement.  I
17  believe it was May the 8th, but I would have to look at the
18  date on the statement itself.
19  Q.    I believe you have those in your notes, sir, in front
20  of you.  You might want to refer to those if they're
21  helpful.
22        MR. THAPAR:  Objection, Your Honor.  He's
23  referring to a specific statement.  I don't think those are
24  in his notes, but, if he wants to show him the statement
25  he's talking about, the officer just said it would help him

CALHOUN - DIRECT

1    remember.

2            THE COURT:  Do you understand the objection?

3            MR. ANDREWS:  Kind of.  Your Honor, I believe

4    it's referred to in the notes.  But, if they're not, I can

5    provide him with a copy of the statement.

6            MR. THAPAR:  I mean, I just think that's a

7    simple --

8            THE COURT:  Yes, I understand your objection.  If

9    you're going to ask him questions about the statement, you

10   need to give him the statement.

11           MR. ANDREWS:  We will.

12   BY MR. ANDREWS:

13   Q.   Is that the statement to which you refer?

14   A.   Yes, sir.

15   Q.   That's been handed to you and marked.  Now, looking at

16   your notes again, what is the last entry on your notes?

17   A.   May the 8, 2002, 2:30 in the afternoon.

18   Q.   And it starts out with what line?

19   A.   I interviewed Stephanie and got some good information

20   from her.

21   Q.   This is the statement we are talking about?

22   A.   Correct.

23   Q.   So it was reflected in your notes?

24   A.   Correct.

25   Q.   Now, you had attempted to make special arrangements on

1    behalf of Ms. Luster that day to have someone else present

2    during the interview?

3    A.    No, sir.  I didn't make any special arrangements.

4    Q.    Will you look at your entry just above the one I just

5    referred you to?  You want to take a moment to read that?

6    A.    Oh, I did.  I'm sorry.  I forgot about that.  Yes.

7    Q.    And those arrangements were what?

8    A.    Her mother wanted to speak with her, and I tried to

9    arrange to have her mother there.

10   Q.    And you were bringing her mother from where?

11   A.    The Butler County Jail.

12   Q.    Okay.  And that never took place, I take it, or did

13   it?

14   A.    No.  That one did not, no.

15   Q.    Okay.  Is it unusual to have someone brought from a

16   jail facility to the police station to be part of an

17   interview with a third party?  And if you don't understand,

18   I'll try to ask it another way.  That was not very artfully

19   asked.  Have you made this kind of arrangement to have a

20   relative present in an interview with a witness when it

21   involves bringing them from a jail facility?

22   A.    This is the first time that this had presented itself.

23   Q.    So it is a fairly unusual thing to take place?

24   A.    I have never had a relative in jail of someone I was

25   interviewing that wanted to speak with them, no.

1   Q.   Okay.

2          MR. ANDREWS:  Mr. Snyder, could you hand

3   Detective Calhoun Defendants' Exhibit or the defendants'

4   exhibit book, please?

5          THE COURT:  I'm sorry.  Which one?

6          MR. ANDREWS:  Please?

7          THE COURT:  What exhibit?

8          MR. ANDREWS:  The exhibit book.  Open it to

9   Exhibit BB-4.

10  BY MR. ANDREWS:

11  Q.   Officer, just to make sure you understand what that

12  exhibit is, would you turn back to BB?  I don't think we

13  put a dash 1 after it, but it's just BB.  Have you seen

14  that document before?

15  A.   I don't recall seeing it before, sir.

16  Q.   Okay.  So you're unaware of the contents of this

17  document?

18  A.   Yes, sir.

19  Q.   Okay.  So you did not participate in the preparation

20  of this document by Agent Moran?

21  A.   No, sir, I did not.

22  Q.   So the contents of it are wholly unknown to you and

23  would not in any way refresh your memory?

24          MR. THAPAR:  Objection.  Asked and answered.  I

25  believe he said he didn't know about the contents.

1      THE COURT:  Sustained.

2  BY MR. ANDREWS:

3  Q.    When did you become aware that Shanell Holston was a

4  girlfriend, if you will, of my client?

5  A.    It was sometime after he was arrested.  I don't know

6  if it was a day or two after that.  I tried to talk to her

7  again to get some more information from her.

8  Q.    And when did you become aware she was a jilted, for

9  lack of a better term, girlfriend?

10  A.    That wasn't until some time later.  I don't know on

11  what exact date, but it was some time later on.

12  Q.    The motivation for a person giving you information is

13  important to you?

14  A.    It can be, yes, sir.

15  Q.    And the good information you refer to in your note of

16  May 8th, is that the statement that you took there?

17  A.    Yes, sir.

18  Q.    Now, Officer, did you ever follow up on the stolen

19  vehicle from the Trotwood area?

20  A.    Yes, sir, I did.

21  Q.    And was it located?

22  A.    Yes, sir, it was.

23  Q.    Where was it located?

24  A.    Back in the same area where it was taken from.

25  Q.    Which is -- never mind.  Withdraw that.  Did you

CALHOUN - DIRECT

1  follow up on the reports of drug dealers being robbed in

2  the Dayton area?

3  A.    No, sir.

4  Q.    Matter of fact, drug dealers being robbed in any area

5  are reasonably low priority for police?

6  A.    They usually go unreported.

7  Q.    And you have done some drug work?

8  A.    No, sir.

9  Q.    No?

10 A.    No, sir.

11 Q.    Have you been involved in any drug investigations?

12 A.    No, sir.

13 Q.    You were present at the search of Mr. Renfro's home?

14 A.    No, sir.

15 Q.    You were not present?

16 A.    No, sir.

17 Q.    Officer Cifuentes handled that aspect of the

18 investigation; is that correct?

19 A.    That is correct.

20 Q.    It is your information that no money was found in that

21 home; is that correct?

22 A.    I believe, after reviewing property logs, $56 was

23 found.

24 Q.    Okay.  You have heard the surreptitiously taped

25 conversation between Walter Pugh and Shanell Holston,

CALHOUN - DIRECT

1    correct?

2              MR. THAPAR:  Your Honor, I'm going to object

3    again to the characterization of evidence and the leading

4    questions.

5              THE COURT:  Sustained.

6    BY MR. ANDREWS:

7    Q.   Have you heard the tape made between Walter Pugh and

8    Ms. Luster?

9    A.   I don't believe there was a tape made between Mr. Pugh

10   and Ms. Luster.

11   Q.   Excuse me.  Not with Ms. Luster -- Ms. Houston --

12   Holston.

13   A.   I heard a taped conversation between Shanell Holston

14   and Walter Pugh, yes, sir.

15   Q.   Okay.  Now, in that tape, at no time is there the

16   discussion of $153,000; is that correct?  I'll withdraw

17   that.

18        What is the amount of money discussed in this tape?

19   A.   I believe it was 100,000, but I'm not positive.  I

20   haven't heard the tape since the day it was made.  That was

21   the only time I listened to it.

22             MR. ANDREWS:  Thank you, Officer.

23             If we could have one moment, Your Honor.

24             Your Honor, I believe that concludes our direct

25   examination of Officer Calhoun.

CALHOUN - CROSS

1          THE COURT:  Okay.  Mr. Felson, do you have any

2    examination of this witness?

3          MR. FELSON:  Yes, I do.

4                    CROSS-EXAMINATION

5    BY MR. FELSON:

6    Q.   Officer, you were talking about Ms. Luster's mother

7    was brought or there was some request to bring her from the

8    jail.  From the Butler County Jail was it?

9    A.   Yes, sir.  I was going to try to bring her over from

10   the Butler County Jail.  She wanted to speak with her

11   daughter.

12   Q.   So, Ms. Luster, Stephanie Luster, requested you bring

13   the mother over?

14   A.   No, sir.  The mother wanted to speak to her daughter.

15   Q.   How would you know that -- were you speaking to the

16   mother?

17   A.   Yes, sir.

18   Q.   Okay.  How did you come to speak with the mother?

19   A.   When the name Stephanie Luster came up, we began

20   looking for her mother, thinking she might know her

21   whereabouts or where her kid might be as a way to track her

22   down.  We located the mother and spoke with her.

23   Q.   And where was the mother?

24   A.   In the Butler County Jail.

25   Q.   For what?

CALHOUN - CROSS

1              MR. THAPAR:  Objection, Your Honor.  What's the

2    relevance?

3              MR. FELSON:  Motive.

4              THE COURT:  All right.  Overruled.

5    BY MR. FELSON:

6    Q.    For what?

7    A.    I don't know.

8    Q.    Was it -- do you know if it was a felony or

9    misdemeanor?

10   A.    I believe it was felony, but I don't know, sir.

11   Q.    And so the mother wanted to speak to the daughter?

12   A.    That is correct.

13   Q.    Okay.  Do you know what that was about?  Did she tell

14   you why she wanted to speak to the daughter?

15   A.    Yes, sir, because she didn't want to see her daughter

16   get in trouble for something other people allegedly did.

17   She wanted to tell her daughter to tell us the truth, to

18   cooperate with us.

19   Q.    Okay.  So did she -- well, her daughter was a suspect

20   at the time, in other words?

21   A.    We weren't sure what involvement her daughter had.

22   All we were sure was her daughter was not in Hamilton

23   anymore, and the information we had was that she was with

24   the Pughs.

25   Q.    Okay.  And did you get that information from the

CALHOUN - CROSS

1  mother?

2  A.    We got that information from the mother.  I don't know

3  where else.   There were other sources on the street that

4  gave us that information, but the mother told us that they

5  were together, yes.

6  Q.    It was just rumor, though, that they were together,

7  right?  I mean the mother was in jail, wasn't she?

8  A.    Correct.

9  Q.    Did she just get to jail, or hadn't she been in jail

10  for a little while?

11  A.    I don't know how long she had been in jail, sir.

12  Q.    All right.   Now, did the mother give a written

13  statement?

14  A.    Yes, she did.

15  Q.    Do you have a copy of that written statement?

16  A.    No, I don't, not with me.

17  Q.    Okay.   Do you have any anywhere?

18  A.    At the Hamilton Police Department.

19  Q.    The mother's statement?

20  A.    At the Hamilton Police Department.

21  Q.    Can you get it faxed over here; is that possible?

22  A.    It's locked in a filing cabinet.   I've got the key.

23  Q.    You have the only key?

24  A.    To my filing cabinet, yes, sir.

25  Q.    Okay.   Was that statement provided to the prosecution?

CALHOUN - CROSS

1    A.    I believe it was, yes, sir.

2    Q.    Okay.  So they would have a copy of it, the U.S.

3    attorneys?  You gave them a copy, right?

4    A.    I gave it to Special Agent Moran.  From there, I don't

5    know where it went.

6    Q.    All right.  Now, okay.  Now, the mother was -- do you

7    know how much time she had left to do?

8    A.    I don't know, sir.

9    Q.    Do you know whether you or anybody else from your

10   department may have spoken to the judge or probation

11   officer on behalf of the mother to try to assist her in any

12   way with her case?

13          MR. THAPAR:  Objection.

14          THE COURT:  Go ahead.  Mr. Thapar, go ahead and

15   make your objection.

16          MR. THAPAR:  Objection.  We have heard about

17   this, and the witness said he doesn't have any personal

18   knowledge; his only knowledge is according to what other

19   people may have known in the office, in the police

20   department.

21          THE COURT:  Sustained.

22   BY MR. FELSON:

23   Q.    Did Ms. Luster request any consideration for her

24   mother?

25   A.    No, sir.

CALHOUN - CROSS

1  Q.   Not to you?

2  A.   I don't know that she dealt with anyone else at the

3  police department, sir.

4  Q.   All right.  Now, let's talk about you mentioned jilted

5  lovers.  Was Ms. Luster also a jilted lover?

6          MR. THAPAR:  Your Honor, he never mentioned that

7  word.  I think Mr. Andrews did.

8          THE COURT:  Sustained.

9  BY MR. FELSON:

10  Q.   You will agree that Shanell was a jilted lover.  I

11  think you agreed to that earlier; is that right?

12  A.   If that's how Mr. Andrews wants to characterize her.

13  That's his characterization, sir.  I don't know what the

14  circumstances were surrounding their split-up.  I don't

15  know.

16  Q.   Do you know whether there was any sort of similar

17  relationship between Ms. Luster and Tyreese?

18  A.   They were found together.  I would assume that they

19  were still together.

20  Q.   Okay.  That's your testimony; they were together?

21  A.   The night he was arrested, yes, sir.

22  Q.   I understand that.  But that she was not -- there was

23  no bad relationship between them; is that your testimony?

24  A.   Yes, sir.

25  Q.   Okay.  And that's because you found them together?

1    A.    No one has ever said anything to the contrary, sir.

2    Q.    All right.  Did you ever interview Ra-Shay Patterson?

3    A.    I dealt with Ms. Ra-Shay Patterson in the past, yes,

4    sir, but not in reference to this case.

5    Q.    All right.  Now, are you aware that there was some

6    newspaper articles on this case?

7    A.    Yes, there were.

8    Q.    Did you give the information to the newspaper?

9    A.    It's my policy to never give information to the media

10    at all, sir.

11    Q.    You're aware that somebody did?

12    A.    Someone in our department has that designation, yes,

13    sir.

14    Q.    Now, was at least one time there was believed to be a

15    third person involved in this?

16    A.    There was the possibility of that, yes, sir.

17    Q.    Okay.  Well, that's the information that was given to

18    the newspaper, wasn't it?

19    A.    It's what was in that article that I read.

20          MR. THAPAR:  Your Honor, again I object.  I would

21    ask that you ask Mr. Felson to keep the questions to the

22    witness' personal knowledge.

23          THE COURT:  Sustained.

24    BY MR. FELSON:

25    Q.    Well, you read the newspaper article, right?

1    A.    Yes.    When it was supplied to me up here on the stand

2    the previous time I testified, yes, sir.

3    Q.    Did you make any effort to correct the newspaper

4    article that mentions three people?

5    A.    I didn't see a need to make any correction.    I never

6    read the article before it was presented to me here, sir.

7    To go back and correct it now --

8    Q.    Okay.    You didn't read it at that time?

9    A.    No, sir.

10    Q.    All right.    But I guess the description of the third

11    person was a male black.    Was that the description; do you

12    recall?

13             MR. THAPAR:    Your Honor, objection.

14             THE COURT:    Sustained.

15    BY MR. FELSON:

16    Q.    All right.    This stolen vehicle in Dayton, you said it

17    was located in Dayton?

18    A.    Yes, sir.

19    Q.    Was it -- did anybody search it to determine whether

20    there was anything in it from the bank?

21    A.    The police department that located it did look through

22    it for us, yes.

23    Q.    But did you look through it?

24    A.    No, sir, I did not.

25    Q.    Do you know a Sergeant Jim Malone?

1  A.    He is our Juvenile Section supervisor.

2  Q.    Is he the one in charge of giving information to the

3  newspapers?

4  A.    He could be.  He's one of my supervisors.  So, if they

5  asked for information in reference to an investigation, he

6  could supply it.

7  Q.    Who is Hamilton Police Sergeant Tom Kilbourne?

8  A.    He's the sergeant in charge of the Public Affairs

9  Section.

10  Q.    Is he the one -- that sounds more like the guy that

11  should give information for the newspaper.

12  A.    Normally, that's the procedure, yes, sir.

13  Q.    Did you talk to him about who was involved in this

14  case and how many people, suspects, they were looking for?

15  A.    I believe, as I previously testified to, sir, no, I

16  did not.

17  Q.    So you weren't aware what he told the newspapers?

18  A.    No, sir.

19        MR. FELSON:  All right.  That's all.  Thank you.

20        THE COURT:  Mr. Thapar, Ms. Cross, do you wish to

21  cross-examine this witness?

22        MR. THAPAR:  Yes, Your Honor.  I will be doing

23  the cross-examination.  Thank you.

24                    CROSS-EXAMINATION

25  BY MR. THAPAR:

1   Q.   Good morning.

2   A.   Good morning, sir.

3   Q.   I'm going to start out talking about Ms. Luster's

4   mother and just want to go over -- you remember all the

5   questioning about that, right?

6   A.   Yes, sir.

7   Q.   Okay.  A couple things I want to cover with you.  They

8   said that -- or they asked you about whether Stephanie

9   Luster was in town.  Did you also go to her apartment to

10  verify that she wasn't in town?

11  A.   Yes, sir.  In fact, we executed a search warrant on

12  her apartment.

13  Q.   And she wasn't there, right?

14  A.   That is correct.

15  Q.   And they talked about Stephanie Luster and Mr. Pugh,

16  Tyreese Pugh.  They used the word "jilted."  Did you find

17  them in bed together on the 3rd?

18  A.   The Hamilton County Sheriff's Department SWAT team

19  did, yes.

20  Q.   And going back, and I'm sorry to jump around a little,

21  to her mother, did she know the defendants Walter and

22  Tyreese Pugh?

23  A.   Yes, sir, she did.

24  Q.   And is that why you talked to her?

25  A.   Yes, sir.

CALHOUN - CROSS

1   Q.   And when you showed her the pictures of the bank

2   robbery, isn't it true that she identified Walter and

3   Tyreese Pugh?

4            MR. ANDREWS:  Objection.

5            THE COURT:  What's the basis?

6            MR. ANDREWS:  Clearly hearsay, Your Honor.  The

7   statement has not been produced.  We have no idea what the

8   statement says.  She is a witness, hasn't been called to

9   court.  The only question was, as I understand, was she

10  interviewed and did they take the statement.  I don't

11  believe that opens the door as to the contents of the

12  statement.

13           MR. THAPAR:  Your Honor, it clearly does.  They

14  asked why she was going to have her down to the police

15  department, why they talked to her.  It is in the officer's

16  notes.  In the notes, they refer to her.  We're allowed,

17  once they open the door, to explain the contents and why

18  they did the things they did.

19           THE COURT:  Overruled.

20  BY MR. THAPAR:

21  Q.   Did she identify Mr. Walter Pugh?

22  A.   She did.

23  Q.   Did she identify Mr. Tyreese Pugh?

24  A.   She referred to him with his street name as Butter,

25  yes.

1    Q.    Okay.  And when you were trying to locate Stephanie

2    Luster, she put you in touch with Marty Jackson, right?

3    A.    That is correct.

4    Q.    And that's Ms. -- let me get the name right -- Shelly

5    Luster's brother?

6    A.    Correct.

7    Q.    And he said -- and she also told you that he said

8    Marty Jackson received a call from Stephanie in Georgia,

9    right?

10    A.    Correct.

11          MR. ANDREWS:  Objection.  Being a little far on

12    the hearsay.  We are now to the contents of a phone call

13    from Georgia to a third party described through a fourth

14    party to the officer.

15          MR. THAPAR:  Again, Your Honor, it goes to --

16    this goes to Mr. Felson's questions about whether they knew

17    where Stephanie was.  It's not offered for the truth of the

18    matter.  It's offered for the state of mind of the officers

19    in determining where the defendants and Ms. Stephanie

20    Luster were.

21          THE COURT:  Overruled.

22    BY MR. THAPAR:

23    Q.    And so, through Ms. Shelly Luster, you determined that

24    Stephanie was in Georgia, correct?

25    A.    Correct.  She was attempting to make contact with