RENFRO - DIRECT

1    A.    Cortes Renfro, R-e-n-f-r-o.

2    Q.    Where do you live?

3    A.    11979 Wincanton Drive.

4    Q.    Is that in Mt. Healthy, Ohio?

5    A.    Colerain Township.

6    Q.    Please?

7    A.    Colerain Township.

8    Q.    On the north edge of the county?

9    A.    Yes.

10   Q.    Do you know Walter and Tyreese Pugh?

11   A.    Yes, I know Walter.

12   Q.    They came to your house one night last May or one

13   afternoon last May?

14   A.    Yes.

15   Q.    Tell us what prompted that.  Why did they come there?

16   A.    My son-in-law just brung them there just briefly.

17   Q.    When they arrived there, who were they in the company

18   with, if anyone?

19   A.    Two girls, two young girls.

20   Q.    Okay.  And what car were they in, if you recall, what

21   kind of car?

22   A.    A beige -- I don't know exactly what kind of car.  I

23   know it's a beige.

24   Q.    Okay.  Did you help carry anything from that car into

25   the house?

RENFRO - DIRECT

1   A.   One of those girls dropped a bag in my driveway, and I

2   helped her get her stuff up off the driveway, because it

3   had busted.

4   Q.   Clothes fall out of that bag or what?

5   A.   A bunch of rubber bands and a few little clothing

6   items.

7   Q.   Okay.  Carried that into your house.  What happened

8   then?

9   A.   She went on downstairs in the basement.

10  Q.   Please?

11  A.   She went downstairs in my basement.  She took it on

12  downstairs into the basement.

13  Q.   Anybody else go to the basement area?

14  A.   No.

15  Q.   During the next number of hours, who went to your

16  basement, if anyone?

17  A.   Just her and Pugh, that's the only one.

18  Q.   When you say Pugh, are you referring to Walter Pugh?

19  A.   Walter, yes.

20  Q.   Prior to that date, did you or did you not know

21  Walter's son?

22  A.   I didn't know his son at the time.

23  Q.   Okay.  So if you say Pugh --

24  A.   I mean, yes.

25  Q.   -- you mean Walter Pugh?

RENFRO - DIRECT

```
 1   A.   Yes.

 2   Q.   Now, what happened then?  What did all of you do?

 3   A.   I basically stayed upstairs, and I had been drinking

 4   and stuff and watching TV.

 5   Q.   Do you recall what time they showed up?

 6   A.   Probably about 10, 11 or something like that.  I'm not

 7   for sure exactly.

 8   Q.   In the morning or evening?

 9   A.   In the morning.

10   Q.   Were you drinking at that time?

11   A.   Yes, I was drinking.

12   Q.   You continued to drink through the balance of the day;

13   is that correct?

14   A.   Yes.

15   Q.   Matter of fact, you also did some illegal drugs?

16   A.   Yes.

17   Q.   And during this time you were in the company of the

18   two Pughs, the two males?

19   A.   Yes.

20   Q.   Were you in the company of the two women that came

21   with them the whole time?

22   A.   Yes.

23   Q.   Now, did you ever learn the names of the women?

24   A.   Yes, because one of them stayed up and talked to me

25   for a little bit.
```

RENFRO - DIRECT

| | |
|---|---|
| 1 | Q. And which woman talked to you? |
| 2 | A. I think it was Stephanie. |
| 3 | Q. Okay. Was the other woman named Shanell, if you know? |
| 4 | A. I remember her saying she was Shanell. She introduced |
| 5 | herself. |
| 6 | Q. Was she with Walter from what you could tell? |
| 7 | A. Yes. |
| 8 | Q. Did you observe them talking? |
| 9 | A. Briefly, not too much, because they said they could go |
| 10 | downstairs. They wanted, you know, to be alone. |
| 11 | Q. Did you note anything about their discussions? |
| 12 | A. Not really, but I just remember she came back upstairs |
| 13 | kind of mad. |
| 14 | Q. Mad? |
| 15 | A. Yes. |
| 16 | Q. Was acting angry? |
| 17 | A. Yes. |
| 18 | Q. Did she stay there through the whole evening? |
| 19 | A. No. She left. |
| 20 | Q. Do you recall about what time she left? |
| 21 | A. I would say about 6 or 7. I'm not for sure exactly |
| 22 | what time. |
| 23 | Q. This was after you saw her angry? |
| 24 | A. Yes. |
| 25 | Q. Did she return at any time later? |

RENFRO - DIRECT

| | | |
|---|---|---|
| 1 | A. | Yes, she returned.  That's when she dropped the bag, |
| 2 | | when she returned. |
| 3 | Q. | She dropped the bag when she returned? |
| 4 | A. | Yes. |
| 5 | Q. | How long did she stay at your house then? |
| 6 | A. | Not too long I don't think.  I don't think.  Briefly. |
| 7 | Q. | From there, what happened? |
| 8 | A. | She stormed out and said she was going to take a |
| 9 | | shower or something like that. |
| 10 | Q. | Okay.  And appeared angry? |
| 11 | A. | Yes. |
| 12 | Q. | Did she make any phone calls to your home? |
| 13 | A. | Yes. |
| 14 | Q. | Do you remember how many? |
| 15 | A. | I don't know the conversation.  I don't know who she |
| 16 | | called or anything. |
| 17 | Q. | Okay.  I'm not saying you knew.  Do you remember how |
| 18 | | many phone calls she made? |
| 19 | A. | No, I don't remember. |
| 20 | Q. | Was it more than one, if you know? |
| 21 | A. | I would say so, yes. |
| 22 | Q. | Okay.  After these phone calls, did she come back to |
| 23 | | your home? |
| 24 | A. | Yes.  I think she called back. |
| 25 | Q. | Okay. |

RENFRO - DIRECT

1    A.    Before she --

2    Q.    She called?

3    A.    Yes.

4    Q.    And then she came back?

5    A.    Yes.

6    Q.    Did Walter have any of those conversations in front of

7    you on the telephone?

8    A.    No.

9    Q.    So you have no idea what he said, she said, or

10   anything else?

11   A.    No.

12   Q.    Now, when she returned the next time, what happened

13   then?

14   A.    She just briefly came downstairs, and I don't know how

15   long she stayed, because I was -- I think I had left and

16   went to the store to get some beer and stuff.

17              THE COURT:   Can you speak up just a little bit,

18   Mr. Renfro?

19   A.    I had left and went to the store and came back.  So I

20   don't know exactly how long she stayed.

21   Q.    Did you leave in her company at some time later?

22   A.    Yes.

23   Q.    Okay.  Who was in the car that you left in?

24   A.    In the car that I left in?

25   Q.    Um-hum.

RENFRO - DIRECT

1    A.    The last time?

2    Q.    Yes.

3    A.    A friend of mine's girlfriend.

4    Q.    Who was that?

5    A.    Kim.

6    Q.    Okay.

7    A.    I forgot her last name.

8    Q.    And who else was in that car?

9    A.    Pugh.

10   Q.    And who else?

11   A.    And her.

12   Q.    And?

13   A.    Me.

14   Q.    Okay.

15   A.    I'm sorry.

16   Q.    There were three of you in the car then?

17   A.    Yes.

18   Q.    And the police stopped you at that time?

19   A.    Yes, the last time.

20   Q.    It is correct you gave the police permission to search

21   your house?

22   A.    Yes.

23   Q.    And they did search your house?

24   A.    Yes.  They tore it up.

25   Q.    They tore it up badly?

RENFRO - CROSS

1   A.   Yes.

2   Q.   Knock things all over?

3   A.   Everything.

4        MS. CROSS:   Your Honor, I'm going to object to

5   the leading.  This is his witness.

6        THE COURT:   Sustained.

7   BY MR. ANDREWS:

8   Q.   Now, during the time that Walter and Tyreese Pugh were

9   in your house, did you ever see any guns?

10  A.   No.

11  Q.   During the time Walter and Tyreese Pugh were in your

12  house, did you ever see any large sums of money?

13  A.   No.

14       MR. ANDREWS:   I have nothing else of this

15  witness.

16       THE COURT:   Thank you, Mr. Andrews.

17       Mr. Felson, do you have any questions of this

18  witness?

19                    CROSS-EXAMINATION

20  BY MR. FELSON:

21  Q.   Tell me about the search that they did.

22  A.   Excuse me?

23  Q.   How did they search your house?  Where did they look?

24  A.   I wasn't there.  They had me out.

25  Q.   But based on what you saw afterwards, the damage that

| | |
|---|---|
| 1 | was done. |
| 2 | A.   Upstairs, all my bedrooms, my front room, my basement, |
| 3 | my garage. |
| 4 | Q.   Did they take drawers out? |
| 5 | A.   Yes.   Everything was just -- all my clothes and |
| 6 | everything out of the closets in each room, in every room. |
| 7 | Q.   Did they put it back after they were done? |
| 8 | A.   No.   Everything was just a mess. |
| 9 | Q.   Anything broken?   Did they break things? |
| 10 | A.   It was a few items broken, a mirror and a few other |
| 11 | lamps and other little things. |
| 12 | Q.   Okay.   Now, you said you saw them bringing stuff into |
| 13 | the house.   I'm talking about Walter and the girl. |
| 14 | A.   I only saw the girl brought a little bag. |
| 15 | Q.   Did you see Tyreese bring anything into the house? |
| 16 | A.   No. |
| 17 | Q.   Do you know where -- well, who was sleeping where? |
| 18 | Did you assign people to have different rooms? |
| 19 | A.   I told Tyreese that he can go upstairs with his |
| 20 | girlfriend and, you know, have some privacy. |
| 21 | Q.   Whose room was he in? |
| 22 | A.   He was in the little room upstairs, a room that I |
| 23 | don't even -- |
| 24 | Q.   I'm sorry? |
| 25 | A.   A room that I usually have shut, locked.   This is a |

RENFRO - CROSS

1    four-bedroom home.

2    Q.    So it's a big house?

3    A.    Yes.

4    Q.    Four bedrooms, and who else lives in the house?

5    A.    Just me, and my son used to.

6    Q.    Does your son still come in and out of there?

7    A.    No.

8    Q.    Not even holidays?

9    A.    Yes.  You know, around the holidays he comes.

10   Q.    Okay.  And who else that day, the day that the police

11   officers came in and searched, who else was there that day?

12   We got the two, Walter, Tyreese.  Who else?

13   A.    A friend of mine came over.

14   Q.    Who's that?

15   A.    Gilbert.

16   Q.    Who's that?

17   A.    Gilbert Wilson.

18   Q.    Male or female?

19   A.    Gilbert, a male.

20   Q.    Okay.  Was he spending the night there, too?

21   A.    No.  He just had ran me somewhere.

22   Q.    Was he over for a little while?

23   A.    Briefly, just like 10 or 15 minutes.

24   Q.    Okay.  Who else?  A couple of women there?

25   A.    Just --

RENFRO - CROSS

1    Q.    Stephanie?

2    A.    Just their girlfriends, Walter Pugh and Tyreese

3    girlfriends.

4    Q.    Okay anybody else other than who you mentioned so far?

5    A.    No.

6    Q.    There was -- Kim was there, too?

7    A.    Yes, but she just came over briefly to pick me up to

8    take me to the store.

9    Q.    She picked you up and brought you back?

10   A.    No.   They blocked us off.

11   Q.    Okay.   I get you.   Do you have a car?

12   A.    No.

13   Q.    Now, do you know when, well, what time you left, what

14   time had you left before you got arrested, before the

15   police stopped you?

16   A.    I say maybe 9-something, 10-something.

17   Q.    Nine p.m.?

18   A.    Somewhere around in there.

19   Q.    Do you know what time the police came in to search

20   everything?

21   A.    I'm not for sure, but I would say it had to be 11, 12,

22   something like that at night.

23   Q.    Okay.   Were you -- did they bring you back to the

24   house when they searched?

25   A.    They kept me down at the LoBill's grocery store for a

RENFRO - CROSS

1    good while.  Then they brought me back to the house, but
2    they didn't let me come in my own house.
3    Q.    Do you know what -- do you know the -- let's see.  Do
4    you know whether Stephanie went up to the room for privacy
5    before Tyreese, or did they go up together, or were you
6    watching or --
7    A.    I really wasn't watching.  I don't know how -- either
8    if they went up together or not.
9    Q.    You don't know how long they were up there?
10   A.    No.
11   Q.    All right.  Did Shanell go up there, upstairs?
12   A.    If she did, it was probably when I could have been in
13   the kitchen or went to the bathroom or something.  I'm not
14   for sure.
15   Q.    Okay.  But are there other bedrooms on the second
16   floor?
17   A.    Yes.
18   Q.    Now, you were on the first floor?
19   A.    Yes.
20   Q.    Were you there on the first floor the whole evening?
21   A.    Yes, mostly.
22   Q.    Do you know whoever went up to the second floor?
23   A.    Not really.
24          MR. FELSON:  That's all I have.  Thank you.
25          THE COURT:  Do you have any cross-examination,

RENFRO - CROSS

1   Ms. Cross or Mr. Thapar?

2              MS. CROSS:  Yes, Your Honor.

3              THE COURT:  You may proceed.

4              MS. CROSS:  And, Your Honor, if I may ask

5   Mr. Snyder, I'm going to be showing with witness Government

6   Exhibits 10, 11, 12.

7                        CROSS-EXAMINATION

8   BY MS. CROSS:

9   Q.   Hi, Mr. Renfro.  It's true that your -- do people call

10  you Corkey as well?

11  A.   Yes.

12  Q.   And you have known Walter Pugh for a number of years,

13  correct?

14  A.   Yes.

15  Q.   Did you grow up in Hamilton together?

16  A.   Yes.

17  Q.   Would you consider yourself to be good friends?

18  A.   We associates.

19  Q.   Long-time associates?

20  A.   Yes.  Just, you know, I haven't seen him in a long

21  time.

22  Q.   In fact, I was going to ask you that.  You hadn't seen

23  him in a number of years, correct?

24  A.   Right.

25  Q.   And this day that he showed up with Tyreese and these

RENFRO - CROSS

1    two females, had it been planned that they were coming to

2    your house?

3    A.    My son-in-law called me and told me that he wanted --

4    got somebody that wanted to see me from old times.

5    Q.    So this was a spur-of-the-moment thing, correct?

6    A.    Yes.

7    Q.    You hadn't invited them to come and stay over your

8    house and visit for a couple of days, had you?

9    A.    No.    I didn't never know who was coming at the time.

10   He just said it was going to be a surprise.

11   Q.    In fact, wasn't it your understanding that they

12   weren't going to stay very long at your house?

13   A.    Right.

14   Q.    Now, you said that, on that day, you had been

15   drinking?

16   A.    Yes.

17   Q.    All day --

18   A.    Yes.

19   Q.    -- pretty much.    And where is your room located in

20   your house?

21   A.    All the way in the back.

22   Q.    First or second floor?

23   A.    Second floor.

24   Q.    Okay.    And where were you pretty much during the day

25   when you had these visitors?

1   A.   Basically in the den or in the front room.

2   Q.   So you didn't roam through your house the whole day;

3   you pretty much stayed put entertaining, correct?

4   A.   Yes.

5   Q.   And you weren't watching everything, everyone's move

6   and everything that was happening in the house, were you?

7   A.   No.

8   Q.   Now, did you leave the house more than one time on

9   that day?

10   A.   Yes.

11   Q.   Do things like go to the store?

12   A.   Went to the store.

13   Q.   And so you don't know what was happening at your house

14   when you weren't there?

15   A.   No.

16   Q.   And when you left and went to the store the first

17   time, the defendants were still there, correct?

18   A.   Yes.

19   Q.   Now, did you say that when Shanell Holston came over

20   the second time and dropped this bag in the --

21   A.   Driveway.

22   Q.   -- driveway, that some clothes fell out?

23   A.   A few items and some rubber bands.

24   Q.   Some rubber bands?

25   A.   Yes.  Like doing your hair or something, you know, and

RENFRO - CROSS

1   a few other hair products, I believe it was.

2   Q.   Now, how long have you known Shanell?

3   A.   I never knew her.

4   Q.   You didn't know her before that day?

5   A.   Until that day, yes.

6   Q.   But you had known Defendant Walter Pugh a long time?

7   A.   Yes.

8   Q.   Had you met Tyreese Pugh?

9   A.   Yes.

10          MS. CROSS:   If I could show Mr. Renfro Government

11   Exhibits 10, 11 and 12.

12   Q.   As he's bringing those over, I ask you:  Did you

13   testify that the room that Tyreese, you sent Tyreese up

14   into to sleep, you kept locked pretty much?

15   A.   Shut.  It's not locked.

16   Q.   You didn't use it, right?

17   A.   No.

18   Q.   Mr. Renfro, before you is Government Exhibits 10, 11

19   and 12.  As you can, see they're guns, correct?

20   A.   Correct.

21   Q.   Looking at Number 10, the shotgun, the big black

22   shotgun there, is that yours?

23   A.   No.

24   Q.   Looking at the brown revolver, Number 11, is that

25   yours?

RENFRO - REDIRECT

```
1    A.    No.

2    Q.    Looking at Number 12, is that yours?

3    A.    No.

4              MS. CROSS:  Thank you, Mr. Renfro.

5              THE COURT:  Any redirect examination?

6              MR. ANDREWS:  Only a couple of things, Your

7    Honor.

8                    REDIRECT EXAMINATION

9    BY MR. ANDREWS:

10   Q.    Did you overhear a conversation about $800?

11   A.    Briefly.

12   Q.    Okay.  Relate what you heard.

13             MS. CROSS:  Your Honor, I'm going to object.

14             MR. ANDREWS:  Actually, it does go beyond.  I'll

15   withdraw it.

16             Oh, one additional thing.

17   BY MR. ANDREWS:

18   Q.    You say when the bag opened up some rubber bands fell

19   out?

20   A.    Yes.

21   Q.    These were rubber bands?

22   A.    To do your hair.

23   Q.    What, hair care products?

24   A.    Yes.

25   Q.    Sometimes called twisties, I think, by women?
```

```
 1    A.    Yes.
 2    Q.    They weren't typical rubber bands like you would use
 3    in business?
 4    A.    It was a bunch of rubber bands and twisties and some
 5    hair products, I believe.
 6              MR. ANDREWS:  Okay.  Nothing further.
 7              THE COURT:  Mr. Felson.
 8                    RECROSS EXAMINATION
 9    BY MR. FELSON:
10    Q.    You said that the room that Tyreese was, I guess,
11    given for privacy was shut but not locked; is that right?
12    A.    Right.
13    Q.    And was there furniture in there?
14    A.    Yes, a bed and, I don't know, chest of drawers.
15    Q.    Okay.  Do you have -- is that like a guest room?  You
16    use it as a guest room?
17    A.    Yes.
18    Q.    Other guests have stayed there before?
19    A.    Yes.
20    Q.    All right.  Do you keep -- I mean, there are closets
21    in there?
22    A.    Yes.
23    Q.    And do you recall what's in the closets?
24    A.    A bunch of old things, like old clothing and some old
25    pictures and some luggage.
```

RENFRO - RECROSS

```
 1   Q.   So it's not a barren room?

 2   A.   No.

 3   Q.   It's been used.   There just is nobody living in it on

 4   a day-to-day basis?

 5   A.   Right.

 6              MR. FELSON:   That's all I have.

 7              THE COURT:   Anything further, Ms. Cross?

 8              MS. CROSS:   No, Your Honor.

 9              THE COURT:   Mr. Renfro, the Court appreciates

10   your coming here today, and you are excused.   Thank you.

11              Mr. Andrews, do you have any more witnesses?

12              MR. ANDREWS:   Your Honor, that would conclude the

13   defendant Walter Pugh's witnesses at this time, Your Honor.

14              THE COURT:   All right.

15              MR. ANDREWS:   And we will rest.

16              THE COURT:   Are you going to move any exhibits

17   into evidence?

18              MR. ANDREWS:   If I could have one moment.

19              THE COURT:   Sure, I think we can do that outside

20   the presence of the jury.

21              MR. ANDREWS:   Thank you, Your Honor.

22              THE COURT:   All right.   Anything further?   Any

23   rebuttal, Ms. Cross?

24              MS. CROSS:   No rebuttal case, Your Honor.

25              THE COURT:   All right.   Ladies and gentlemen of
```

1    the jury, you have now heard all of the testimonial

2    evidence.  We're going to take a recess.

3         One thing, you have got lunch waiting for you,

4    and I need to talk to the lawyers for a few minutes about

5    some of the exhibits, and then we will get started with

6    argument at 12:30.

7         So if you want, after you have a bite of lunch,

8    if you want to go outside in the sunshine or smoke or

9    whatever, feel free to do that, but I ask that you be back

10   in the jury room at 12:30.

11        And remember -- this is the last time I'll give

12   you this admonition -- please don't discuss the case with

13   anyone, including your fellow jurors.  The case will get to

14   you this afternoon, and then you can finally talk to each

15   other.

16        (Jury excused from the courtroom.)

17        THE COURT:  Mr. Felson, do you also have exhibits

18   that you're going to move into evidence?

19        MR. FELSON:  I think that, if I could just

20   refresh my recollection on which numbers I have marked

21   already.  We are not offering the --

22        THE COURT:  I think you have only got -- B is the

23   only thing I have written down, statement of Stephanie

24   Luster.

25        MR. FELSON:  I think we're just going to leave

1    that out.  I'm not going to offer it.  And then, of course,

2    Dr. Fulero is irrelevant.  I think that's it.

3              THE COURT:  All right.  Mr. Andrews?  Mr. Pugh?

4              MR. ANDREWS:  Your Honor, in conferring with

5    Mr. Pugh on this matter, it's our recollection everything

6    we have used we have used by way of impeachment, not as

7    direct evidence, and it's been used in that manner, and

8    we're not asking it be admitted into evidence.

9              THE COURT:  All right.  Then all the evidence is

10   in, including the exhibits.

11             Are we -- I guess we're still on the same

12   schedule for argument?  Let me think how I'm going to work

13   out the timing.  I'll charge the jury at 12:30.  I'll do

14   the charge, which will go to about 1:20.  Then we have got

15   the government.

16             How are you going to split?  Do you have any idea

17   how you're splitting the argument?  About how many minutes

18   first?

19             MS. CROSS:  Your Honor, I think probably 20

20   minutes on the front and then 20, 25 then rebuttal.

21             THE COURT:  So if we do your opening -- Steve,

22   you're better at figuring this out than I am.  We do the

23   government's opening, then take -- Mr. Felson wants an

24   hour, and Mr. Andrews wants a half hour, and then the

25   government wants more.

1       Here's the choices, and I don't really have a

2   strong feeling either way.  I think it's sorts of up to the

3   government, because it's their argument that will be split.

4   Since my reading of the instructions takes about 50

5   minutes, we could tack the government's opening onto that,

6   which would be about 70 minutes, then give everybody a

7   break, and then we would have somewhere between an hour and

8   a half to two hours of argument when we come back from the

9   break.  That seems to be probably of the most logical way

10  to split it so they're not sitting too terribly long.

11      MS. CROSS:  That's fine, Your Honor.

12      THE COURT:  If the jury looks to me like they

13  have been sitting too long, then we'll just take an extra

14  recess.  Probably just a short one, a five or ten minute

15  one, just to give them a chance to stretch their legs.

16      I'll see you all back here at 12:30.

17      MR. FELSON:  Your Honor, there is one other issue

18  that I have been sort of waiting.  You know, there has been

19  no testimony by Walter Pugh -- first of all, before I

20  forget it, is it possible to have something to write on

21  here, like a little blackboard of some sort?

22      THE COURT:  Oh, for the --

23      MR. FELSON:  Yes.

24      THE COURT:  You want to write on the paper to

25  project onto the board?  You can write onto a piece of

1    paper, and it will be projected up on the screen.

2           MR. FELSON:  All right.  That's fine.

3           The next issue is -- I'm not sure.  There is an

4    issue about statements of coconspirators and the

5    admissibility thereof that's been addressed in a case

6    called Lilly v. Virginia.

7           THE COURT:  Lilly v. --

8           MR. FELSON:  Virginia, 527 U.S. 116.  We made a

9    copy of it this morning.  I think you have my copy.  But,

10   in any event, the issue really only applies to a couple of

11   things that Walter Pugh stated to Stephanie Luster or to

12   Ms. Patterson relating to any culpability of Tyreese Pugh.

13   Okay?  It has nothing to do with anything else except what

14   he might have said to declarant that came up on the witness

15   stand that included, not only Walter's inculpability or

16   statement against penal interests or whatever, but also

17   included Tyreese.

18          And my understanding from reading this case and

19   some other cases like that is that what she said or what

20   any statements made against Tyreese would give Tyreese the

21   permission to cross-examine the person that made the

22   statement originally, according to these cases.

23          Now, you can call it a confession or admission or

24   statement against interests or whatever.  But the point is

25   it brings up confrontation clause issues, and it brings up

1   hearsay exceptions and that type of thing.  And my
2   understanding of the -- reading the current case law is
3   that that then has to be either excised or some kind of a
4   curative statement has to be given, because we weren't
5   obviously able to cross-examine Walter since he's chosen
6   not to take the stand.  It's not relevant until he chooses
7   not to take the stand.  My understanding is he's chosen not
8   to do that.  That's why I didn't want to make a big stink
9   about it until they closed.
10            But if I could address the Court to this case,
11   seems like it's on point.  I understand this particular
12   case talks about a confession.
13            THE COURT:  We have reviewed the case.
14            MR. FELSON:  All right.  Thank you.
15            THE COURT:  Let me hear from the government.
16            MR. THAPAR:  Your Honor, the United States just
17   heard of this this morning, so I'm just going to briefly --
18   I have to cite a case, which I'm going to be candid with
19   the Court, is a Sixth Circuit case that I have not
20   Shepardized.  I didn't have time, because I was here.  I'm
21   also going to refer to the Lilly case.
22            First, to keep the record as clean as possible, I
23   think Mr. Felson misspoke when he said a statement to
24   Ms. Patterson.  I think he was referring to the statements
25   in the hotel that were made to Ms. Luster when Walter Pugh

1   said, "We hit a lick" and "I went to the vault and Tyreese

2   manned the door," or something to that effect.

3          THE COURT:  Is that what you mean, Mr. Felson?

4          MR. FELSON:  Yes.  There was also, I think, one

5   other statement made that I have written down in my notes,

6   but there is only about two or three issues.

7          MR. THAPAR:  Okay.  And I think -- let's keep the

8   record as clean as possible.  There was a statement in

9   Atlanta where the government put forth evidence that Walter

10  was talking about the bank robbery and Tyreese was

11  demonstrating how he held the gun, et cetera, that

12  Ms. Luster testified.  Obviously, that's not a statement,

13  and that comes in against Mr. Tyreese Pugh.

14         With regard to the statements in Tennessee in the

15  hotel, the government would argue two things.  One, when

16  Your Honor looks at the Lilly case, the Lilly case has to

17  do with confessions.  The Court takes great pains to point

18  out that one of the points of Lilly is, when you have got

19  two defendants interviewing separately by the police, the

20  defendant -- for example, one defendant would have an

21  interest in making a statement against penal interests of

22  both of them in order to get time cut off or in order to

23  cooperate.

24         That isn't the case here.  In fact, the Lilly

25  case, in footnote two, refers to a case that I would submit

1    is more on point called <u>Dutton v. Evans</u>, 400 U.S. 74.  It

2    says the only arguable --

3              THE COURT:  Mr. Thapar, slow down.  I can't

4    follow you, and neither can Betty.

5              MR. THAPAR:  I'm sorry.  The only arguable

6    exception to this unbroken line of cases arose in our

7    plurality opinion in <u>Dutton v. Evans</u>, and that is again

8    about confessions and statements against penal interests.

9    And the final sentence says:  Rather, the five justices in

10   the majority emphasize the unique aspects of the case and

11   emphasize that the co-conspirator spontaneously made the

12   statement and had no apparent reason to lie.

13             In this case, the United States would submit that

14   Mr. Walter Pugh was not in the custody of the government,

15   was not making a statement to law enforcement officials,

16   and had, like Dutton, no apparent reason to lie.

17             Similarly, I'm now going to refer to the Sixth

18   Circuit case.  The United States would argue secondly, and

19   maybe more importantly, that this was an adoptive admission

20   by Tyreese Pugh.  And I would refer Your Honor to two

21   cases, <u>United States v. Hoosier</u>, and its 542 F.2d, 687.

22   That's a Sixth Circuit 1976.  And <u>United States v. McKinny</u>,

23   which is 379 F.2d 259 at 261.  That's the Sixth Circuit

24   1967.  And that's where a defendant's girlfriend was

25   talking about sacks of money related to a bank robbery that

1   the defendant had, and they said:  Circumstances show that

2   the defendant would naturally have denied the girlfriend's

3   statement if untrue.  So the district court properly

4   admitted the girlfriend's statements as adopted by the

5   defendant.

6          Here, Mr. Walter Pugh said, "We hit a lick."  He

7   then said, "I went into the vault, and Tyreese manned the

8   door."  It seems like, with the girlfriend, Tyreese had

9   ample opportunity back at the room and other occasions to

10  deny those statements, to say, "I wasn't a part of it," to

11  say, "That money is not mine."  He never did it.  So that,

12  the United States would argue, is an adoptive admission by

13  Mr. Tyreese Pugh.  And the United States would argue on

14  those two grounds, along with the natural argument of a

15  co-conspirator's statement.

16          THE COURT:  Okay. Anything else?

17          MR. FELSON:  Briefly in response to that, I think

18  there wasn't any evidence that Tyreese heard or understood

19  what was said.  In other words, I don't think she said we

20  were all standing in a circle.  But that leads me to my

21  other question is, particularly with Ms. Luster, when the

22  statement was made, "We hit a lick," I asked her what

23  did -- or even the statement, she says "I took it to mean."

24  In other words, she is saying that her, we'll say,

25  interpretation of what those words was something that's

1   inculpatory to my client, Tyreese.

2           Now, the same thing I'm suggesting happened, not

3   only in that case, but also in the other statements that

4   she made.  In other words, did he say, "We hit a lick," "I

5   hit a lick"?  The exact words were not -- we don't really

6   know.  But the point I'm making is that those words require

7   some sort of cross-examination to at least get what the

8   exact words are.  Because what's happening here is she is

9   saying what she thought she heard.  Then she's saying what

10  she took it to mean.  And then all of a sudden it turns

11  into some sort of admission that is inculpatory against my

12  client, which, without any cross-examination whatsoever,

13  really leaves me exposed.  I can't get to the bottom of

14  exactly what was said, and it's very prejudicial to

15  Tyreese.

16          THE COURT:  I understand.

17          Anything further?

18          MR. THAPAR:  Just briefly.  I appreciate

19  Mr.Felson's pointing that out, because what he's saying, is

20  this _Lilly_ case isn't even on point.  He's saying this

21  question is open for the jury to interpret that statement

22  how they may.  It's not a confession.  He admitted it's not

23  a confession implicating Tyreese.  What he says is it's a

24  statement open to interpretation.  And we submit that's

25  best left to the jurors.

1          THE COURT:  Okay.

2          MR. FELSON:  I just wanted to clarify, I'm not

3   saying that it's the way she said it.  It certainly seems

4   like some sort of a confession or inculpatory statement.

5   I'm not saying that that's the way we're viewing it.  She

6   might have been mistaken.  I'm saying that the matter needs

7   cross-examination, or else it's very prejudicial.

8          THE COURT:  I think I understand the legal

9   arguments.

10          The Court is going to deny the defendant Tyreese

11  Pugh's motion to strike for all of the reasons articulated

12  by Mr. Thapar.

13          Anything I need to add to that, Mike?

14          Okay.  I will see you all back here at 12:30.

15          (Luncheon recess at 11:40 a.m.)

16                    AFTERNOON SESSION

17          THE COURT:  All right.  We're now at that stage

18  of the trial that I described to you where the Court is

19  obligated by law to read the jury instructions to you.  We

20  have provided a copy to each of the jurors.  That's your

21  own individual copy.  If you want to write on it or make

22  notes, that's fine.  You can take it with you at the end of

23  the trial.  You may not want to read along with me, or you

24  may want to.  Whatever is most comfortable with you is

25  fine.  If you want to just listen, that's fine, too.

1       The reason we provided you the written

2   instructions as well as my reading it to you is that people

3   learn differently.  Some people are aural.  They learn

4   better by listening.  Some people are visual.  They learn

5   better by seeing something.  And there are some people who

6   are kinetic.  They learn better by touching.  And they say,

7   when you combine these methods of learning, it's sort of

8   the one reinforces the other.  So, you're going to have it

9   aurally and visually, and you can do it whichever way you

10  want.

11      Let me start with the caption of the case on the

12  front of the jury instructions.  And if at any time you all

13  have difficulty hearing me, just let me know.

14      The caption of the case is:  In the United States

15  District Court for the Southern District of Ohio, Western

16  Division, United States of America, plaintiff, versus

17  Walter M. Pugh, Jr., and Tyreese D. Pugh, defendants, case

18  number CR-1-02-504.  And I am District Judge Susan J.

19  Dlott.  These are the jury instructions, and today is

20  September 9, 2002.

21      You'll notice in the beginning there we have a

22  table of contents for you.  That's simply to help you find

23  a topic easier if you want to find it during deliberations.

24  You may remember I said something about credibility of

25  witnesses and you want to go over that instruction again,

1   well, you can find "Credibility of Witnesses" there, it's

2   on page 10, and then turn directly to that.

3             Members of the jury, it is now time for me to

4   instruct you about the law you must follow in deciding this

5   case.  I will start by explaining your duties and the

6   general rules that apply in every criminal case.  Next, I

7   will explain the elements of the crimes that the defendants

8   are accused of committing.  Then I will explain some of the

9   rules that you must use in evaluating particular testimony

10  and evidence.  And, last, I will explain the rules that you

11  must follow during your deliberations in the jury room and

12  the possible verdicts you may return.

13            Please listen carefully to everything I say.

14            You have two main duties as jurors.  The first

15  one is to decide what the facts are from the evidence that

16  you saw and heard here in court.  Deciding what the facts

17  are is your job, not mine, and nothing I have said or done

18  during the trial was meant to influence your decision about

19  the facts in any way.

20            Your second job is to take the law that I give

21  you, apply it to the facts and decide if the government has

22  proven each defendant guilty beyond a reasonable doubt.  It

23  is my job to instruct you about the law, and you're bound

24  by the oath you took at the beginning of the trial to

25  follow the instructions that I give you even if you

1    personally disagree with them.  This includes the
2    instructions that I gave you before and during the trial
3    and these instructions.  All of the instructions are
4    important, and you should consider them together as a
5    whole.
6              Ms. Cross, Mr. Felson -- we should have
7    Mr. Thapar's name in there, too.  I apologize to you.
8              MR. THAPAR:  Your Honor, I'm not making argument.
9              THE COURT:  You're not making argument, okay.
10             Ms. Cross, Mr. Felson and Mr. Andrews may talk
11   about the law during arguments, but, if what they say is
12   different from what I say, you must follow what I say.
13             Likewise, some of the witnesses may have talked
14   about the law in their testimony.  If what they said about
15   the law is different from what I say, you must follow what
16   I say.  What I say about the law controls.
17             Perform these duties fairly.  Do not let any
18   bias, sympathy or prejudice that you may feel toward one
19   side or the other influence your decision in any way.
20             As you know, the defendants -- and I'll start
21   reading the topics where I think that they might be helpful
22   to you.  This is about presumption of innocence, burden of
23   proof and reasonable doubt.
24             As you know, the defendants have pled not guilty
25   to the crimes charged in the indictment.  The indictment is

1    not any evidence at all of guilt.  It is just the formal
2    way that the government tells the defendants what crimes
3    they are accused of committing.  It does not even raise any
4    suspicion of guilt.

5            Instead, the defendants start the trial with a
6    clean slate, with no evidence at all against them, and the
7    law presumes that they are innocent.  This presumption of
8    innocence stays with them unless the government presents
9    evidence here in court that overcomes the presumption and
10   convinces you beyond a reasonable doubt that they are
11   guilty.

12           This means that the defendants have no obligation
13   to present any evidence at all or to prove to you in any
14   way that they are innocent.  It is up to the government to
15   prove that they are guilty, and this burden stays on the
16   government from start to finish.  You must find the
17   defendants not guilty unless the government convinces you
18   beyond a reasonable doubt that they are guilty.

19           The government must prove every element of the
20   crimes charged beyond a reasonable doubt.  Proof beyond a
21   reasonable doubt does not mean proof beyond all possible
22   doubt.  Possible doubts or doubts based purely on
23   speculation are not reasonable doubts.  A reasonable doubt
24   is based on reason and common sense.  It may arise from the
25   evidence, the lack of evidence or the nature of the

1  evidence. Proof beyond a reasonable doubt means proof that
2  is so convincing that you would not hesitate to rely and
3  act on it in making the most important decisions in your
4  own lives. If you are convinced that the government has
5  proven the defendants guilty beyond a reasonable doubt, say
6  so by returning a guilty verdict. If you are not
7  convinced, then say so by returning a not guilty verdict.

8          Evidence defined. You must make your decision
9  based only on the evidence that you saw and heard here in
10 court. Do not let rumor, suspicions or anything else that
11 you may have seen or heard outside of court influence your
12 decision in any way. The evidence in this case includes
13 only what the witnesses said while they were testifying
14 under oath, the exhibits that I allowed into evidence and
15 any stipulations that the defendants and government agree
16 to.

17         Nothing else is evidence. What is said in
18 opening statements and closing arguments is not evidence.
19 The attorneys' questions and objections are not evidence.
20 My legal rulings are not evidence. And my comments and
21 questions are not evidence.

22         During the trial, I did not let you hear answers
23 to some of the questions that Ms. Cross, Mr. Thapar,
24 Mr. Felson, Mr. Andrews and Mr. Pugh asked, and sometimes I
25 ordered you to disregard things that you saw or heard here

1   in court, or I struck things from the record. You must
2   completely ignore all those things. Do not even think
3   about them. Do not speculate about what a witness might
4   have said. These things are not evidence, and you are
5   bound by your oath not to let them influence your decision
6   in any way.

7          Make your decision based only on the evidence as
8   I have defined it here and nothing else.

9          Objections. There is one more general subject
10  that I want to talk to you about before I begin explaining
11  the elements of the crimes charged. Ms. Cross, Mr. Thapar,
12  Mr. Felson, Mr. Andrews and Mr. Pugh objected to some of
13  the things that were said or done during the trial. Do not
14  hold that against any of the parties. The parties have a
15  duty to object whenever they think that something is not
16  permitted by the rules of evidence. Those rules are
17  designed to make sure that all parties receive a fair
18  trial.

19         Do not interpret my rulings on their objections
20  as any indication of how I think the case should be
21  decided. My rulings were based on the rules of evidence,
22  not on how I feel about the case. In the event that I
23  sustained an objection and did not permit a witness to
24  answer a question, you must not draw any inferences from
25  that question or speculate on what the answer of the

1   witness might have been.  Remember that your decision must
2   be based only on the evidence that you saw and heard here
3   in court.

4          You should use your common sense in weighing the
5   evidence.  Consider the evidence in light of your every day
6   experience with people and events and give it whatever
7   weight you believe it deserves.  If your experience tells
8   you that certain evidence reasonably leads to a conclusion,
9   you are free to reach that conclusion.

10         Direct and circumstantial evidence.  Now, some of
11  you may have heard the terms "direct evidence" and
12  "circumstantial evidence."  Direct evidence is simply
13  evidence like the testimony of an eye witness that, if you
14  believe it, directly proves a fact.  If a witness testified
15  that he saw it raining outside, that would be direct
16  evidence that it was raining.

17         Circumstantial evidence is simply a chain of
18  circumstances that indirectly proves a fact.  If someone
19  walked into the courtroom wearing a raincoat covered with
20  drops of water and carrying a wet umbrella, that would be
21  circumstantial evidence from which you could conclude that
22  it is raining.

23         It us your job to decide how much weight to give
24  the direct and circumstantial evidence.  The law makes no
25  distinction between the weight that you should give to