1   can say without boring you to tears. And I'm not asking

2   you to do anything other than go in the back, talk it over

3   and look at each and every bit of evidence and say to

4   yourself: Was this really proven? Is there any backup,

5   other than somebody saying something from hearsay, et

6   cetera, et cetera? Do we have any real evidence, any hard

7   evidence, of Tyreese's involvement in this crime? And if

8   you don't, if there is some reasonable doubt, you have to

9   find him not guilty.

10          Now, this concept of possession in count five is

11  sort of an interesting count. Did he possess it? All I

12  can tell you is there are no statements by him. Just read

13  the instructions. Read them carefully. Go over it word

14  for word. You owe that to Tyreese. And decide if the

15  state provided or the government provided evidence beyond a

16  reasonable doubt that he knowingly possessed the gun, okay,

17  beyond a reasonable doubt. And if you do that, that's all

18  I can ask of you. Okay? But do it slowly. Do it

19  carefully. Read carefully the instructions.

20          It's not just what you think. Possession doesn't

21  mean what it does out in the street. Okay? Sometimes you

22  have to take your own common sense and put it aside,

23  because "possession" doesn't mean that, what you might

24  think it means. Okay? You don't have to have something in

25  your pocket to possess it, but, on the other hand,

```
 1    something could be two feet away from you and you don't
 2    possess it legally.  Okay?  So just give it the time it
 3    deserves as far as discussing it with each other.
 4              Okay.  I think that's about it.  Let's see if
 5    there is anything else.
 6              Ask yourselves why isn't there more physical
 7    evidence.  Why didn't the government do more physical tests
 8    to figure out who belongs to what here?
 9              Remember, Luster didn't know any of the specifics
10    to anything, even if Officer Calhoun said it.  And anything
11    you think about Officer Calhoun, any of his testimony, I
12    hope you disregard it, because it wasn't right what he did
13    with those.  I mean, it wasn't right what he tried to do to
14    make you think that it was a similar print, et cetera.  It
15    wasn't right, and you should discount all the rest of his
16    testimony because of that.  And some of his testimony
17    doesn't even hurt us, but discount it anyway.  Because he
18    shouldn't be given the consideration of you believing what
19    he said after trying to pull that.
20              Okay.  That's all.  Thank you.
21              THE COURT:  Thank you, Mr. Felson.
22              Mr. Andrews, are you prepared to make closing
23    argument on behalf of Walter Pugh?
24              MR. ANDREWS:  Certainly, Your Honor.
25              THE COURT:  You may proceed.
```

MR. ANDREWS: Good afternoon, ladies and
gentlemen. Thank you for your kind attention over the last
week. I know it's been difficult. I know sometimes we get
long winded and aren't a lot of fun to listen to. And I
have watched. I have a peculiar perch from which to watch
this trial this time, and I have watched you, and you have
all been attentive. And I and Walter both thank you for
your attention during this trial.

We're here kind of on a unique day, two days
before April (sic) 11th, a very patriotic day. And I have
had one other interesting thing from this chair over here.
When I look out and I look at the reflection on that
building over there, for the last five days I have been
looking at the American flag flutter on top of the building
between here and there. And it's given me a lot to think
about in conjunction with this case.

And you think, boy, that's an odd thing to bring
up. Maybe not if you're an attorney. It's not an odd
thing to bring up, because what makes this country
different than every other country in the world is that we
are a country of laws. We're a country that is based upon
the Constitution. We are a country even where the worst of
the worst are supposed to get their fair day in court when
they come in here.

I am not going to walk in this courtroom and try

1    to tell you that these two gentlemen are wonderful guys or

2    that you want them over to your house or that you want to

3    spend any time at all with them.  You would think I was an

4    idiot if I told you that, because it isn't true.  They are

5    men who live on the street.  They are tough men.  They are

6    men who hang out with the women you saw on the witness

7    stand, which, I submit to every man on the jury, you would

8    be lucky if you go your whole life without meeting any

9    women vaguely like Shanell and Stephanie.  These are not

10    your next door neighbors in the suburbs.  These are people

11    who live, as they're quoted as saying, "in the hood."

12            Let me start out by saying there was a bank

13    robbery.  We all concede that.  We all concede two black

14    men went in and robbed this bank.  Are there differences in

15    how we approach it and they approach it?  Yes, there are.

16    We look at all this much more carefully than do the police

17    and do the U.S. attorneys.

18            When we are looking, say, at the picture of this

19    gentleman going over, I want you to look carefully at

20    something.  You're going to have these in the jury room,

21    both of them.  I want you to look down at the tops of them.

22    Look at the end.  These are .22's, small-bore guns.  Look

23    at the end of this gun.  It's a large-bore gun.  You can

24    see it.  It's not the end of this pistol.  It's the end of

25    some other pistol.  I don't know whose.  I don't know what.

1 | But they are different.

2 | If you recall, the ATF agent who is sitting back

3 | there took the stand, looked at these weapons and said

4 | there was no way in the world that she could ever identify

5 | either of those or that shotgun as being the weapons in

6 | these pictures.  And yet -- this is what brings me to the

7 | important point here -- Officer Calhoun could look at them,

8 | and they were good enough for him.  Yep.  They were good

9 | enough for him.  The expert, qualified expert, qualified in

10 | courts all over America, can't say it, but it's good enough

11 | for Officer Calhoun.  He knows the answer.

12 | Now, let's look at Officer Calhoun's wonderful

13 | investigation that this case is based upon.  Start from day

14 | one.  Day one, Officer Jackson gets an anonymous call from

15 | somebody he's known all his life.  I don't know how that's

16 | anonymous.  I have a little problem with it being

17 | anonymous.  They knew from the beginning they are being

18 | called by the jilted ex-girlfriend of my client.  They knew

19 | it was Shanell.  Why didn't they want to say it was

20 | Shanell?  Why did they say anonymous?  Now let's see.

21 | What do we know about her?  She's been convicted

22 | of forgery.  She has been convicted of theft.  She has been

23 | convicted of robbery.  Humpf?  That's exactly who I want to

24 | base my investigation on, a three-time loser liar.  Okay.

25 | That's who started this and directed it towards my client.

1    On that first day she called, she didn't just

2  call my client -- or call the officer.  She called my

3  client's sister.  It's Walter.  It's Walter.  You heard me

4  ask the question this morning.  What did you base that upon

5  other than women's intuition?  Oh, the guns used and the

6  car.

7    Let's get to that car.  Let's start with the car,

8  number one.  We know that there is a car of the same

9  identification, stolen where?  Trotwood.  Same time.  Now,

10  just a minute.  My client's smart, conniving.  He can put

11  it together type guy, right?  He goes and uses his sister's

12  car that has mechanical problems?  Bad brakes and

13  alternator?  I mean, at least Officer Calhoun would

14  acknowledge you would not use Stephanie as the getaway

15  driver because she wasn't reliable.  So would you use an

16  unreliable car?  It doesn't fit.

17    They have a car in Trotwood that was stolen that

18  looked like this car, and it was used in the robbery.  Did

19  they ever go check that car?  No.  That would be too easy.

20  You can go up and maybe find evidence.  I mean, this isn't

21  brain surgery anymore.

22    All you have to do is turn on the TV on Saturday

23  night.  You get back-to-back episodes of CSI.  If one

24  forensic show isn't enough, we got another one coming this

25  fall.  I understand this week on Court TV it's forensic

1   evidence week all week long.

2          And do they have these labs at their disposal?

3   Absolutely.  Not only do they have Miami Valley Lab in

4   Dayton, they have Hamilton County Coroner's Lab in

5   Cincinnati.  They have the Bureau of Criminal

6   Investigation, which the officer couldn't even correctly

7   identify as being in London, Ohio.  If you recall, he said

8   it was in Columbus.  In London, Ohio.  And finally we have

9   the FBI lab, which I understand to be the finest forensics

10  lab in the world.  Do they check anything?  No.

11         They relied on two women, one of whom has a

12  criminal record who would make her unworthy to clean your

13  house, because you wouldn't trust her to do it.  Now, I

14  submit, if you wouldn't trust her to clean your house, you

15  shouldn't trust anything she has to say.

16         The other woman, Stephanie Luster, interesting

17  woman.  She was going to talk to the officers, so we have

18  to get her mother out of jail, who's on her way to prison

19  by the way, to come over and convince her to do the right

20  thing.  Get her mom out of jail.  She's on her way to

21  prison, and she is going to be the beacon of truth light in

22  the American way?  Give me a break.  I don't know who the

23  heck this officer thinks he's coming in and trying to kid.

24  You guys look a lot smarter than that to me.  These people

25  look like hard core, low-life criminals, both of them.

1  She comes in, and she tells this story. Oh, we
2  go over to Tenikia's, and they let me off, and I go to
3  sleep at 9 o'clock in the morning. Of course, this woman
4  is so concerned about her children, remember she signed a
5  false affidavit to get her kids out of the Hamilton schools
6  into the Fairfield schools. Same woman is riding around
7  with the kid not in his safety seat. She's so concerned.

8  Anyway, she is over there. You remember, Walter
9  was there. Walter wearing a white T-shirt. Hum? White
10  T-shirt. White T-shirt. This gentleman coming over the
11  top here isn't wearing a white T-shirt, is he?

12  What did Bessie tell you? We're supposed to
13  believe Bessie, believe her because she is an honest,
14  straightforward, wonderful woman. That's what the U.S.
15  attorney told you. What did Bessie tell you about Walter?
16  Doesn't wear checks.

17  Oh, Walter is so maniacal and planned this out so
18  well that he thinks, you know, months from now, when I get
19  caught, they're going to call my sister as a witness
20  against me. So I'll wear a checked shirt so my sister will
21  say I would never wear a checked shirt. The truth is
22  obvious. Walter wasn't wearing a checked shirt. Walter
23  was wearing a T-shirt. Walter wasn't at the robbery. He
24  wasn't there.

25  Do we know who was? No. Do we know what car was

1   used?  Yes, the one up in Trotwood.  Will they get out Bessie's
2   car to show somehow it was used in the robbery?  Have they got
3   evidence Walter was in the car?  Or Walter Pugh, Tyreese Pugh
4   or Stephanie Luster, because we all know they smoke Black &
5   Mild.  Actually, the only evidence I have heard so far that
6   Walter smokes Black & Mild was from one of the two women.  His
7   sister, who you should believe, told us he smokes cigarettes,
8   not Black & Milds.
9           You heard the U.S. attorney say you must believe
10  the women that knew them best to find them guilty.  I
11  submit that neither of these women are worthy of your
12  belief at all.  Skip back to dear Stephanie.  They left
13  here on the 24th of April.  I'm not asking you to go
14  outside the evidence.  All you have to do is look at a
15  calendar starting on April 24th.  They left on the 24th, and
16  they stayed in Tennessee that night.  They then drove on to
17  Atlanta and stayed there on the 25th.  They stayed at the
18  Travelodge for two nights.  That would be the nights of the
19  25th and 26th.  She says they then went to a relative's house.
20  She said it was the Watsons, but you heard my client's
21  relative say there was no way they stayed there; they
22  stayed at some other house.  But they stayed there for two
23  nights.  Okay?  That takes care of the 27th and 28th.
24          Ladies and gentlemen, there is some time missing
25  here, because they weren't arrested, my client wasn't arrested

Case 1:02-cr-00054-DB   Document 85-6   Filed 07/21/2003   Page 10 of 21

1   until May 3rd.  If you take her time line and they drove
2   directly back to Hamilton that day, which is what she said
3   on the stand, they're back in Hamilton on the 30th of April,
4   and that's when they got arrested.  Because we all know they
5   got arrested as soon as they got back, within that 24-hour
6   period after they got back.

7            I submit to you, someone who could not tell the
8   story of a trip which covers approximately six-and-a-half to
9   seven days and cover all six-and-a-half to seven days is
10  lying to you.  She's got enough that she could lie about,
11  enough to make the U.S. Attorneys, the FBI, the Hamilton
12  police for sure happy as cats covering whatever, but the
13  truth of the matter is she doesn't remember a damn thing about
14  that trip.  Very simply, she is -- either she is of such a
15  low IQ that she can't remember, or, number two, she was so
16  frigging high during all of it that she doesn't know what
17  happened.  And if you're looking at that, you can't relate
18  what happened over a seven-day period of time, how can you
19  believe that she can correctly relate to you these two
20  incidents out of those days?

21           First of all, let's look at the money scene.  If
22  you are to believe her, which is your right as a juror -- I
23  don't think you should, as Walter's attorney, but if you were
24  to believe her, there were crumpled tens and twenties covering
25  what was described as a corner of the bed.

```
 1         I want you to think of -- here's a five.  I want
 2   you to think how much money it takes to make a stack of
 3   $153,000.  That's five dollars.  We know from the testimony
 4   of the security person who did the audit there was $40,000
 5   in one-hundred dollar bills.  That would make approximately
 6   400 one-hundred dollar bills.  That's a whole bunch.  Okay?
 7   I mean, I don't think I have ever seen that many, not
 8   legitimately anyway.  So where did they all go?
 9         Walter and Tyreese rob the place.  They drive
10   like demons.  According to the government time line, they
11   only got a couple minutes leeway between robbing the bank at
12   2:32 and making it down to Bessie's before the 3:00 change
13   of shift.  But somehow they fight their way through
14   Hamilton traffic, and they make it.  And they immediately go
15   to Tenikia's, and they immediately take off for Tennessee.
16   Now remember, this is Stephanie's testimony.
17         Where did the money go?
18         They're running like mad to get out of town before
19   they even know.  Where did the money go?  It certainly wasn't
20   the money she saw on the bed.  That's a bunch of tens and
21   twenties, not 400 one-hundred dollar bills.
22         I submit to you, assuming that they bought
23   everything in all of this, add it up.  It's not $153,000.
24   I don't care what it is.  It's not close.  Where did the
25   money go?  They don't have an explanation for it.  We can't
```

1  give you one, because we don't know.

2       Let's go back to Officer Calhoun.  What do we know

3  the police did?  At least according to Officer Calhoun in his

4  own notes we asked him about this morning, we know when he

5  got a call or actually got information through Detective

6  Nugent, who told him that these two gentlemen were robbing

7  dope dealers in Dayton.  Dangerous trade, but a profitable

8  one.

9       I draw your attention to one instruction of all the

10  instructions the judge is going to give.  That instruction

11  is you should only be looking at the particular crime charged

12  in the indictment.  What other nefarious acts could these

13  people be up to?  Hanging out with Ms. Luster and Shanell,

14  the mind only boggles at what they could have been up to.  But

15  they weren't robbing the bank.

16       They may have been robbing dope dealers.  You're

17  going to see a conviction on Tyreese.  He's been convicted

18  of a drug-related offense.  Were they selling dope?  Robbing

19  dope dealers?  I don't know.  And you know what?  Neither do

20  the U.S. attorneys.  Neither does Officer Calhoun, because

21  he came up with the concept of investigation I've seen over

22  24 years of the practice of law, both as a prosecutor, as a

23  defense attorney, as appointed counsel here before you.  I've

24  heard this many, too many, times:  It's good enough for me.

25  Actually, we used to use it when I was a construction

1   worker as a pejorative term for governmental action.  When
2   we'd put up a greenhouse -- I was building greenhouses in
3   college -- we would always say when something was kind of --
4   I'll use the phrase half-assed done, well, it's good enough
5   for government work.

6           Well, we're in here.  And is it good enough for
7   government work?  You're going to be the arbiters of that
8   very shortly.  We know that the man going over this counter
9   was a 30-ish agile man.  You know from what you have heard
10  of my client he's about 45 years old.  You know from what
11  they could identify, which was very little in the bank, he
12  was a young, spry individual who was able to leap over that
13  counter.  I assure you at 51 I am not able to do it.  I don't
14  know about anybody else.

15          We know that the shirt's wrong.  We know that the
16  muzzle on the gun is too big.  We know that there was another
17  car stolen at the same time matching the car used in the
18  robbery.  We know that the officers did nothing to check out
19  any forensic evidence on anything other than our cookie cutter
20  shoe thing.  You know this cookie cutter; take the shoe and
21  say, gee, does that match?  Doesn't look like it to me.

22          Could this have all been done correctly?  Yes, it
23  could have been.  Were the means at their disposal?  Yes, they
24  were.  Did they do it?  No, they did not.

25          Now, I ask this jury to not deliberate and give the

1  government it's good enough for me as an answer.  Yes, these

2  men are not the nicest guys in the world.  But they are also

3  not the two men robbing this bank.  They have a right as

4  American citizens to be treated fairly by you; even if they

5  weren't American citizens, to be treated fairly by you -- but

6  they are -- to have you go back and duly consider not only

7  everything that was done, but to consider everything that

8  wasn't done.

9          Why wasn't it done?  Why are we sitting here

10  today with this absolute lack of evidence in so many areas

11  where it could be conclusive?  It's very simply because, as

12  an investigation, it was good enough for him.  Well, I'm

13  hoping, ladies and gentlemen of the jury, it wasn't good

14  enough for you.

15          Finally, just to paraphrase, and I certainly do not

16  look like the actor who said this.  I want you to keep in the

17  back of your mind, with those people rushing to get out of

18  town, with them rushing all over all these other places, as

19  it was stated in a movie, "Show me the money."  I looked

20  through all this, and we have what?  $56.

21          Thank you.

22          THE COURT:  Thank you, Mr. Andrews.

23          Ms. Cross, do you wish to make closing argument?

24          MS. CROSS:  Briefly, Your Honor.

25          THE COURT:  All right.

1          MS. CROSS:  Ladies and gentlemen, there's a

2    saying:  When the law is against you, argue facts.  When

3    the law and the facts are against you, blame the police.

4    That's exactly what's going on in this case.

5          The defense makes much ado about testing.  Test

6    what?  How would testing these new clothes with the tags

7    still on them prove that it was the defendants inside the

8    bank?  Why would testing this gun, which was found with

9    Tyreese, why would they test it for prints?  It was found

10   with him.  They expected his prints to be on it.

11         I don't smoke, and maybe some of you do.  But I

12   have seen people smoke, and I know that, when people smoke,

13   the smoke goes out to the air, and, if you stand there about

14   two or three seconds, it will dissolve.  That's exactly what

15   this defense is about, smoke and creating lots of it.  But,

16   if you sit and you think about it for three seconds, you'll

17   realize and you'll see it dissolve.  It doesn't make sense.

18   The defense wants you not to use your common sense, not to

19   draw upon your experiences of your everyday lives in deciding

20   this case.  They want you to ignore your common sense.

21         If Walter and Tyreese Pugh were so innocent, why

22   were they running?  Why were they trying to get out of town?

23   If it weren't them, why were they trying to get out of town?

24         And I asked you in the beginning to listen to how

25   they were going to attack Bessie.  Did you hear the attack

1   on Bessie?  No one attacked Bessie.  And she was the one

2   that says, "Walter, that looks like you, and that other one

3   looks like Tyreese, my nephew."

4          Ladies and gentlemen, Mr. Andrews is absolutely

5   right; these are not nice men.  These are men that carry

6   these guns into a bank and harass and intimidate and scare

7   the living daylights out of tellers.  That's who these men

8   are.  And they say don't listen to the government witnesses.

9   Can't be relied upon.  Don't rely on what they have to say.

10  I say to that, ladies and gentlemen, and I ask you this

11  question:  Can you rely on this?

12          (Playing excerpt of audiotape.)

13          Ladies and gentlemen, I submit to you, you can

14  rely on that.  Thank you.

15          THE COURT:  Thank you, Ms. Cross.

16          Ladies and gentlemen, I'm now going to give you

17  your final instructions on how to deliberate.  You'll now

18  retire to the jury room to begin your deliberations.  Before

19  you do that, however, I'd like to give you a few practical

20  instructions regarding how you should conduct your deliberations.

21          When you retire to the jury room, the first thing

22  you should do is elect a foreperson.  This person will be

23  your spokesperson here in the courtroom.

24          All 12 of you must be present in the jury room

25  when you are deliberating.  You may take breaks whenever

1   you want, for instance, if someone would like to smoke a

2   cigarette, but you should cease your deliberations until

3   everyone has returned to the jury room.

4          You should decide what time in the morning you

5   wish to start your deliberations.  You may elect to start

6   earlier in the morning if that is more convenient for you;

7   however, you should not start any later than 9 a.m.

8          Remember that you cannot begin your deliberations

9   each day until all 12 of you have arrived.

10          Finally, you may deliberate as late as you wish.

11   You should deliberate at least until 4:30 p.m.  And I'm

12   going to have Steve check with you this afternoon to see if

13   you want to go later.  That's fine with the Court.  You can

14   go as late as you want, or, if you want to go home, that's

15   fine, too.

16          If you do decide to go later than 4:30 today, you

17   just need to let me know so we can order you dinner and so

18   we can prepare to have the marshals get dinner for you.

19          Once you decide when you want to recess for the

20   day, please tell Mr. Snyder.  When you are ready to leave

21   for the day, you will come back into the courtroom, and I'll

22   give you our regular admonition.

23          Now, as jurors numbers 13 and 14 must know by now,

24   I keep talking about the 12 of you, and I want to thank both

25   of you for being such wonderful alternates.  It looked like

1  on Friday, with the trial running longer, I was fearful that
2  we were going to lose two jurors then, and we definitely
3  would have needed your services.  As it turned out, we are
4  fortunate to have all of you up to this point in time.  So
5  I'm going to excuse our alternates.  I want to thank both
6  very much for serving.  I know that serving is a sacrifice,
7  but I hope you also found that it was a privilege.

8          I'm going to ask you not to talk to anyone about
9  the case until there has been a verdict.  That's just in
10  case, if something should happen to one of the jurors for
11  any reason during deliberations, we can call you back in to
12  participate in deliberations.

13          If you would like to know the outcome, if you will
14  give Steve your phone numbers, we will be glad to call you
15  as soon as we have a verdict and let you know what has
16  occurred.

17          With that, ladies and gentlemen, I'm going to send
18  you back to the jury room to begin your deliberations.

19          (Jury excused to deliberate at 3:30 p.m.)

20          Counsel, I want everybody to stay until -- actually,
21  for the next hour, just stay somewhere here on the 8th floor.
22  The marshals can take the defendants downstairs if you want to.
23  But, just in case we have any questions or anything, I would
24  like you to be at hand so we can deal with that as promptly
25  as possible and get the jury back deliberating.

1    We'll check with them about a quarter after 4
2  probably to see what they want to do, if they have any idea
3  of whether they want to work later today or if they want to
4  go home and come back tomorrow.  As soon as we have a sense
5  of that, as soon as we hear from them on that, we'll let
6  you know.
7          So hang out here, or we've got a lawyer's lounge
8  down the hall if you want to use that.
9          U.S. Attorney's Office, do you have a satellite
10  office here?
11          MR. THAPAR:  Down on the second floor.
12          THE COURT:  If you're going to be down there,
13  just make sure Steve's got the number for that.
14          And defense counsel are welcome to stay in the
15  courtroom if you like.
16          Any questions or anything?
17          Okay.  See you all in a little bit.
18          (Court in recess at 3:32 p.m.)
19          (In open court at 5:45 p.m.)
20          THE COURT:  Ladies and gentlemen, the Court has
21  been advised that the jury wishes to end its deliberations
22  for today and reconvene tomorrow morning.
23          Have you decided what time you're going to come
24  in?
25          Let's see.  Number 3, are you the foreperson?

1           JUROR NO. 3:  No, I'm not.

2           THE COURT:  Number 4?  Anybody can answer that.

3           JUROR NO. 4:  Nine o'clock.

4           THE COURT:  Okay.  You don't need to come into

5    the courtroom.  And counsel, I'll speak with you afterwards

6    about your availability.  You can go right to the jury room.

7           Do they need to go upstairs and sign in?

8           Go upstairs and sign in, then go to the jury room.

9    Once all 12 of you are there, you can begin your deliberations.

10   And just remember, if you want to take a break for any

11   reason, that's fine, but you can't -- you must cease your

12   deliberations and you can't resume them again until all 12

13   people are in the jury room.  We'll check with you in the

14   morning about whether or not you think you will be here

15   through the lunch hour.  If you are going to be here then,

16   we will provide lunch again.

17           I think that's all, except to remind you, please

18   don't discuss this case with anyone, including your fellow

19   jurors, people involved in the trial or anyone else until

20   you resume deliberations tomorrow in the jury room.

21           Have a nice evening and just report to the jury

22   room tomorrow morning.

23           (Jury excused for the day.)

24           Counsel, I would like you to be within 10 minutes

25   of the courtroom tomorrow so that, if we do have a question

```
 1    or anything, we can handle it immediately.

 2                          * * *

 3                 COURT IN RECESS AT 6:00 P.M.

 4

 5

 6                   C E R T I F I C A T E

 7            I, Betty J. Schwab, the undersigned, do

 8    hereby certify that the foregoing is a correct

 9    transcript from the record of the proceedings in

10    the above-entitled matter.

11

12                          _____
                            BETTY J. SCHWAB, RPR
13                          Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```