RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

**FOR YOUR INFORMATION**

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

WALTER MEADE PUGH, JR. (03-3241) and TYREESE PUGH (03-3243),
    *Defendants-Appellants.*

Nos. 03-3241/3243

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00054—Susan J. Dlott, District Judge.

Argued: June 9, 2004

Decided and Filed: May 3, 2005

Before: KEITH and CLAY, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** William K. Fulmer II, Florence, Kentucky, Pierre H. Bergeron, SQUIRE, SANDERS & DEMPSEY, Cincinnati, Ohio, for Appellants. Wende C. Cross, CROSS, SMITH & ASSOCIATES, Cincinnati, Ohio, for Appellee. **ON BRIEF:** William K. Fulmer II, Florence, Kentucky, Pierre H. Bergeron, Scott A. Kane, SQUIRE, SANDERS & DEMPSEY, Cincinnati, Ohio, for Appellants. Wende C. Cross, CROSS, SMITH & ASSOCIATES, Cincinnati, Ohio, for Appellee. Walter M. Pugh, Jr., Atwater, California, pro se.

---

## OPINION

    DAMON J. KEITH, Circuit Judge. Defendants Walter Meade Pugh, Jr. and Tyreese Pugh appeal their convictions related to an armed bank robbery and their sentences entered on February 10, 2003, by the United States District Court for the Southern District of Ohio. For the reasons stated below, we **REVERSE** the convictions of Walter Pugh, and **REVERSE**, in part, and

---

[*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

1

**AFFIRM**, in part, the convictions of Tyreese Pugh. We **REMAND** this case to the district court for proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

At approximately 2:20 p.m. on April 24, 2002, two armed men robbed the First National Bank of Southwestern Ohio ("First National Bank"), located at 2299 Peck Boulevard in Hamilton, Ohio. One robber, wearing a mask and carrying a shotgun, ordered the bank manager to get down on the floor and instructed him not to activate the alarm. At the same time, the other robber, who was unmasked and carried a handgun, jumped over the teller counter and demanded that the tellers empty the cash from their drawers into a trash can liner. The unmasked robber forced a teller into the bank's vault at gunpoint; after taking money from the vault, he instructed her to get on the floor of the vault and shut her inside of it. The robbers exited the bank with approximately $153,189 in unmarked bills. As the robbers were escaping, the bank manager saw them enter a vehicle, which he believed was a late 1980's or early 1990's maroon Oldsmobile. Joint Appendix ("J.A.") at 172. He also indicated that another man was in the back seat. *Id.*

When the police arrived, the officers secured the bank, interviewed the employees, and retrieved the bank's surveillance camera videotape. Detective James Calhoun of the Hamilton Police Department reviewed the videotape to ascertain descriptions of the robbers. The descriptions of the robbers—one tall, slender black male, wearing dark clothes, a baseball cap, and possessing a long gun, and one shorter black male, wearing a checkered shirt and dark pants—and their vehicle were dispatched to all local patrol units. *Id.* at 255. Detective Calhoun also lifted a shoe print from the teller counter, but detectives did not dust the area for fingerprints because the men were wearing latex gloves. *Id.* at 257-59.

The following day, April 25, 2002, Detective Calhoun received information that led him to interview defendant Walter Pugh's sister, Bessie Pew.[1] During the interview, Ms. Pew viewed a picture of the robbers from the bank's surveillance videotape. Upon looking at the picture, Ms. Pew began to cry and said that the picture looked like her brother, Walter Pugh. Ms. Pew then consented to a search of her vehicle, which was a 1988 maroon Oldsmobile Cutlass Cierra. Because she was having car problems and needed him to repair it, Ms. Pew had loaned Walter her Oldsmobile for several days prior to the robbery. *Id.* at 469. At approximately 3:00 p.m. on the day of the robbery, Walter Pugh, along with his son Tyreese Pugh, returned her vehicle, and Ms. Pew returned Walter's keys to his 1989 Cadillac Deville. During the search of Ms. Pew's Oldsmobile, Detective Calhoun found a partially torn latex glove and a pair of tennis shoes that, in his view, matched the footprint found on the teller counter.[2] Based on a statement given by Ms. Pew, Detective Calhoun obtained an arrest warrant for Walter Pugh. *Id.* at 267. The police began searching for Walter and Tyreese Pugh.

In attempting to obtain an arrest warrant for Tyreese Pugh, the police officers executed a search warrant at the apartment of Stephanie Luster, Tyreese Pugh's girlfriend. *Id.* at 268. Stephanie was not present during the time of the search. *Id.* at 269. In searching for Stephanie, Detective Calhoun interviewed her mother, Shellee Luster, who was incarcerated in a local jail. *Id.* at 519. Shellee indicated that she believed that her daughter was with the Pughs. *Id.* at 521. Upon being

---

[1]The siblings spell their surnames differently.

[2]Upon further examination, the detectives determined that the print did not match the shoes retrieved in Ms. Pew's vehicle. J.A. at 294. In fact, shoes that matched the print were never retrieved. *Id.* at 295.

shown a picture taken from the bank's surveillance videotape, Shellee identified Walter and Tyreese Pugh as the bank robbers. *Id.* at 523.

On May 2, 2002, Walter Pugh's former live-in girlfriend, Shannell Holston, contacted an officer with the Hamilton Police Department. That same evening, she met with Detective Calhoun, Detective James Cifuentes, and others at the Hamilton County Sheriff's Department. *Id.* at 571. While at the Sheriff's Department, Holston called Walter Pugh and the police recorded the conversation. *Id.* at 573. Although Walter did not confess to the robbery, he mentioned wanting to launder $100,000. *Id.* at 575.

Holston also informed the officers of Walter Pugh's whereabouts. *Id.* After determining the Pughs' location, the detectives and officers formulated a plan to take the Pughs into custody. *Id.* at 573. Late at night on May 2, 2002, officers conducted a surveillance of the home where Holston believed that the Pughs were located. *Id.* at 278. The officers sat near the house for two hours and observed several individuals enter and exit the home. *Id.* at 278-79. The surveillance continued into the early morning of May 3, 2002. Around 2:00 a.m. on May 3, Walter Pugh and two other individuals left the house in a car. *Id.* at 442. Once the car was a safe distance from the house, the police effected a traffic stop and arrested Walter Pugh. *Id.* at 243. Upon being questioned, Walter informed the police that Tyreese Pugh was asleep in the upstairs bedroom of the house and that he had a gun. *Id.* at 444. He explained to the police officers that he did not want Tyreese to get hurt and even provided instructions to the officers on how to safely enter the home. *Id.*

When the S.W.A.T. team entered the house with a search warrant, the officers went to the upstairs bedroom and found Tyreese Pugh and his girlfriend Stephanie Luster in bed asleep. *Id.* at 446. Tyreese Pugh was pulled out of bed and had a shotgun beneath his body. *Id.* Tyreese Pugh was arrested. *Id.*

### B. Procedural History

On May 15, 2002, a federal grand jury for the Southern District of Ohio returned a five-count indictment against Walter and Tyreese Pugh. Count 1 charged both defendants with conspiring with each other to commit armed bank robbery in violation of 18 U.S.C. § 371. Count 2 charged both defendants with aiding and abetting each other in the commission of the bank robbery in violation of 18 U.S.C. §§ 2113(a) & (d) and 18 U.S.C. § 2. Count 3 charged Walter Pugh with the knowing use of a long barreled revolver, during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Count 4 charged Tyreese Pugh with the knowing use of a shotgun, during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Count 5 charged Tyreese Pugh with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[3]

On September 3, 2002, a jury trial commenced against both defendants. During voir dire, defense counsel objected to the Government's use of its peremptory challenges. The Government struck juror twenty-three, a black woman, reasoning that she had two brothers in jail for robbery and that she had made a gesture that, the Government argued, displayed a distrust of law enforcement officers. J.A. at 149. Defense counsel objected, stating that many jurors have relatives in jail, and there were only three minority jurors in the pool of forty-one jurors. *Id.* at 150. The district court noted the objection but allowed the dismissal because the juror's brothers were in jail for robbery. *Id.*

The Government also used a peremptory challenge to strike juror forty-nine, a black man, and the defense objected because he was the only black man in the jury pool. The Government

---

[3] Count 5 referred to the morning of May 3, 2002, when Tyreese Pugh was found with a shotgun and arrested.

argued that the juror was a high school dropout, and it was asserting peremptory challenges against all high school dropouts. *Id.* at 153. Defense counsel stated that, although racially neutral, the decision to exclude high school dropouts has a disparate impact on minorities who have a higher dropout rate. *Id.* at 155. The district court overruled the objection.

During the trial, the Government presented testimonial evidence from various witnesses.[4] Tyreese Pugh's girlfriend, Stephanie Luster, testified that she was with Walter and Tyreese Pugh on the day of the robbery. *Id.* at 317-18; 334. She stated that Walter and Tyreese left her and her children at Walter's girlfriend's house for a few hours on April 24, 2002. *Id.* at 318. When they returned sometime during the afternoon, they instructed Stephanie and Tenikia, Walter's girlfriend, that it was time to leave. *Id.* at 320. Stephanie and her two children, Tenikia and her child, and Walter and Tyreese left the house; Stephanie claimed that she did not know why they were leaving. *Id.* at 322. At that time, Walter was wearing jeans and an old T-shirt, and Tyreese was wearing a black shirt and black pants. *Id.* at 319.

The four adults and three children traveled in two cars from Ohio, stopped for an evening in Tennessee, and arrived in Atlanta, Georgia. During their stay in a motel in Tennessee, Stephanie Luster noticed a large pile of cash lying on the bed. When she questioned Walter about it, he responded, "[w]e hit a lick." *Id.* at 338. She said that Walter also mentioned "something to the effect about them having the teller open the vault," *id.* at 339, and related that Walter told her, "Tyreese mann[ed] the door," *id.* at 340. Tyreese said nothing, and she asked no further questions. *Id.* Stephanie also testified that, while in Georgia, she overheard Walter retelling his family the story that he had told her in Tennessee, and she believed Tyreese was demonstrating how he held a gun. *Id.* at 346.

The Government called Shannell Holston, Walter Pugh's former live-in girlfriend, to testify.[5] Holston testified that sometime in April 2002, after reading an article in the newspaper, she called Bessie Pew to inquire about the whereabouts of Ms. Pew's car. Holston knew that Walter had been driving Pew's car. *Id.* at 562. Holston told Pew that she believed that the car was mentioned in the newspaper and that Walter was the suspect that the police were looking for in connection with the bank robbery. *Id.* at 563. Holston also testified that, one week later, Walter Pugh called her from Atlanta, Georgia. *Id.* at 564. He wanted her to rent a car and travel to Atlanta; she believed that he ask her to do this because he had robbed the bank. *Id.* at 564-65. Defense counsel objected to Holston's testimony that Walter robbed the bank, but the district court overruled the objection. *Id.*

Deputy Matthew Wittich also testified for the Government. Deputy Wittich was one of the officers present during the arrest of Walter Pugh. The Government asked him what Walter said regarding Tyreese when Walter was being interviewed during the arrest. Over objection from both defendants, the district court allowed Deputy Wittich's answer. Deputy Wittich recounted how Walter told the officers that Tyreese had a gun and that he did not want his son to get hurt. *Id.* at 444. He also reiterated that Walter said that Tyreese would use the gun if he knew the officers were coming. *Id.*

In addition to witness testimony, the Government also introduced stipulated facts into evidence. *Id.* at 252. The stipulation contained a statement that both Walter and Tyreese Pugh agreed that the First National Bank was insured by the Federal Deposit Insurance Corporation ("FDIC"). No objections were made to the introduction of this evidence.

---

[4] Only the witnesses whose testimony is relevant to the issues presented on appeal need be discussed.

[5] Holston and Walter Pugh lived together from August 2000 until March 2002. J.A. at 550. According to Holston, they were not living together at the time that the bank was robbed.

In presenting Walter Pugh's case, defense counsel called Detective Calhoun on direct examination. Defense counsel inquired about Detective Calhoun's visit to Stephanie Luster's mother, Shellee Luster, in jail in an attempt to establish that Detective Calhoun made special arrangements for Stephanie to see her mother. *Id.* at 516. On cross-examination, the Government asked Detective Calhoun why he had interviewed Shellee. In response, Detective Calhoun affirmed that he spoke with her because she knew Tyreese and Walter Pugh. *Id.* at 522. The Government then asked Detective Calhoun if Shellee identified the defendants in the picture reproduced from the bank's surveillance videotape. *Id.* at 523. Defense counsel objected based on hearsay. *Id.* In response, the Government argued that the defense opened the door about why Detective Calhoun met with Shellee Luster and that the Government should be allowed to explain "why they did the things they did." *Id.* The district court overruled the objection, and Detective Calhoun stated that Shellee Luster identified Tyreese and Walter Pugh as the men in the picture. *Id.*

Defendants also presented trial testimony from Ra-shay Patterson, Tyreese Pugh's fiancé. Patterson testified as to the bias of the Government's witness, Stephanie Luster. During cross-examination, the Government questioned her about an outstanding warrant in another state. *Id.* at 503. Both defendants objected, but before the court ruled, the Government continued its questioning. The defendants objected again. At a sidebar, the defendants moved for a mistrial, arguing that instructions to the jury could not cure the prejudice suffered by the defendants. The court denied the motion and overruled the objections.

On September 10, 2002, the jury found both defendants guilty on all counts. On February 10, 2003, Walter Pugh was sentenced to 137 months for Count 1 and 137 months for Count 2, both to be served concurrently, and 84 months for Count 3, to be served consecutively. Tyreese Pugh was sentenced to 130 months for Count 1, 130 months for Count 2, and 120 months for Count 5, all to be served concurrently, and 84 months for Count 4, to be served consecutively. Both defendants have filed separate, timely appeals.

On appeal, Walter Pugh argues that (1) the Government violated his equal protection rights by failing to give race-neutral reasons when it exercised peremptory challenges against two black jurors; (2) the district court abused its discretion when it allowed Shannell Holston's testimony that she believed Walter Pugh to be involved in the armed bank robbery; (3) the district court abused its discretion when it allowed Shellee Luster's out-of-court identification of the Pughs through Detective Calhoun's testimony; and (4) the Government failed to prove the bank deposits were FDIC insured at the time of the robbery, which was a necessary element of the crime.

In a separate appeal, Tyreese Pugh argues that (1) the district court violated his rights under the Confrontation Clause when it admitted hearsay statements of Walter Pugh, a non-testifying defendant, through Stephanie Luster and Deputy Wittich; (2) the district court abused its discretion in denying his motion for mistrial because the Government improperly impeached a defense witness about an outstanding arrest warrant; and (3) his attorney provided ineffective assistance when counsel failed to seek separate trials for the defendants.

In their supplemental briefs, Walter Pugh and Tyreese Pugh also challenge their sentences under *Blakely v. Washington*, 124 S.Ct. 2531 (2004), and *United States v. Booker*, 125 S.Ct. 738 (2005). They both argue that their sentences were enhanced based on facts found by the judge.

After reviewing the record and both defendants' claims, we reverse the related armed robbery convictions of Walter Pugh and Tyreese Pugh based on the Confrontation Clause violation as it relates to Shellee Luster's out-of-court identification. Because we reverse the armed robbery convictions based on these specific violations, the other arguments related to those convictions will not be discussed. *See, e.g., United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004) (indicating that we need not reach other issues raised on appeal based on the resolution of the Confrontation

Clause issue). We, however, affirm the felon in possession of a firearm conviction of Tyreese Pugh based on the out-of-court statement made by Walter Pugh, but vacate his sentence and remand to the district court for further proceedings.

## II. ANALYSIS

### A. Walter Pugh's Conviction

Walter Pugh argues, *inter alia*, that the district court erred when it allowed inadmissible hearsay into evidence during the Government's cross-examination of Detective Calhoun. Detective Calhoun testified that while Shellee Luster was in jail, she identified the Pughs from the still picture taken from the bank's surveillance videotape. Over an objection from Walter's counsel, the district court allowed this testimony to be entered into evidence. Walter Pugh claims that he had no prior knowledge of Shellee Luster's out-of-court identification and that the admission of this testimony violated his Sixth Amendment right of confrontation.

This court reviews the district court's evidentiary rulings for an abuse of discretion. *United States v. Bartholomew*, 310 F.3d 912, 920 (6th Cir. 2002) (citing *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997). Under this standard, we will reverse the lower court's decision only if we are firmly convinced that a mistake has been made. *United States v. Kingsley*, 241 F.3d 828, 835 n.12 (6th Cir. 2001).

In the case before us, Walter Pugh had no prior opportunity to cross-examine Shellee Luster, and she did not testify at trial. Accordingly, we must determine whether Shellee Luster's out-of-court statement was inadmissable hearsay that violated Walter Pugh's right of confrontation. Hearsay is an out-of court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Because the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him," U.S. Const. amend. VI, hearsay is presumptively inadmissible. Until recently, however, any out-of-court testimonial statement made by an unavailable declarant could be admitted provided that the judge found that it bore adequate indicia of reliability. *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). The United States Supreme Court had determined that even though generally the Sixth Amendment required the prosecution to produce a defendant's accuser, there were exceptions if the accuser was unavailable. *Id.* at 65. The *Roberts* Court maintained that "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.* at 66. Applying such logic, the Court held that the statement of a non-testifying declarant could be used against a defendant at trial so long as the declarant was unavailable and the statement was reliable. *Id.*

In 2004, however, the Supreme Court limited the rule established in *Roberts* as it relates to the admissibility of hearsay testimony. *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford*, the Court examined the "bedrock procedural guarantee" of an accused's right to confront witnesses who testify against him. 124 S.Ct. at 1359. The Court struck down an evidentiary ruling that dispensed with a defendant's right of confrontation simply because the challenged testimony had been found reliable by a judge. *Id.* at 1371. The Court made it abundantly clear that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374. After a detailed analysis of the history of the Confrontation Clause and its jurisprudence, the Court reached the conclusion that "[t]estimonial statements of witnesses absent from trial have been admitted *only where* the declarant is unavailable, and *only where* the defendant has had a prior opportunity to cross-examine." *Id.* at 1369 (emphasis added); *see also United States*

*v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004) (citing *Crawford*, 124 S.Ct. at 1369, 1374).[6] While the Court did not define what constituted a testimonial statement, it indicated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 124 S.Ct. at 1374.

We have applied the rule in *Crawford* to a case involving the out-of-court statement of an informant. *See Cromer*, 389 F.3d 662. In *Cromer*, we held that "statements of a confidential informant are testimonial in nature and therefore may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant." *Id.* at 670-71. In determining that such a statement was testimonial, we analyzed the Court's opinion in *Crawford*. We noted that the "Court emphasized that, '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" *Cromer*, 389 F.3d at 672 (citing *Crawford*, 124 S.Ct. at 1364) (alteration in original). Thus, we determined that the proper inquiry in deciding whether a statement is testimonial for evidentiary purposes is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675.

The admission of a testimonial statement in and of itself is not enough to trigger a violation of the Confrontation Clause. Instead, the statement must be used as hearsay--in other words, it must be offered for the truth of the matter asserted. *See id.* at 676. As we stated, "[t]he Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Id.* (citing *Crawford*, 124 S.Ct. at 1369 n.9). Using the rule in *Crawford*,[7] this court must first determine whether Shellee Luster's out-of-court statement is testimonial in nature and second whether it was offered as hearsay, i.e., offered to prove that Walter and Tyreese Pugh were the robbers in the bank surveillance picture.

### 1. Testimonial Statement

In applying the first prong of the *Crawford* analysis, we find that Shellee Luster's statement identifying both defendants in the picture is a testimonial statement for the following reasons. First, the statement was given during a police interrogation, which meets the requirement set forth in *Crawford* where the Court indicated that the term "testimonial" at a minimum applies to "police interrogations." 124 S.Ct. at 1374. Second, the statement is also considered testimony under *Crawford*'s reasoning that a person who "makes a formal statement to government officers bears testimony." *Id.* at 1364. Finally, we find that Shellee's statement is testimonial under our broader analysis in *Cromer*. In asking "whether a reasonable person in [Shellee's] position would anticipate h[er] statement being used against the accused in investigating and prosecuting the crime," *Cromer*, 389 F.3d at 675, we think that any reasonable person would assume that a statement that positively identified possible suspects in a picture of the crime scene would be used against those suspects in

---

[6] Here, there was neither an inquiry made regarding Shellee Luster's availability, nor a showing by the Government of her unavailability. Although it is unnecessary for our resolution of this case to address her availability, we note that this failure to establish Luster's unavailability provides additional support for why her statement should have been excluded.

[7] The United States Supreme Court provides: "after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review." *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987). We note, however, that even if we were reviewing the case under *Roberts*'s "indicia of reliability" test, we still would find that the district court's ruling was an abuse of discretion. For the reasons stated in Section II.A.2, *infra*, the defendant did not "open the door" to the testimony that was presented. Therefore, the testimony was hearsay and the district court did not offer any explanation as to why it was reliable evidence that should be permitted under *Roberts*.

Nos. 03-3241/3243   *United States v. Pugh, et al.*                                          Page 8

either investigating or prosecuting the offense. For these reasons, we determine that Shellee's statement identifying Walter and Tyreese Pugh was testimonial in nature.

### 2. Offered for the Truth of the Matter Asserted

The second prong of the *Crawford* analysis requires us to determine whether the statement was offered for the truth of the matter asserted. The Government argues that the statements are not hearsay because they were not offered for their truth but rather to explain Detective Calhoun's reasons for attempting to transport Shellee from jail to the police station and because the defendant had "opened the door." Appellee's Br. at 35; *see, e.g., United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002) ("[W]here one party has 'opened the door' on an issue, the opponent, in the trial court's discretion, may introduce evidence on the same issue to rebut any false impression that may have been created by the earlier admission of evidence."). The Government's argument fails for several reasons.

First, while the Government asserts that the evidence was admitted to explain Detective Calhoun's actions when questioning Shellee Luster, the identification of the defendants does not explain either why Shellee was questioned or why the detective attempted to make special arrangements to have her transported from jail to the station. Moreover, the Government had previously presented testimony from Detective Calhoun indicating that when he asked Shellee if she knew the defendants, she answered affirmatively. At that juncture, there was no need for the Government to then ask if Shellee identified the defendants as the men portrayed in the picture. Under these circumstances, we cannot conceive of any other reason that the positive identification of the defendants from the bank surveillance picture would be introduced except to prove that the defendants were, in fact, the men in the picture.

Second, the Government asserts that the defendant opened the door, and it was merely responding to the defendant's assertion that Calhoun made special arrangements with Shellee "to curry favor with her daughter." Appellee's Br. at 35. We have held, in light of *Crawford*, that "the mere fact that [a defendant] may have opened the door to the testimonial, out-of-court statement that violated his confrontation right is not sufficient to erase that violation." *Cromer*, 389 F.3d at 679. We noted that "a defendant only forfeits his confrontation right if his own wrongful conduct is responsible for his inability to confront the witness." *Id.* (providing the example of a witness who is "unavailable to testify because defendant has killed or intimidated her"). In the instant case, Walter Pugh may have "opened the door" to allow the Government to provide an alternative reason for questioning Shellee Luster, but the Government overstepped constitutional bounds by asking Detective Calhoun if Shellee identified the defendants as the robbers. The fact that Walter Pugh raised the issue of Detective Calhoun's motive for attempting to transport Shellee from jail to the police station for questioning did not justify admitting into evidence a positive identification of the parties from crime scene pictures. We therefore find that Shellee Luster's out-of-court identification of Walter and Tyreese Pugh is both testimonial in nature and offered for the truth of the matter asserted.

### 3. Harmless Error

While we are firmly convinced that the district court abused its discretion and violated the rule established in *Crawford* and *Cromer*, we must also address whether this violation was a harmless error. *See Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005) ("Confrontation Clause violations are subject to harmless error review."). "In determining whether an error is harmless, the reviewing court 'must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened.'" *United States v. Hardy*, 228 F.3d 745, 751 (6th Cir. 2000) (citing *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)) (alteration in original). In other

Nos. 03-3241/3243   *United States v. Pugh, et al.*                                    Page 9

words, we must find "that it was more probable than not that the error materially affected the verdict." *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004).

In this case, the error that occurred was not harmless. Walter Pugh's Sixth Amendment right of confrontation was violated as it relates to a non-testifying witness who positively identified him as the bank robber. Only one other witness, Walter's sister, testified that she *thought it looked like* her brother and nephew—but the defendants were permitted to cross-exam her, leaving her testimony contested.[8] No other evidence placed Walter and Tyreese at the scene of the crime, and there were issues of credibility with several witnesses. In light of the problems with the remaining evidence, the uncontested testimonial hearsay appears to have played a central role in the defendants' convictions. We are convinced that it is "more probable than not" that denying Walter the right to confront Shellee regarding her uncontested identification of him "materially affected the verdict." We therefore reverse Walter Pugh's convictions as to Counts 1, 2, and 3, based on the error committed by the district court in allowing Officer Wittich's testimony regarding Shellee Luster's statement into evidence.

### B. Tyreese Pugh

#### 1. Convictions for Armed Robbery

Shellee Luster's out-of-court statement positively identified both Walter Pugh and his son, Tyreese, as the men in the bank surveillance picture. The district court's error in admitting her statement was a violation of the rule outlined in *Crawford*, and certainly the Confrontation Clause violation affected both defendants. Tyreese Pugh, however, has not presented this issue to the Court on appeal. Generally, when an appellant does not raise an issue on appeal, we will consider that issue "abandoned and not reviewable on appeal." *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998). Although we do have the discretion to overlook the application of the *Crawford* error as it relates to Tyreese, we are also permitted to address it under Federal Rule of Criminal Procedure 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Several cases that we have decided lend guidance in determining whether it is appropriate for us to exercise our discretion and analyze the *Crawford* error with regard to Tyreese.

In *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), the defendant was convicted of various conspiracy counts and related drug charges and was sentenced accordingly. On appeal, this Court upheld his conviction but reversed his sentence. After trial, but before oral argument, the Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The defendant failed to raise an argument related to *Apprendi* on appeal. We, nevertheless, addressed the validity of the defendant's sentence under *Apprendi*, *sua sponte*. In particular, we noted that "this Court has discretion to correct plain errors affecting important rights of criminal defendants, even when not raised on appeal." *Graham*, 275 F.3d at 521. We asserted that "Rule 52(b) permits *sua sponte* consideration of plain errors that have not been raised before the court of appeals," *id.*, and we found it appropriate to conduct a *sua sponte* review of *Apprendi* issues because "the facts relevant to the *Apprendi* issue are fully set forth in the record, and the governing legal principles are clear," *id.* at 522.

---

[8] Bessie Pew testified that the picture she initially saw was "grainier" than the ones presented at trial, and that she was so upset when the officers first questioned her that she "d[id]n't recall exactly what [she] said." J.A. at 477. She also indicated that her brother wears glasses, but the person in the picture was not wearing glasses. *Id.* at 485. Furthermore, she said that she herself was supposed to wear glasses but never did. *Id.* at 486.

Nos. 03-3241/3243   *United States v. Pugh, et al.*                                Page 10

In *United States v. Finch*, 998 F.2d 349 (6th Cir. 1993), the defendant was challenging his conviction, claiming that the police conducted an unlawful search under the Fourth Amendment. Although this Court had recently decided *United States v. Nabors*, 901 F.2d 1351 (6th Cir. 1990), which was applicable to the defendant's case, the defendant did not raise the issue presented in *Nabors*. We discussed Rule 52(b) and indicated that it permitted us to notice plain errors that affect the substantial rights of a defendant, even if such errors were not brought to our attention. *Finch*, 998 F.2d at 354. We refrained, however, from exercising our discretion to consider the issue that was not raised, indicating: "Although the facts appear to have been well developed, it is possible that the failure of the defense to raise the issue may have influenced the manner in which the evidence was developed. Moreover, conflicting theories of law have evolved on the necessity of delaying entry when the search is for controlled substances." *Id.* at 355.

In the case before us, Tyreese Pugh's counsel did not raise the *Crawford* argument related to Shellee Luster's out-of-court statement on appeal, yet a plain error occurred that has affected his substantial rights. Similar to the circumstances in *Graham*, the Supreme Court decided *Crawford* while this case was on appeal. Here, also like *Graham*, the facts are fully set forth regarding this issue. The defendants were both tried together. The circumstantial evidence presented against both defendants was similar. The error certainly had as harmful an effect on Tyreese's case as it did on Walter's case. It may have arguably had a more harmful effect on Tyreese's case because Shellee's out-of-court statement was the only uncompromised testimonial evidence that positively identified Tyreese as one of the robbers. Moreover, an argument cannot be made that the government has been denied the opportunity to respond to the issue because Walter raised this specific issue in his appeal. Since the *Crawford* error applies to both defendants, we think that it is neither just nor judicially efficient for us to ignore the error as it relates to Tyreese. We shall therefore exercise our discretion under Rule 52(b) and address the issue *sua sponte*.

In conducting our review, we must apply the test for "plain error." *See* Fed. R. Crim. P. 52(b); *Cromer*, 389 F.3d at 672. In particular, for us to reverse the ruling of the district court, there must be error, which is plain, which affected the substantial rights of the appellant, and which "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations omitted) (alteration in original). Here, we find that the error meets the standard for plain error review. It certainly constituted an error that was plain. *See, e.g., Johnson v. United States*, 520 U.S. 461, 468 (1997) (finding that "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal–it is enough that an error be 'plain' at the time of appellate consideration"). Moreover, the error of admitting into evidence an out-of-court statement, which affirmatively identified Tyreese and Walter Pugh as the bank robbers, affected the substantial rights of both defendants. As emphasized by the Court in *Crawford*, the Sixth Amendment demands the right of confrontation at trial unless the accuser is unavailable and the defendant was given a prior opportunity to cross-examine her. 124 S.Ct. at 1374; *see also Cromer*, 389 F.3d at 679 ("Based on *Crawford*'s affirmation of the importance of the constitutional right to confrontation, we readily can determine that [the defendant's] substantial rights were affected by these violations."). In this case, Tyreese was denied his constitutional right of confrontation. Finally, in addition to affecting the constitutional right of the defendants, the court's error also seriously has affected the fairness and integrity of Tyreese's trial. This was critical testimonial evidence that positively identified Tyreese as one of the bank robbers. The only other testimony that identified Tyreese was compromised.[9]

---

[9]At trial, when Bessie Pew was asked if she identified Tyreese as one of the robbers, this was her relevant testimony:

Q: And did you say that looks like Tyreese?
A: I -- yes, I think I did say that.
Q: Okay. Well, does that look like Tyreese to you?

Nos. 03-3241/3243   *United States v. Pugh, et al.*                                Page 11

Additionally, no physical evidence was presented that linked Tyreese to the crime scene. Thus, the *Crawford* error that occurred in this case tainted the fairness and integrity of the trial.

"Rules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel v. Helvering*, 312 U.S. 552, 557 (1941). To overlook the obvious error that occurred in this case as it applies to Tyreese based on a purely procedural rule would arbitrarily deny Tyreese the rights guaranteed to him by the United States Constitution. We, therefore, reverse Tyreese Pugh's convictions as to Counts 1, 2, and 4.

### 2. Conviction for Being a Felon in Possession of a Firearm

Tyreese Pugh argues that the district court, over his objection, improperly admitted Walter Pugh's out-of-court statements through Deputy Matthew Wittich. Deputy Wittich testified that, when the officers arrested Walter Pugh, Walter admitted that Tyreese was asleep in the house, armed with a gun. Tyreese Pugh asserts that his rights under the Confrontation Clause were violated because Walter Pugh's alleged statements implicated him, and, in turn, he did not have the opportunity to cross-examine Walter during the trial. Because Tyreese Pugh objected to this error at trial, we review the error for abuse of discretion. *Bartholomew*, 310 F.3d at 920. Accordingly, we must reverse the district court's admission of Deputy Wittich's testimony if the court failed to apply or misapplied the correct legal standard. *Schenck*, 114 F.3d at 593.

As we have discussed above, the rule in *Crawford* provides that if the prosecution uses a testimonial hearsay statement, then the defendant must have had a prior opportunity to cross-examine the declarant. In this case, Walter Pugh exercised his Fifth Amendment right and did not testify at trial. Tyreese Pugh had no prior opportunity to cross-examine Walter regarding his statement that was admitted into evidence through the testimony of Deputy Wittich. Walter made this statement to Deputy Wittich while he was being arrested and interviewed regarding Tyreese's whereabouts. Under those circumstances, it is clear that the statement was testimonial in nature. *See Crawford*, 124 S.Ct. at 1374 (stating that "testimonial" statements apply to police interrogations). Walter's out-of-court statement satisfies the requirement of *Crawford*—that is, it was an out-of-court statement admitted into evidence to prove that Tyreese Pugh possessed a firearm, and Tyreese had no opportunity to confront Walter regarding the statement.

While we find that the district court's admission of Walter Pugh's out-of-court statement was a violation under *Crawford*, we nevertheless conclude that the error was harmless. *See* discussion *supra*, Section II.A.3. The Government had the burden of proving beyond a reasonable doubt that Tyreese was a felon in possession of a firearm. The arresting officers presented uncontested testimony that Tyreese was found with a gun when arrested. Additionally, testimony was presented that Tyreese was sleeping in a "guest room," and the homeowner did not own the gun. Based on this other evidence, we are not convinced that it was more likely than not that "the error materially affected the verdict." *Trujillo*, 376 F.3d at 611. As there is overwhelming evidence that proves Tyreese actually possessed the gun when he was apprehended, the admission of Walter Pugh's out-

---

    A: It does. I said I knew my nephew. Really, I can't say.
    Q: Can you even see the face on that picture?
    A: No.
    Q: Did they tell you that the person in the picture --
    A: I was so upset that day, I don't recall exactly what I said. I was in shock when I went there. When I had went up to the police station and they had told me my car was in the paper and the police looking for it, and when I went up and the detective and them was questioning me, I was nervous and crying.

J.A. at 477.

of-court statement was harmless error. We therefore affirm Tyreese Pugh's conviction as to Count 5.

Because we affirm Tyreese's conviction as to Count 5, we must briefly address his sentence. Tyreese has challenged the sentence, which was imposed based on all four of his convictions. Tyreese argues that the district court enhanced his sentence based on facts not found by a jury, thus violating the United States Supreme Court's recent decision of *United States v. Booker*, 125 S.Ct. 738 (2005).[10] When the district court sentenced Tyreese, it applied the then-mandatory 2002 version of the United States Sentencing Guidelines ("Guidelines"). The district court sentenced him to 130 months for Count 1, 130 months for Count 2, and 120 months for Count 5, all to be served concurrently, and 84 months for Count 4, to be served consecutively. Because we reverse his convictions as to Counts 1, 2, and 4, his sentences for those convictions are no longer valid. He was sentenced, however, based on the *combined* offense level for all four counts. As indicated in his Presentence Investigation Report (PSR), Tyreese's adjusted offense level for Counts 1, 2, and 4 (conduct related to the bank robbery) was 26; his adjusted offense level for Count 5 (conduct unrelated to the bank robbery) was 20; and his combined adjusted offense level was 27. Based on his prior convictions, the PSR indicated that his criminal history level was VI. In accordance with the PSR, the district court sentenced him to the range as provided in the Guidelines for an offense level of 27 and a criminal history of VI. The minimum sentence required under the Guidelines was 130 months. The district court noted, however, that it could only sentence him to 120 months on Count 5, because the statutory maximum under 18 U.S.C. § 922(g)(1) is ten years.

In his appeal, Tyreese argues that his sentence must be vacated because it incorporated enhancement factors that were not based upon facts found by the jury in violation of his Sixth Amendment right as prescribed in *Booker*. We agree that Tyreese's sentence should be vacated for two reasons. First, the enhancement factors related specifically to his armed robbery convictions. The district court used those factors when concurrently sentencing Tyreese on Count 5. Because we reverse Tyreese's armed robbery convictions, it follows that his related sentence must also be vacated. Second, if he had been sentenced based only on Count 5, with an offense level of 20 and a criminal history of VI, he would have been subject to a range of 70-to-87 months under the then-mandatory Guidelines. His current sentence is, therefore, beyond the maximum term as provided under the Guidelines. Since we cannot speculate what his sentence would have been had Tyreese only been sentenced based on Count 5 and had the Guidelines not been mandatory, *see United States v. Barnett*, 398 F.3d 516, 528 (6th Cir. 2005) (noting our "deep concern with speculating" as to what sentence the district court would have imposed post-*Booker*), we find it necessary to vacate his sentence and remand to the district court for resentencing.

### III. CONCLUSION

An accused has a constitutional right to confront those who bear witness against him. As the Supreme Court has recently clarified, that right cannot be compromised through a judicial determination of the reliability of a statement. Thus, we **REVERSE** the convictions of Walter Pugh for Counts 1, 2, and 3, we **REVERSE** the convictions of Tyreese Pugh for Counts 1, 2, and 4, and we **AFFIRM** the conviction of Tyreese Pugh for Count 5, but **VACATE** his sentence based on our

---

[10] Specifically, Tyreese argues that his Sixth Amendment right to a jury trial was violated because the district court imposed two, 2-level sentence enhancements based on the fact that (1) someone was physically restrained to facilitate the commission of the offense and (2) the financial institution's loss was more than $50,000. *See Booker*, 125 S.Ct. at 749 (noting that the "[Sixth Amendment] right [to a jury trial] is implicated whenever a judge seeks to impose a sentence that is not solely based on 'facts reflected in the jury verdict or admitted by the defendant'") (citing *Blakely v. Washington*, 124 S.Ct. 2531, 2537 (2004)).

above reasoning, and we **REMAND** this case to the district court for proceedings consistent with our opinion.